UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
In re IMAGE RENT A CAR, INC.,   Case No. 1-11-42390 NHL

                    Debtor.   Adv. Pro. No. 12-01288 (NHL)
-------------------------------------------------------------X

**AFFIDAVIT OF SHARKY LAGUNA OF DIGBY ADLER GROUP LLC d/b/a BANDAGO IN OPPOSITION TO PROPOSED SETTLEMENT AGREEMENT AND IN SUPPORT OF CROSS-MOTION TO DISMISS CHAPTER 7 CASE**

State of California,
County San Francisco

      Sharky Laguana, president of the Digby Adler Group LLC d/b/a/ Bandago ("Digby"), hereby deposes, swears and says:

      1.    I am the Chief Executive Officer of Digby Adler Group LLC d/b/a/ Bandago ("Digby") and submit this affidavit (a) in opposition to the proposed settlement with defendants[1] which **appears to have been signed by individuals who were not authorized to represent or act on behalf of two of the defendants**; and/or (b) in support of its cross motion to dismiss the Debtor's case and the case of Van Rental Co., ("Van Rental, and collectively with the Debtor, the "Debtors") for cause.   Except as stated, I have personal knowledge of the facts of this matter based upon, among other things, an investigation conducted through Digby, its Trademark attorneys, and Digby's former bankruptcy counsel, Daniel Gershburg (now special litigation counsel to the Trustee) of the Debtors' financial affairs; public records; court and deposition transcripts; papers and pleadings; bank statements of the Debtors, written communications; and conversations with Digby's former and current counsel.

---

[1] Unless defined herein, capitalized terms used herein shall be ascribed the same meaning in the Trustee's Motion to approve the proposed Settlement (the "Settlement Motion").

## SUMMARY

*2.*     Digby is the ONLY unsecured creditor of the estate (with a claim of $300,000) and the LARGEST creditor holding "OVER 98.5% OF THE CREDITOR BODY," as per the Trustee. There are 3 other claims filed in the case by taxing authorities, aggregating to $4,222.77**.** As set forth below, Schneior Zilberman ("Zilberman") is the president of the Debtor.  The Trustee has unfathomably sought to settle an Adversary Action which seeks to recover **over $4 million** in assets from insider transferees of all of Debtor's assets, including the Debtor's funds, vehicles, website, trademark, good will, etc., to entities, such as Adir Plaza, Inc., of which Zilberman is CEO.  In fact, the proposed settlement agreement reflects that ***defendant Schneior Zilberman signed the settlement agreement on behalf of transferee, Adir Plaza, Inc., for whose benefit the Debtor transferred the sum of $132,189.30 in October and November 2009, alone.***

3.     Egregiously, all or some of the defendants, including Adir Rent A Car, have continued to operate the Debtor's business without interruption, through the Debtor's website , http://www.imagerentacar.com, and at the Debtor's place of business at 391 Empire Blvd., Brooklyn New York ("391 Empire Blvd.") which bears a sign "Image Rent A Car" with the Debtor's same telephone number 718-771-4858.  Public records and declarations reveal that Zilberman is the president of Adir Rent A Car.  In fact the proposed settlement agreement with the Trustee reflects that ***Zilberman signed such settlement agreement on behalf of Adir Rent A Car, Inc***.  By the Adversary Action, the Trustee also sought judgment against defendants Zilberman and Sebag (defined below) for breaches of fiduciary duty and deepening the insolvency of the Debtor.  Through an investigation financed by Digby by Mr. Gershburg, it was revealed that prior to the bankruptcy filing, the Debtor was generating approximately $250,000 per month in GROSS REVENUE, as reflected in relevant pages of the Debtor's bank statements attached as **Exhibit A**

2

hereto.  The proposed settlement of $120,000, payable over 2 years, with 4 opportunities to cure defaults after written notice is **less than ½ of one months' revenue and approximately 4 PERCENT of the approximate annualized revenues of the Debtor of $2,931,536.**  It is only **2.8 PERCENT** of the **$4,283,419** in monetary transfers sought to be recovered via the Adversary Action.  As set forth below, after the payment of administrative and priority expenses, at best, Digby could expect a recovery of just 15% of the $120,000 settlement, first payable in small installments starting 15 or so months.  Given the enormity of the Debtors' assets and gross revenue prior to the filing, Digby submits that the settlement is below the lowest range of reasonableness. **Why Should Zilberman be allowed to continue his business under the veil of "Adir" (*on behalf of which he signed the settlement agreement*) and earn millions of dollars a year using the Debtor's assets, when Digby has not been paid in full**?

    4.    Rather than use his leverage to enforce this Court's Order darted April 30, 2013 (the "Turnover Order"),  by filing a motion for contempt of court and rather than prosecuting the Adversary Action, at a minimum, to notice and take depositions and obtain missing documentation and assets, the Trustee rushed to settlement.  This is inexplicable given the enormity of the assets, revenue and transfers involved, the Trustee's fiduciary duty to his creditors (to wit, Digby), Trustee's duty to investigate and maximize the assets for the benefit of the estate and the fact that I had agreed to allow Digby's former counsel, Mr. Gershburg, to become the Trustee' special counsel with the understanding that the Trustee would aggressively prosecute the Adversary Action.  (The investigation conducted by Mr. Gershburg, which Digby funded prior to the Trustee's retention of Mr. Gershburg, provided the information necessary for Mr. Gershburg to prepare the Adversary Action and the motion seeking turnover of assets and records, dated February 12, 2013 (the "Turnover Motion").  In fact the Trustee's complaint and Turnover Motion

are replete with references of the Trademark Action and/or information uncovered in that action and in the bankruptcy.) Mr. Gershburg was willing to assume the risks associated with prosecution because he was very confident in the case. The Debtor has consistently refused to provide a complete set of books or financial records despite numerous judicial orders to do so and most recently the Turnover Order. This settlement is being considered without the Trustee at a minimum, (a) obtaining certain documentation, such as bank statements for certain accounts which were not turned over and which could have reflected funds on the very day of the bankruptcy, and (b) questioning Zilberman and Sebag as to pervasive "electronic withdrawals," the continuation by Zilberman of his business under the veil of "Adir," the universe and whereabouts of the transferred assets and open questions as set forth below. Without that information, and given the enormity of the transfers and revenue it is impossible to conclude this settlement is reasonable.

5. As it appears that the Trustee does not want to pursue the Avoidance Action and a motion (the "Contempt Motion") to enforce the Turnover Order, despite Mr. Gershburg being retained to do so and his being ready, willing and able, and to so as to not further prejudice Digby, the only creditor, so that it can in fact pursue the very fraudulent conveyances it thought the Trustee was aggressively going to do in exercise of his fiduciary duty, Digby requests the immediate dismissal of this case for cause.[2]

---

[2] The Trustee's attempt to justify its abominably low settlement by asserting that Digby has recourse in the District Court is unconvincing. Whether a claimant can go after a debtor's principals as alter egos does not remove a trustee's fiduciary duty to that claimant to investigate the Debtor's assets and financial affairs in order to maximize the estate. Further, the statement that Digby has been prosecuting its action pending the bankruptcy case is not true. It was prevented from doing so after Sebag and Zilberman obtained a stay from the District which, based upon "judicial economy" remains in effect until the bankruptcy case is "resolved." It is apparent that the District Court believed that the Trustee would pursue the Debtor's assets for the benefit of creditors, which did not happen. If this case is dismissed, Digby can now litigate the action it was stayed from litigating for the last two years by the filing of this fraudulent bankruptcy. Dismissal was not sought earlier given the expectation that the Trustee would be maximizing the estate via Mr. Gershburg.

6. Further, and very significantly it appears that the Settlement was **signed on behalf of two of defendants without being authorized**. The New York Secretary of State reveals that the Chief Executive Officer of each of Adir Group, Inc. and Group Travel Solution is David Baksht. See Attached **Exhibit B**. Yet, the signatory to the settlement on behalf of those companies is Philip Naim. A search of the New York Secretary of State reveals that Mr. Naim has no association with either of those companies. A search of the Florida Secretary of State reflects that Mr. Naim was at one time an officer of another company called Group Travel Solution, Inc., which was incorporated in Florida, is <u>inactive</u> and was <u>voluntarily</u> <u>dissolved</u> in July 26, 2011. The New York company, Group Travel Solution, Inc., which was the actual transferee of the vehicles and Image website (see ¶15) never actually signed or authorized the signatures! By having the wrong entity (a defunct entity with no assets) sign the settlement agreement rather than the true transferee of Image's website and vehicles, Zilberman clearly sought again to shield assets and also make the confession of judgment executed by Group Travel Solution illusory. (**<u>In a similar vein, it appears that the Debtor and the Adir entities as controlled by Zilberman are being investigated for mail fraud by the US Postal Office</u>**.[3]) David Baksht recently contacted Digby's counsel, Barbie D. Lieber, Esq., and me via email. The emails are consistent with a voice mail left by Mr. Baksht on Ms. Lieber's voicemail box on July 23, 2013, to which we both listened.[4] By such emails, with exhibits, Mr. Baksht indicates, among other things, that (a) he is

---

[3] As per Mr. Basksht's email to me received yesterday, it appears that the United States Postal Service is investigating the interception of mail at Mr. Baksht's and his companies' address to 391 Empire Blvd, the Debtor's and Adir's address. True copies of the emails sent to me are attached as **Exhibit "D"**

[4] "My name is David Baksht and I'm calling regarding the image case in bankruptcy court . My number is 718-363-9505 and I am the owner of Group travel Solution and Adir group and I never gave authorization to or for the final settlement. These two companies were hijacked from our office by Shneior Zilberman without our permission. And he is perpetrating fraud by making believe he owns these companies. But if you check the secretary of state's office, just get a read out you'll see we own the companies. So please call me regarding the matter."

the "sole officer and director of both Adir Group, Inc. and Group Travel Solutions" (as confirmed via the NYS Department of State website, which lists him as CEO, President and Secretary); (b) he did not authorize the settlement; (c) he sent termination letters to Stephen A. Somerstein, Esq., and Bruce Weiner, Esq. on June 23 and 24, 2013 advising them that they were not authorized to represent Group Travel Solution, Inc. or Adir Group, Inc. , respectively or  enter into any settlement and, that to the extent that they felt they were authorized, they were "dismissed as attorney"[s];  and (d) "this corporation was hijacked from us by Shnoir Zilberman to perpetrate a fraud on the court and the creditors."  Attached as **Exhibit "B"** are true copies of such emails, with exhibits as well as an Affidavit of Mr. Baksht faxed today averring to the foregoing.  From the forward links reflected on Mr. Baksht's email sent to Ms. Lieber on July 25, 2013 at 1:27pm, it also appears that Mr. Baksht had previously notified Mr. Gershberg on July 23, 2013 of Group Travel Solution's dismissal of Sommerstein, which presumably Mr. Gershburg forwarded to the Trustee. On July 29, 2013, I also brought the foregoing to the attention to the Trustee and his respective counsel.  The Trustee has nevertheless not withdrawn the Settlement Motion.  If this settlement agreement were never authorized, it cannot be approved by the Court.

    **I.**    **Relevant Background**

        **A.**  **Fraudulent Filing by Debtor Earning Approx. $3 Million in Revenues, Which is 24.44 times greater than the Proposed Settlement**

    7.    This bankruptcy case was filed on March 24, 2011 (the "Filing Date"), **three (3) days after** individual defendants Gad Sebag ("Sebag") and Zilberman,  CEO and President of the Debtor, respectively, were added as defendants to an action (the "Trademark Action") initially commenced by Digby against the Debtor and Van Rental on February 10, 2010 in the United States District Court for the Northern District of California (the "District Court") after attempts to have

the Debtors cease and desist their infringement failed.[5] The District Court granted leave to amend Digby's complaint on grounds that the corporate veils of the Debtor and Van Rental should be pierced given the complete disregard for the separate identities of the Debtor and Van Rental, through which fraud was perpetrated by Zilberman and Sebag (who is Zilberman's brother-in-law). See Trustee's Turnover Motion Exhibit D. The Petition, Schedules and Statement of Financial Affairs contained material omissions and were basically bare. They also contained a number of purported "creditors" who turned out to be insiders and/or not creditors at all.

8.      Zilberman is identified as the President in the petitions of the Debtors. Zilberman testified at a 341 meeting that Van Rental, which, like the Debtor, also operated out of 391 Empire Blvd. was "basically run through Image". See Turnover Motion, Exhibit B, p. 5. Sebag and Zilberman ***concealed*** Sebag's insider position with the Debtors in the petitions, schedules and statement of financial affairs. Sebag is listed as a CEO of the Debtor with the New York Department of State. Sebag also identified himself as the sole officer and director of Image in Image's annual report, filed with the Florida Secretary of State in January 2010. Sebag also filed a declaration in the Trademark Action, declaring himself CEO of both the Debtor and Van Rental. Egregiously, the Debtor's schedules listed Sebag as a *"creditor"* for $250,000 for Image, and $300,000 for Van Rental Inc., for a total of $550,000. Notably, none of the Debtor's "creditors"

---

[5] Digby is the registered holder of Bandago and the registered domain holder of Bandago.com and is in the business of renting vehicles and cars, including 15 passenger vans. The law suit, entitled, Digby Adler Group LLC d/ba/a Bandago, plaintiff v. Image Rent A Car, Inc., Van Rental Co, Inc., Gad Sebag, Shneior Zilberman, sought in violation of 15 U.S.C. §1125(d), California Business & Professions Code . §17200 (d) and 17 U.S.C. §501 *et seq*, for cybersquatting, trademark infringement, unfair competition, false advertising and copyright infringement, alleges that without the Debtor's ever using or registering the name "Bandago" in commerce, the Debtor, through Sebag and Zilbermman, (a) created a website at the domain name bandago.net which automatically and immediately redirected visitors to the Debtor's website, thereby harming Digby, (b) unlawfully bid on several variations of the BANDAGO Mark in Google AdWords, namely, "Bandago, "Bandago Van Rentals" and Bandago Van Rental," causing users who searched for Digby's website to be diverted to the Debtor's competitive website and (c) copied multiple original texts from Digby's website, thereby engaging in copyright infringement.

filed proofs of claims other than Digby. ***In August 2009, the Debtor transferred $100,000 to its CEO, Sebag for no consideration.*** **See Adversary Action, ¶60.**

9. Prior to the Filing Date, the Debtors through their principals rented vehicles and cars, including 15 passenger vans, from the location at 391 Empire Blvd. Zilberman testified at a 341 Examination that the Debtor's business grossed approximately $700,000 to $900,000 of revenue in 2010. See Exhibit A to the Trustee's Turnover Motion. This was contradicted by Debtor's amended petition filed with the Court on February 15, 2012, sworn under oath, which reflects that the Debtor had revenue of $1.4 Million in 2009 alone. The Debtor's Bank Statements for Account xxx1611 further contradict this amended petition by revealing that in actuality over $3 Million passed through the Debtor in 2009 and $500,000 in the first 3 months of 2010. The Debtor's March 2010 bank statement reveals $244,294.70 was deposited into the Debtor's account in March of 2010 alone, which amounts to **$2,931,536 in annualized gross revenue, which *is 24.4 TIMES GREATER THAN THE PROPOSED SETTLEMENT AMOUNT***. See Relevant pages of March and May 2013 Bank Statements attached hereto as **Exhibit A.** This same bank statement for March 2010 also reveals $177,693.80 in "electronic withdrawals." Id. The April 2010 bank statement is **MISSING**, and has not been produced despite several orders to do so. The bank statement for May 2010 **reveals that the balance in that particular account was stripped to less than $3,000**. Id.

**B. The Trustee's Rush to Settle without Obtaining Missing Documents, Etc.**

10. The Trustee rushed into a settlement in principle for $120,000 payable over 2 years before ascertaining answers to or otherwise investigating critical open issues and questions that should have arisen from review of the limited documents produced as a result of this Court's Order

dated September 21st, 2011, and accompanying subpoena (the " 2004 Order"), such as: **What happened to the $177,692.80 in withdrawals**? Still missing is the April 2010 bank statement which will show **what happened to the $47,223 that was in the bank at the end of March 2010**, and would provide clues as to why monthly revenue, which was $244,294 in March 2010, suddenly disappeared without a trace in May 2010. **The business never stopped operating at 391 Empire Blvd. even after the bankruptcy filing (and incredibly continues to operate to this day), so where did the vehicles and the revenue go?** The Debtors also had multiple accounts with respect to which complete sets of statements were simply never turned over. Without obtaining those bank records through the contempt motion and questioning of defendants, the Trustee could not know whether there were any funds in those accounts that could have been recovered. As such, how could the Trustee submit that the proposed settlement is reasonable? He cannot. This is particularly true since limited bank accounts obtained through the 2004 exam revealed in excess of $3,000,000 in funds passed through the Debtor in 2009 and over $500,000 in the first 2 months of 2010.

11.  Why rush into a settlement that provides for an infinitesimal and protracted recovery to the only unsecured creditor without first seeking a contempt order against the Debtor and its principals, especially when this Turnover Order had been violated? By the Turnover Order, the Court directed that "the Debtor, by its principals, officers, employees and/or agents … turnover to the Trustee on or before 12:00 pm on May 15, 2013 all property accounts, funds and monies held in the name of or title to the Debtor including but not limited to the vehicle bearing New York license number ESB1283; and (b) any books and records in the Debtor's possession. **Why not question Zilberman and Sebag about missing funds and documents**? **Why not recover assets that are currently registered in the Debtor's names, such as five (5) vehicles currently**

**registered with the Department of Motor Vehicles (the "5 Image Vans")?  Why wait two (2) years to recover the $100,000 from Sebag, who was also being sued for breach of fiduciary duty in the Adversary Action?**

12.     Instead, as the Trustee admits in ¶¶ 8 and 9 of the Settlement Motion, after issue was joined in November and December 2012, the Trustee and its professionals engaged in numerous discussions and "lengthy negotiations" to resolve the claims without the need to engage in protracted litigation.  This was done rather than seeking the turnover of missing assets and documents as well as proceeding forward with the Adversary Action through his special counsel, Mr. Gershburg, who was ready, willing and eager, and was retained to aggressively prosecute the action. Notably, notices of deposition were not even served. Had I known that the Trustee would not complete his investigation and prosecute the Adversary Action, I would have never agreed to relieve Mr. Gershburg as Digby's counsel and would have moved to dismiss the case, especially when it was becoming apparent that Digby was the only creditor and the petition, schedules and statement of financial affairs contained false information and concealed other information, as set forth below.  Rather than spending "lengthy discussions" to reach a settlement which will only pay at most 15% next year or so to Digby, why not use the time to recover against Zilberman (who admittedly is in control of Adir Plaza and Adir Rent A Car, Inc. as reflected in public documents and in the execution of the proposed settlement agreement), which took over the assets and multi-million dollar operations of the Debtor?

      **C. The Debtor's Affiliates, Controlled by Zilberman and Sebag, are currently Operating the Debtor's Multi-Million Dollar Business**

13.     The Stripping of the Debtor's assets, by its principals, included not only money, but tangibles and intangible assets which were transferred to insider transferees, such as **Adir Plaza**

**and Group Travel Solutions, Inc,** and which, as reflected in the Adversary Action, operate through **Adir Rent A Car, Inc**. at the Debtor's address at 391 Empire Blvd.  As stated in the Turnover Motion and as confirmed via a Google search today, the Debtor's address still bears a large sign for "Image" with the Debtor's and Adir Rent A Car's telephone number: 718-771-6666. Employees answer the phone on behalf of Image.  See Turnover Motion ¶23.  Further, a Google search conducted today by me confirms that the Debtor's website: http://www.imagerentacar.com is still in force and reflects the telephone number 718-771-6666.  (In October and November, 2009 alone, the Debtor transferred for the benefit of Adir Plaza $132,189.30, as reflected in relevant pages of the Debtor's bank statements attached as **Exhibit A.)**  Notably, **Zilberman** is listed as **CEO of Adir Plaza** with the NY Secretary of State.  **Zilberman** also identified himself as the **president of Adir Rent A Car** in a declaration filed in the Trademark Action.  As set forth above, Zilberman signed the proposed settlement with the Trustee as a representative of Adir Plaza, Inc. and Adir Rent A Car, Inc.  Despite his declaration and contrary to Zilberman's most recent signature on the proposed settlement agreement, astoundingly, Zilberman testified at a 2004 Examination that Adir Rent A Car was sold to Menachem Mendel Shneurson in 2004 for $500 (see Turnover Motion, Exhibit D at 33, 38).  Egregiously, Shneurson was one of the "creditors" listed in the petition filed by the Debtor and Van Rental, for $50,000 each.

> D. **Monetary Transfers of $3,486,165, $697,233.14 and $100,000; and Transfers of Image's Trademark, Website and Good Will and $200,000 In Vehicles Greatly Exceed the $700,000 reflected by the Trustee as the Transfers**

14. The proposed settlement amount pales in comparison to the assets that were to be recovered by the Trustee in the Adversary Action.  The Trustee's estimate in paragraph 5 of the Settlement Motion that the transfers are $700,000 is a vast understatement.  Further, the Debtor transferred far more than "funds and certain vehicles".  What about the Image trademark, the

website, good will, etc.? Furthermore, the transfer of funds to Adir Plaza from March 2009 through 2010 was **$697,233.14** alone. Who knows what other transfers may have been revealed in bank statements for accounts that were never produced? Also, the Trustee had estimated in his Adversary Action that the transferred vehicles were worth approximately $200,000. Those two assets alone exceed the Trustee's estimate of transfers, by almost $200,000. <u>But there is more</u>:

15. By the Adversary Action, Trustee seeks the recovery of (a) "not less than **$3,486,165** plus interest" against one or more of the defendants as property of the estate; (b) monies in an amount to be determined against Zilberman and Sebag for **breaching their fiduciary duties** by deepening the insolvency of the Debtors; (c) the "Image Rent-A-Car" **Trademark** transferred for free to Adir Group in or about April 2010; [6] (d) **http://www.imagerentacar.com**, the Debtor's website which was transferred to Group Travel Solution, Inc.; (e) the Debtor's "**goodwill**"; (f) the Debtor's **vehicles** transferred to Group Travel Solution, Inc. for approximately $75,000 when the Trustee estimated that they were worth approximately **$200,000**; (g) $**100,000** paid to insider **Sebag**; and (h) **$697,233.14** paid to Adir Plaza between March 2009 and 2010 and which currently has registered with the New York Department of Vehicles in its name and the name of Group Travel Solution, Inc. **more than 200 vehicles**, including pricy vehicles, such as Mercedes Benz, BMW and Porsche. Additionally, a recent search conducted with the Department of Motor Vehicles (and paid for by Digby and forwarded to the Trustee after the status conference on May 14, 2013) reveals that there are *<u>currently five vehicles</u>* <u>(not just one vehicle as originally thought) registered in the Debtor's name at 391 Empire Blvd.</u>, for which demand by Digby has been made

---

[6] Adir Group, Inc. was formed one (1) month before the transfer apparently for **no consideration** (See Trustee's Adversary Actiont¶49). **Any revenues that have resulted through the operation of the Image Website, which is an asset of the Debtor, should inure to the benefit of the estate**. **What are those revenues? They should have been turned over.**

for the Trustee to request the turnover of such vehicles consistent with the Trustee's duties under the Bankruptcy Code, particularly when the proceeds of these vehicles could be realized now, rather than in 2 years.[7] Digby's request to the Trustee was ignored.

## II.   The Proposed Settlement Amount and Terms Are Below Reasonable and the Settlement Is Premature

16.     Digby objects to the proposed Settlement, which provides as follows:  $120,000 payable over 2 years with installments of $5,000 each.  The settlement liberally allows the defendants to default <u>four (4)</u> times after being sent written default notices before any confessions of judgments are entered; thereby effectively extending the 24-month payment term (including the down payment) to 28 payments or so.  The proposed settlement amount is (a) **2.8 PERCENT** of the **$4,283,419** in transfers sought to be recovered via the Adversary Action; (b) **17 PERCENT** of the **"$700,000"** in "transfers" reflected in the Settlement Motion, which as set forth above, is completely understated;  (c) **LESS THAN HALF of the Gross Revenue** generated by the Debtor in the SINGLE MONTH of March 2010 and only approximately **4 PERCENT OF THE DEBTOR'S ANNUALIZED REVENUE** prior to the Filing Date; and (d) **8.5 PERCENT of the $1.4 Million** reported by the Debtor in its amended petition as gross revenue the Debtor for 2009. By transferring all of the Debtor's assets to related companies (including Adir Plaza, Inc. and Adir

---

[7] These include: 2008 Dodge (plate: EMC9612); 2008 Dodge (plate: EM9613); 2006 Chevrolet (plate: ESB1383), 2006 Chevrolet (plate: ESL9582); 2006 Chevrolet (plate: ESL9583).  Indeed, **Zilberman testified at the 341 meeting that "3 to 10 vehicles" were owned by Image in the 3 months prior to the bankruptcy. What happened to those vehicles?** At the pretrial conference on May 14, 2013 when Defendant's counsel was asked whether a certain vehicle registered in the Debtor's name would be turned over, Defendant's counsel incredulously claimed they "did not have it". Well what happened to it? **When was it sold? Who was it sold to? For how much? Where did the money go**? Some of these vehicles retail in excess of $60,000. These are not idle questions.  Further, the Debtor's Bank records reveal numerous vehicle "payoffs", which refers to when a vehicle's loan is completely paid off, the lien is removed, and the title is transferred back to the borrower/lessee (i.e. Image.)  **Where are those vehicles, now?**  The Debtor is mandated to turnover its assets under the Bankruptcy Code and the Rule 2004 Order and Turnover Order. Why not pursue (when the Trustee is asking Digby to accept a small fraction of its claim over time)?

Rent A Car, Inc. on whose behalf Zilberman signed the proposed settlement agreement) operating out of the 391 Empire Boulevard address, the Debtors' principals can still realize substantial gross revenue of approximately $3,000,000 per year, while defrauding its only creditor with a pittance. Gad Sebag gets to keep his payment to himself of $100,000 while a recovery to the only Creditor is delayed for 1 to 2 years.

17. In terms of a recovery to Digby, Trustee has retained the firms of LaMonica Herbst & Maniscalco, LLP (LH&M) and Daniel Gershburg to represent him. Digby's current counsel, Barbie D. Lieber, Esq. informed me that counsel at LH&M and the Gershburg firms advised her during a conference call on June 24th, 2013 that they estimate their fees are $20,000 and $40,000, respectively. This, together with the trustee's commission of approximately $10,000, would total $70,000. With the tax claims, the total priority costs are approximately $74,222.72, which would be paid over the next 15 months. This leaves at most $45,777 to Digby, which is less than a <u>15% recovery on its Claim</u> (given the time value of money as installments are first contemplated to be made in approximately 15 MONTHS after the Trustee and counsel and the taxing authorities have been paid in full). Further, the recovery to Digby may be less if the Trustee's accountants seek fees and/or the other professional fees turn out to be greater than the estimated amounts. Additionally, despite the Trustee's claim for breach of fiduciary duty, the confession of judgment obtained against Sebag, the CEO of the Debtor, is only for $100,000, which means that only approximately $25,000 of the amounts to be paid to Digby will be secured by a confession of judgment against Sebag, making the likelihood of payment that much more precarious to Digby. The settlement amount and terms are unfair to this 98.6% CREDITOR, particularly given the egregiousness of the facts, including that limited bank accounts obtained through the 2004 exam which revealed in <u>excess of $3,000,000 in funds passed through the Debtor in 2009 and over</u>

14

<u>$500,000 in the first 2 months of 2010</u>.

18.     Why not try to reap the benefits from the work that had already been done and the information obtained in connection with the turnover motion by filing a contempt motion?  This undoubtedly would have provided more leverage over the defendants, which could have resulted in a greater settlement.  It was my understanding that the contempt motion and the deposition notices were going to be prepared and served immediately after the pretrial conference on May 14, 2013.  It is impossible for me to understand why an agreement to settle this matter for $120,000, payable over 2 years was made without pursuing the contempt motion, discovery and depositions and when there were substantial assets at stake which Digby, through its Trademark Counsel and former bankruptcy counsel, Mr. Gershburg unearthed and which needed to be the subject of further questioning and pursuit.  ***<u>This is particularly true when Mr. Gershburg agreed to act as special counsel and was ready, willing and able to continue his prosecution of the action, as he was very confident in the case.  Without investigating and retrieving following information, the reasonableness of this settlement cannot be determined.</u>***

### III. <u>The Trustee's Justification for the Settlement Must be Rejected</u>

19.     The Trustee tries to justify the infinitesimal settlement and 2 year pay-out asserting that: "The Debtor's largest unsecured creditor accounts for over 98.5% of the creditor body and is presently pursuing its rights and remedies against the Defendants in a separate district court action pending in California."     But, as my counsel previously advised each sets of Trustee's counsel, this is untrue.  After Sebag and Zilberman were added as defendants to the Trademark Action as alter egos of the Debtors, which would allow for the veils of the corporations to be pierced, Sebag and Zilberman then sought a stay from the District Court in their favor.   Despite stringent objections by Digby, the District Court issued an order "in the interests of judicial economy" extending

imposing a stay of the litigation against all defendants, including the individual defendants (the "Individual Stay") "until the bankruptcy case was resolved." (A copy of the Court Order imposing the stay is attached hereto as **Exhibit "C".**) Apparently, the District Court believed that Digby would not be prejudiced because the Trustee would maximize the assets of the Debtor and would recover fraudulent transfers for the benefit of creditors-- that Digby could be made whole through the Bankruptcy Court. This has not occurred. Digby then filed a motion in District Court to modify the Order in favor of the individual defendants so as to lift the Individual Stay, which was denied by the District Court. The only possible way that Digby could have gotten relief against the individuals is if it moved to dismiss the bankruptcy case. But being that the Debtor listed a number of purported "creditors" on the petition and concealed and/or falsified other information contained therein (that had to be proven false), it would have been premature to move to dismiss the bankruptcy case following the bankruptcy. When it was becoming apparent (after Digby's investigation) that this was only a 2 party case involving a fraudulent petition and with one unsecured creditor (to wit, Digby), it was in or about that time that the Trustee requested that he retain my own counsel to aggressively litigate. So, despite the Trustee's contentions, Digby has been barred for the last 2 years from litigating the Trademark Action against the individuals.

20. Also, in terms of investigation of the transfers for which the Trustee curiously sought to take credit in paragraphs 4 and 5 of his motion, it was *Digby*, through its federal court counsel for the one (1) year prior to the bankruptcy filing, and then through Mr. Gershburg, Digby's former counsel, which conducted an extensive investigation into the Debtors' affairs and uncovered serial transfers, through 2004 exams, document requests, motion practice, etc. It was that very investigation prior to the Bankruptcy case that empowered the District Court to allow

16

Digby to amend its complaint to include Sebag and Zilberman as alter egos based upon the fraud committed by them.

21. By the time that the Bankruptcy Case was filed, Digby had already incurred $85,287.70 in legal fees in the District Court. The discovery acquired through the Trademark Action also enabled Mr. Gershburg to acquire further information in the Bankruptcy Case. After Digby discovered vast amounts of transfers blatantly transferred by the Debtor to its affiliates, the Trustee asked Mr. Gershburg if he would like to act as special counsel to recover the fraudulent conveyances. At that time, Digby had already invested almost $25,000 in connection with the investigation, but given my understanding that the Trustee wanted to aggressively prosecute the Defendants and that Mr. Gershburg was willing to do so given his familiarity with the facts and his desire to see justice done, I agreed. Otherwise, as set forth above, once Digby could establish that it was in actuality the only real creditor, Digby would have sought to dismiss this case for cause. If the case had been dismissed, Digby would have been able to pursue the very fraudulent conveyances that Digby thought the Trustee would pursue but has chosen not to. Given that the Trustee has failed to pursue the Avoidance Action as was contemplated, which contained allegations that were based upon facts discovered by Digby, through its Trademark Counsel in the Trademark case in the year before the bankruptcy filing and then through its former counsel, Mr. Gershburg, Digby requests that this Court dismiss this case.[8] <u>Otherwise, Digby will be irreparably prejudiced as it will not have realized any meaningful recovery from the fraudulent conveyances in the bankruptcy case, despite spending an inordinate amount of money and lost time as a result of the clearly fraudulent bankruptcy and could be prevented from seeking fraudulent conveyances of</u>

---

8 Notably, the Fraudulent Conveyance Suit references Digby, the fact that the transfers occurred during the Trademark Action and the various declarations filed in the case.

17

<u>the Debtor in the Trademark Action as it will not be able to proceed against the Debtor to judgment.</u>  Accordingly, Digby requests that the proposed settlement not be approved.

22.     It now appears that the defendants, including Group Travel Solution, Inc. and Adir Group, Inc, have not authorized the settlement and that Stephen A. Somerstein, Esq. and Bruce Weiner were not authorized to represent the companies and enter into any settlement, as more fully set forth in **Exhibit B hereto** and in paragraphs 5 and 6 above.  This is yet another reason why this settlement agreement should not be approved.

### IV. <u>This Case Should Be Dismissed for Cause</u>

23.     Additionally, or in the alternative, Digby moves this court for entry of an order dismissing this case for cause as<u> it is now very apparent, among other things,</u> that:

**(i)** the Trustee has refused to immediately file and pursue the Contempt Motion and depositions despite indications from the Trustee's counsel following the pretrial conference on May 14, 2013 that he would;

**(ii)** the Trustee has no interest in seeking the turnover of the 5 Image Vans; recovery of $3,486,186 in monies transferred, or the turnover of over 200 vehicles registered in those companies' names;

**(iii)** the Trustee is not troubled that the related companies are still operating the Image website, which generated approximately $250,000 to $300,000 in **monthly** revenues to the Debtor;

**(iv)** the Trustee has no interest in litigating his Adversary Action and enforcing the Turnover Order to ascertain critical documents, despite my prior understanding that the Trustee wanted to aggressively litigate such claims and had retained Mr. Gershburg, who was eager to prosecute the action and assume the risks of same because of his confidence.

**(v)** had I known that the Trustee would not be prosecuting the fraudulent conveyance action

and seeking the turnover of property, I would have not relieved Mr. Gershburg as my counsel and would have instead sought to dismiss this case for cause and pursued the Debtor and fraudulent conveyances made by the Debtor through the Trademark Action. Denied of the expectation of a meaningful recovery despite Zilberman's blatant continuation of his multi-million dollar business, Digby has been prejudiced by unreasonable delay. As reflected above: (a) the bankruptcy case is only a two party dispute, with Digby being the only creditor and only party in interest (aside from $4,227 in tax claims); (b) as admitted by Bruce Weiner, Esq, counsel for certain of the defendants at the May 14, 2012 pretrial conference, "the reason that they filed this [Bankruptcy Petition] was, you know, to put an end to the California litigation" and clearly to file a petition simply to frustrate a pending litigation violates the very good intentions and purpose of the Bankruptcy Code;  (c) the Debtor filed its bankruptcy case with a fraudulent petition and schedules signed under oath that disclosed no assets and no transfers on the Schedules, concealed other material information; and reflected fictitious and/or insider creditors in contravention; and provided statements that were inconsistent with public records and declarations made by the principals in the Trademark Action and in violation of 18 USC §152 et al. Statements made by the individuals and in the petition and schedules are completely inconsistent with public records and with prior declarations filed in the Trademark Action. The Debtor's principals repeatedly failed to act in a forthcoming nature and failed to cooperate in providing a complete set of books and records.

**Memorandum of Law**

24. Digby respectfully requests that this Court waive the requirements that any motion filed shall have an accompanying memorandum of law. No novel issues of law are presented in this application and many citations to the relevant authority are contained herein. Accordingly, Digby submits that waiver of any such requirements is appropriate under these circumstances.

25. No prior application for the relief sought has been made prior to this application.

WHEREFORE, Digby respectfully requests that the Court (a) deny the approval of the proposed settlement; and/or (b) grant Digby's cross-motion to dismiss this case and such other and further relief as it deems just and proper.

/s/Sharky Laguana

Sworn to before this _31____
Day of July, 2013

State of California
County of San Francisco
Subscribed and sworn to or affirmed before me on this 31st day
Of July, 2013, by Sharky Laguana
 proved to me on the basis of satisfactory evidence to be
the person (s) who appeared before me
Signature    /s*Dylan Siddiqui*

Dylan Siddiqui
Comm. #1923561
Notary Public, State of California
Comm. Exp. Feb 25, 2015