Barbie D. Lieber, Esq.
Lieber & Lieber, LLP
60 East 42nd Street, Suite 2222
New York, New York 10165
Phone:  (212) 949-5586
Counsel to Digby Adler Group, LLC d/b/a/ Bandago

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
In re IMAGE RENT A CAR, INC.,                          Case No. 1-11-42390 NHL


                             Debtor.                       Adv. Pro. No. 12-01288 (NHL)
-----------------------------------------------------------------------X

(I) Cross Motion to (A) to Strike Debtor's Claims Objection For Lack of Standing; or in the
alternative, (B) Stay Determination of Claims Objection Until Determination of Digby's Cross
Motion to Dismiss Case Under 11 USC §707(a) in the Event that Trustee Elects Not to Prosecute
Avoidance Action; (II) Supplement to Cross Motion to Dismiss; and (III) Request that the Court
<u>Refer this Matter for Investigation Pursuant to 18 USC §3057(a) Given Bankruptcy Fraud</u>

       Digby Adler Group LLC d/b/a/ Bandago ("Digby;" the Debtor's <u>sole</u> unsecured creditor

to have filed a proof of claim and whose litigation against the Debtor and its sole shareholder,

Schneior Zilberman ("Zilberman") admittedly precipitated the filing of the bankruptcy case),

files this (I) Cross Motion to (A) Strike and/or Dismiss Debtor's Claims Objection For Lack of

Standing; or in the alternative, (B) Stay Determination of Claims Objection Until Determination

of Digby's  Motion to Dismiss the Case Under 11 USC §707 (a) in the Event that Trustee Elects

Not to Prosecute Avoidance Action[1]; (II) Supplement to  Motion to Dismiss the Case; and (III)

Request that the Court refer this Matter for Investigation to the Appropriate US Attorney

Pursuant to 11 USC §105(a), 18 USC§§3057(a), 152 and 153 given, *inter alia*,  material

omissions, concealment of assets, false oaths and claims as set forth below.   In the event that

---

[1] Unless otherwise defined herein, all terms used herein shall have the same meanings ascribed to them in Digby's
Cross Motion to Dismiss the Case pursuant to 11 USC §707 and opposition to the Proposed Settlement Agreement
dated August 1, 2013, **Dkt #90** (the "**Dismiss Motion**") incorporated by reference. Further, because of the
voluminous nature of the exhibits referenced hereto with the exception of Exhibit 1 hereto, they are included in an
**Exhibit Binder ("EB")** accompanied herewith.

this cross motion to dismiss the Claims Objection is denied, Digby requests that it be afforded an extension of time within which to respond to the Claims Objection (collectively, "the Requested Relief").

## Summary

### A.      The Debtor Lacks Standing As It Is Insolvent.  Even if Zilberman Had Filed the Objection, He Would Have Lacked Standing As He is A Defendant In Trustee's Action

The Debtor (now represented by defendant Zilberman's counsel) has filed an objection to the claim of the only unsecured creditor (Digby).  The Debtor has no standing to interpose such objection.   11 USC§ 502(a) provides that a claim, proof of which is filed under §501 is deemed allowed unless a "party in interest" objects.   To establish standing, the movant must show it has an "**actual pecuniary interest"** in the outcome of the controversy.  The bankruptcy court's order must "**directly and adversely**" affect that interest.  <u>See</u> Legal Argument below. The majority of courts hold that as a general rule "the chapter 7 trustee alone may interpose objections to individual proofs of claim."    Some courts recognize two narrow exceptions, to wit:  if (a) the debtor's estate is solvent or (b) an individual debtor can benefit from an objection to a nondischargeable claim or an objection to an excessive claim that, if granted, would allow for the maximization of the distribution to the holder of the nondischargeable claim.  <u>See</u> Legal Argument, below.        **Neither exception applies**.  This case does **<u>not</u>** involve an individual, let alone one who can benefit from an objection to a dischargeable claim.  Further, the Debtor is a dissolved company which is **<u>insolvent</u>** according to the Debtor's schedules (which lists **<u>no</u> <u>property</u>**) signed under penalty of perjury by Zilberman.   The Debtor has no direct or adverse interest in the outcome of the controversy, unlike a chapter 13 or 11 debtor whose plan is directly impacted by the claims filed.    (Notably, had Zilberman not caused the Debtor to remove its

assets beyond the reach of creditors (causing the insolvency) and had instead filed a chapter 11,

the Debtor would be entitled to object to claims.  Indeed, a chapter 11 corporation is statutorily

authorized to object to claims.  By contrast, the Debtor filed chapter 7 because it supposedly

ceased operations.  It is also a dissolved company, according to the NY Department of State.

As an insolvent and dissolved company, the Debtor thus has absolutely no pecuniary interest in

the distribution of the assets.

<u>Even if Zilberman were to have filed the Claims Objection in his individual capacity as</u>

<u>an equity holder (which did **not** occur here)</u>, because he is a defendant in the Trustee's

Avoidance Action accused of transferring "no less than $3,486,165 in assets" of the Debtor, and

has not obeyed 11 USC §542 (a) (requiring that a debtor "shall" turnover property to the trustee)

and this Court's Turnover Order (as defined below), **he would be barred from interposing an**

**objection**.  **Defendants in adversary proceedings lack standing** to interpose objections to

claims or trustee's sale of assets and the courts have no sympathy for principals of the debtor

whose actions create insolvency, <u>noting that the equities do not lie in their favor</u>.  [2]  Even in

cases involving individuals, relief to object to a claim will be denied if such individual has failed

to turn over books, records or property. **Exh.1** hereto.[3]

---

[2] <u>See</u> e.g. <u>Manshul Construction Corp</u>., 223 B.R. 428 (Bankr. S.D.N. Y. 1998) (denying standing to principals of the Debtor who were subject to a fraudulent conveyance action and who objected to a claim, finding that even if the debtor were deemed to have filed the objection, there would be no "direct" benefit to the debtor if the objection were granted (as distinguished from an individual debtor who has a nondischargeable debt and that in any event, **because they are defendants to the fraudulent conveyance action, they lack standing and "to permit them to sustain this motion would lead to the illogical result of catapulting them to standing above the Debtors and their estates' creditors**." (Emphasis Added)); In re 60 East 80th Street Equities, Inc. (In re Papaanayoutou), 218 F. 3rd 109, 115-116 (2d Cir. 2000) (denying sole shareholder's opposition to proposed sale of certain default judgments to a mortgagee, finding that the *shareholder's actions* prior to the bankruptcy helped to destroy the value of the property and that given that the Debtor had "**no equitable interest whatsoever in the judgments since the sole owner's fraudulent conduct undermined the value of the Debtor's sole asset and gave rise to the judgments in the first place**" (Emphasis Added

[3]  In re Linda Malsh (Bankr. N.D. Oh June 12, 2009) (decision attached hereto as **Exh.1** (allowing individual debtor whose estate involved a nondischargeable claim to object only if she first complied with turnover order and turned over of the property of the estate.  "By objecting to the claims of her creditors, the Debtor, on the

Accordingly, from both a legal and equitable standpoint, the Debtor has no standing as, according to the Debtor's petition which lists no property, it is **insolvent.**  **Zilberman made sure of that.** He worked with insiders and family members to accomplish this, shifting assets to shell and/or newly formed **alter ego** companies, just as he did in the past in response to creditor suits (see fn 15, Exh. A, Tr.14-18:2).  Defendant Group Travel Solutions ("**GTS**") was **formed** just **one** month after the commencement of the Trademark Action (defined below) and within **one** year prior to the bankruptcy filing.  Despite having no assets, operations, revenue, or business of its own, within days of its formation, **GTS** (controlled by Philippe Naim ("Naim;", Zilberman's **uncle by marriage**)) **became the transferee of all of the Debtor's assets** (including vehicles, the Image Rent A Car name and website) and **of vehicles the Debtor purchased in the name of** *Adir Plaza* (a shell company wholly owned by Zilberman with no employees) for no documented consideration.  (According to a recent deposition of Zilberman, and in complete disregard for the corporate entity and in breach of his fiduciary duties, **the Debtor  received "no" payment for the transfers**, but rather *Naim personally paid Zilberman* allegedly $100,000 in cash.).  EB Exh. A, Tr. 74:9-13, 77:21-23 and see fn16 hereof ).  Zilberman also drew a "$1,500 a week" salary **while** **bleeding the company** (Exh. A, Tr.34:2) and *paid off brother in law and "CEO" Gad Sebag* (Tr. 70:15: who was listed as a "creditor" on schedule F)) "about half" of the alleged $300,000 he put into the business. Tr. 21: 23, 24: 14-15. Zilberman admits that GTS occupies 391 Empire Blvd., the Debtor's address (EB Exh. A, Tr. 55:9 to 11) and does business as Image Rent A Car (Exh. A. Tr. 77: 12-13).   GTS uses the

---

one hand seeks the protection of a court order [requiring the turnover of property], while at the same time ignoring an order of the court. This is **disingenuous and clearly constitutes and abuse of bankruptcy process**." (Emphasis added).  See also 11 USC§502(d) (which prevents a creditor from whom property is recoverable under the turnover and fraudulent conveyance provisions etc. from receiving a distribution of a claim before turning over the property.  Indeed, that section has even been applied to purchasers of claims who were not involved in the fraudulent transfers. infra.)

Debtor's telephone number.  There is at least one insider of the Debtor still working for GTS. See below.

By virtue of the transfers, <u>GTS</u>  (operating as "Image Rent A Car") <u>is now the beneficiary of the Debtor's annual revenue, roughly **$3,000,000 a year**, based upon the Debtor's own bank statements</u>.[4]   The Debtor's Bank statements reveal payments to 18 different automobile lenders, including Mercedes-Benz and Porsche, totaling at least $1,689,910.26 (as the April statement is missing.) The statements also reference payments to or for the benefit of Adir Plaza. (A copy of such bank statements, together with a spread sheet prepared by Digby summarizing such statements is included in EB Exh. **B**.)   <u>Zilberman has now confirmed the  lenders did not belong to the Debtor, **but rather Adir Plaza**</u>.[5]   <u>See</u>  EB Exh. A. Tr. at 39.  And this is just for one bank account. There may have been others (Tr. At 30:25, Tr. 3-5) <u>however, the statements were never turned over</u>.  The vehicles purchased in shell company Adir Plaza's name (from the millions of dollars that were transferred from the Debtor to Adir Plaza) were then transferred to GTS and also to third parties.  (Likewise,  real property had also been purchased in the name of Adir Plaza which Zilberman transferred to his company "387 Empire Boulevard" which then transferred it to his "wife's side uncle" Naim.Tr. 44-49; 61:5-10.)

Now, egregiously, and **in violation of 18 USC §§152 and 153,  Zilberman just testified that books and records of the Debtor are "no" longer in existence. Tr. 65:19. "He took the**

---

[4] From the bank accounts statements produced for the Chase account ending in No. 1611, covering January 2009 to May 2, 2010 (and excluding April 2010 as that statement was never turned over), the Debtor **deposited** the sum of **$3,583,264.92**.  In March of 2010 alone the Debtor deposited $244,265.00. Two months later in May 2010, the account shows only $6,781 in deposits, and the balance had **dwindled** **to** **less than $3,000**. <u>See</u> Exh. B

[5]  As set forth in the spread sheet and bank statements (Exh. B), transfers of $553,129.08 were also made to **eight (8)** other bank accounts but the Debtor <u>failed to turn over</u> any other bank accounts, despite the Turnover Order so the recipients are unknown.  Additionally, <u>a payment of **$100,000 was made to Zilberman's** brother in law, **Gad Sebag**  (who also had access to the bank accounts of Adir Plaza.</u> Exh.A Tr. 50: 3) and there are payments that appear to be **personal expenses**, such as "Macy's," "Hampton Inn", "BLAST class", "Gold Supply Group" <u>See</u> Exh. B)

**[records] away." Tr. 65:23.   He does not deny "destroy[ing]" the records.  He may have**

**"disposed" of them**. Tr. 65 and 66. <u>See</u> below.[6]

> **B.  The Claims Objection Was Filed After the Trustee Obtained Incriminating Documents Filed with the DMV, Conducted a Deposition of Zilberman (obtaining Incriminating Testimony Implicating 18 USC§§152 and 153) and Noticed Zilberman's Co-conspirators for Deposition**

Notably, the timing of the Claims Objection, almost **two (2) years** after the claim was

filed on January 10, 2012), could not be more transparent.  Given Digby's objections to the

proposed settlement (including the legal authority of Naim, to sign same on behalf of GTS) [7], the

Trustee adjourned his motion to approve the proposed settlement with the defendants (the

"Settlement Motion") to investigate Digby's allegations.    In the interim, Registration

Applications, Title and related documents were obtained from Department of Motor Vehicles

("DMV").  <u>See</u> EB **Exh. C**.[8]  This documentary evidence exposes and incriminates Zilberman

and others in a scheme to defraud.  The Trustee also deposed Zilberman for the first time on

October 7, 2013, and his testimony corroborates the fraud evidenced by the DMV documents and

bank accounts. (A copy of such deposition transcript ("Tr.") is attached as EB **Exh. A.**)   Given

the questions asked by the Trustee's counsel, coupled with the DMV documents presented at the

deposition and the Trustee's questioning of same (<u>see</u> Tr. 71 to 83"), Zilberman undoubtedly

---

[6] Notably, even if the Debtor had standing, given Zilberman's admissions that the documents are destroyed, Zilberman **spoiled the very evidence that Digby would need to prove its damages**. See para. 4 hereof.   As the proof of claim form required a dollar amount, Digby reflected as $300,000 based upon statutory damages. However, actual damages, as sought via the complaint attached to the proof of claim, are believed to be far greater, consistent with the deposits made into the Debtor's chase bank account, ending in **1611.

[7] The New York Secretary of State reflects that the chief executive officer of GTS is David Baskht and not Philippe Naim. <u>See</u> EB Exh I    Philippe Naim was at one time an officer of another company called Group Travel Solution, Inc. which was incorporated in Florida, is inactive and was voluntarily dissolved in July 26, 2011.  Yet, Naim is the individual who signed the proposed settlement in 2013.

[8] The DMV documents are overly voluminous given the significant number of vehicle transfers.  Given the enormity, attached as **Exh.** C  is a small sample of transfer documents for 9 vehicles, along with a summary page prepared by Digby summarizing and explaining the transactions.  Vehicle "6" is also reflected in **Exh.J,** which includes pages that were inadvertently excluded from Exh.C )

knew that the Trustee had uncovered the very records and scheme that he and his cohorts had successfully tried to hide during the bankruptcy and that additional individuals were being implicated.

**Now implicated in the fraud is Chana Vilenkin a/k/a Connie Grey ("Grey"), the Debtor's secretary/office manager and at times a "director" and officer for both the Debtor and Adir Plaza**. Exh. A, Tr. 72:13, 82: 13-22.   Egregiously, **she facilitated asset transfers by outrageously simultaneously signing for both the "sellers" (the Debtor and Adir Plaza) and the "buyer" (GTS).**   See EB Exh. J and C. When questioned why Grey signed the DMV documents, Zilberman admits to providing Grey with authority to sign, testifying that: "if it was necessary to execute an application, I would have given her the right and the position to." Tr. 77:25 and 78:2-3.   As believed by Zilberman, she is now a **secretary for GTS** (Exh.A, Tr. 54:14) (and not surprisingly, she is now represented by Stephen Sommerstein, GTS' counsel, and self-described criminal defense attorney:  http://www.53ppwlaw.com).   Further, GTS filed an Assumed Name Certification with the NYS Department of State on May 4, 2010 (Exh. C, page 14/93), whereby GTS assumed the name Image Rent A Car, which certificate, the parties egregiously used to facilitate car transfers from the Debtor to GTS, leading the DMV to believe that the Debtor and GTS were the same company, to wit, only a name change was involved, and as such, no fees, etc. would be required. See fn. 17. Exh. C:  "Vehicle 2" pp 9-17).   Also uncovered is an email from Grey a month before the filing, relaying concerns about civil and criminal liability for fraud in response to a "propos[al] [to] mov[e] assets from Image just prior to the filing." See **EB Exh. G**).   Also implicated is "uncle" Naim, who according to Zilberman controls GTS.    In addition to his family relationship, **Zilberman helps Naim with his moving company**. Id. Tr. 61:13.

The Trustee served Grey with a subpoena to appear for a deposition and served Naim with a notice of deposition.  Both parties were both noticed to appear for depositions at the Trustee's offices on November 6, 2013.  Neither of them appeared. Instead, they have repeatedly sought adjournments.   The Trustee counsel advised the undersigned that he made clear to Mr. Sommerstein that January 8, 2014 would be set as a "final adjournment".   Hoping to deflect attention from the foregoing individuals, the Claims Objection was filed, and for the reasons stated above, Digby requests that it be denied for lack of standing.  Very notably, the undersigned has just been advised by Trustee's counsel that **neither Grey or Naim showed up for the "final adjourned" deposition date of January 8th and that Mr. Sommerstein has advised that "Naim is out of the country."**   Clearly, Naim and Grey did everything to avoid being deposed, let alone be deposed before the response was due on the Claims Objection.

**C.  Request For the Court To Refer The Appropriate US Attorney for Investigation or To Any Other Applicable Governmental Agency Pursuant to 18 USC §3057(a)**

18 USC§152, a person commits an offense if he:

"knowingly and fraudulently conceals….any property belonging to the estate of a debtor….makes a false oath or account….;false declaration, certificate, verification or statement under penalty of perjury…receives any material amount of property from a debtor after the filing of any case….conceals  any of his property or the property of such other person or corporation, …conceals, destroys, mutilates, falsifies….any recorded information…relating to the property or financial affairs of a debtor; withholds from a …trustee….any recorded information (including books, documents, records and papers) relating to the property or financial affairs of a debtor."

18 USC§153, a person commits an offense if he:

knowingly and fraudulently appropriates to the person's use, embezzles, spends or transfers any property or secretes or destroys any document belonging to the estate of a debtor…."

18 USC §3057(a) provides that

"any judge, receiver or trustee having reasonable grounds for believing that any violation under chapter 9 of this title or other laws of the United States regarding

insolvent debtors…has been committed, or that an investigation should be had in connection therewith, **shall** report to the appropriate United States attorney all of the facts and circumstances of the case, the names of the witness and the offense or offenses believed to have been committed. (Emphasis Added)

Zilberman has bled the Debtor's assets and destroyed its records, diverting assets to himself and companies owned by him and/or his relatives.    Zilberman's testimony, the DMV documents and the bank statements clearly reflect that the petition, schedules, and statement of financial affairs were completely <u>false</u>. They were virtually blank with no mention or location of assets, transfers and books and records, or the identity of officers and directors, such as Grey and Sebag (who signed the DMV documents as such and who have access to the Debtor's and Adir Plaza's bank accounts. EB Exh. A Tr.33, 50 ), the company's accountant ("Klitrik")Tr. 35), bookkeeper/office manager (Grey), pending lawsuits (see fn 9), etc.   While keeping the Debtor's affairs in the dark by virtue of the foregoing omissions, lack of forthrightness during prior examinations, such as the 341 meeting,  withholding and destruction of books and records, disturbingly, during the bankruptcy, Zilberman, Grey and/or Naim (through the veil of Adir Plaza and GTS) have been able to facilitate the sale of vehicles (initially purchased by the Debtor) to third parties at 391 Empire Blvd.   This filing of this case was a fraud on the court with no legitimate reason other than to obfuscate the Trademark Litigation.  Digby requests that this Court or the Trustee refer this matter for investigation to the appropriate US Attorney. Further, pending investigation, Digby would request that the Court exercise its powers in furtherance of the foregoing statutes and under 11 USC§ 105(a) to enjoin any further sales of vehicles (formerly owned by Image or initially purchased by Image in the name of Adir Plaza) off the lot of 391 Empire Blvd. or otherwise.

**D.  Supplement to Dismissal Motion and Request for an Extension to Respond to the Claims Objection in the event that this Cross Motion is Denied**

Given the foregoing, Digby believes that the Trustee will no longer pursue the proposed settlement.   Digby is hopeful that the Trustee will promptly prosecute this matter, including pursuing Naim and Grey and seeking emergency relief from this court.   In the event that the Trustee does not commit to do so, then Digby seeks to move forward with its Dismiss Motion as supplemented hereby. (Notably, there are only 3 other claims filed in the case, to wit, claims filed by taxing authorities, aggregating to $4,223. Such authorities were served with the Dismiss Motion but did file any opposition papers thereto.)  Further, as the Debtor now asserts that Digby's claim is zero and that the case was filed to thwart Digby's Trademark Action, there is no purpose to prolong the dismissal of this case any further should the Trustee elect not to prosecute defendants and the newly implicated individuals, Naim and Grey. The only beneficiaries of this bankruptcy case have been Zilberman and Sebag (see ¶5 below.)    Further in the unlikely event that the Court denies this cross motion to strike the Claims Objection for lack of standing, then Digby respectfully requests an extension of time within which to file a response.

**Background**

1.      Digby is the registered holder of Bandago and the registered domain holder of Bandago.com and is in the business of renting vehicles and cars, including 15 passenger vans. The Debtor was also in such business, operating out of 391 Empire Blvd, which still bears the sign "Image Rent A Car" with the telephone number previously used by the Debtor, 718-771-4858.  GTS currently operates the business under "Image Rent A Car" from that location. Exh. A, Tr. 55:9-11.

2.      On February 10, 2010, Digby commenced an action in the United States District

Court, District of California (the "District Court") after attempts to have the Debtor and Van

Rental (related entity which filed for bankruptcy) cease and desist their infringement failed.[9]

This was entitled <u>Digby Adler Group LLC d/ba/a Bandago, plaintiff v. Image Rent A Car, Inc.,</u>

<u>Van Rental Co, Inc., Gad Sebag, Shneior Zilberman</u> (the "Trademark Action").

3.      On March 21, 2011, Debtor's principals Zilberman and his brother in law, Sebag,

were added as defendants to the Trademark Action.    The District Court granted Digby's motion

for leave to amend Digby's complaint on grounds that the corporate veils of the Debtor and Van

Rental should be pierced given the complete disregard for the separate identities of the Debtor

and Van Rental, through which fraud was perpetrated by Zilberman and Sebag. A copy of such

complaint is attached as Exhibit D to the Trustee's Turnover Motion, dated February 12, 2013

("Turnover Motion").

4.       The Trademark Action seeks both statutory damages and actual damages, as well

as punitive damages and legal fees.  Actual damages cannot be determined without obtaining

from the infringer documents sufficient to demonstrate Image's revenue for the relevant time

period(s).  In the Trademark suit document requests were served seeking, among other things,

financial records. After defendants failed to respond to documents requests served upon them in

order for Digby to calculate its actual damages, Digby filed a motion to compel discovery with

the District Court on November 3, 2010, which resulted in the court <u>ordering</u> the Debtor to

---

[9] Relief was sought in violation of 15 U.S.C. §1125(d), California Business & Professions Code §17200 (d) and 17 U.S.C. §501 *et seq*, for, *inter alia*,  cybersquatting, trademark infringement, unfair competition, false advertising and copyright infringement, alleges that without the Debtor's ever using or registering the name "Bandago" in commerce, the Debtor, through Sebag and Zilberman, (a) created a website at the domain name bandago.net which automatically and immediately redirected visitors to the Debtor's website, thereby harming Digby, (b) unlawfully bid on several variations of the BANDAGO Mark in Google AdWords, namely, "Bandago, "Bandago Van Rentals" and "Bandago Van Rental," causing users who searched for Digby's website to be diverted to the Debtor's competitive website and (c) copied multiple original texts from Digby's website, thereby engaging in copyright infringement.

produce the documents. Despite the District Court Order, the Debtor still did not comply, forcing

Digby to file a second motion to compel (this time seeking sanctions) on February 15, 2011 (one

month prior to the bankruptcy filing), which sought among other things: Profit and Loss

statements for 2007, 2008, 2009, and 2010; Balance sheets for 2007, 2008, 2009, and 2010; all

documents evidencing any cost or expense identified on the Profit and Loss statements, and tax

filings for 2007, 2008, 2009, and 2010, as well as responses to interrogatories with respect to the

Debtor's use of the domain name of bandago.net. A copy of the foregoing motion ("the Second

Compel Motion") is attached  as **Exh. D**.  **The documents that were requested were never**

**produced in the Trademark Action or Bankruptcy Case despite the Turnover Order**.

     5.     On March 24, 2011 (**three days after the Leave Motion was granted and while**

**the Second Compel Motion was sub judice**), Zilberman caused the Debtor and Van Rental to

be filed under chapter 7 of the Bankruptcy Court.  Zilberman and Sebag have shielded

themselves from Digby's prosecution of the Trademark Action and compliance with Digby's

discovery request as the District Court granted a stay of the entire action until the Chapter 7 case

was resolved (in furtherance of judicial economy presumably to enable the Trustee to pursue and

maximize estate assets). See Exh. C to Dismiss Motion.

     6.     Counsel for defendants Adir Plaza and Zilberman (who now also appears to be

counsel to the Debtor by virtue of the Claims Objection), admitted on the record of a pretrial

conference on May 14, 2013 that:

> "the reason that they filed this [Bankruptcy Petition] was, you know,   to put an end to
> the California litigation [commenced by Digby]…." See relevant pages of Tr. At 9 (lines
> 23-25)-10(lines 3-4), Exh. **E** hereto (emphasis Added.)

     7.     The Petition and Schedules (other than Schedule F) are **BLANK** and default to

"none" or "no".  When the Debtor filed the bankruptcy, Schedule F listed only insiders, except

for Digby[10].

8.    **According to the Debtor's Schedules, the Debtor is INSOLVENT.**

9.    The Debtor's statement of financial affairs ("SOFA") was completely BLANK, other than representing the Trademark Action.   Among other things, **no income** was referenced for 2009, 2010 and 2011 and **no mention of transfers of property** within the past two years was mentioned, despite the approximate millions of dollars Zilberman caused the Debtor to pay to his other corporation, Adir Plaza, which then purchased cars which Zilberman then caused (along with the Debtor's name and website) to be transferred to GTS.   The SOFA also makes no mention of any **closed bank accounts**, **identities of any persons in possession of books** and records, bookkeepers, accountants, or any explanation of missing records. [11]

---

[10] Zilberman had the audacity wait  3 years after the bankruptcy filing to reflect a purported claim on schedule F relating to a personal injury accident that occurred prior to the bankruptcy.    This was true even though his secretary, Grey, appeared at a deposition relating to this litigation as recently as July 2013. **The Law suit was never disclosed in the SOFA** and Zilberman only first amended Schedule F after the Trustee brought the law suit to his attention at Zilberman's deposition. Not surprisingly, Empire Fire and Marine Insurance Company, the Debtor's insurer commenced an action in the District Court for the Eastern District of New York for a declaratory judgment against the Debtor and for damages seeking that it does not have to defend the Debtor in a personal injury law suit (commenced by "Coicou" against "Middleton" (who rented an Image car and who then gave the keys to "Germain" who allegedly injured Coicou) because Grey, Sebag and "Silberman" [sic] failed to cooperate with Empire in the defense as required by contract. Notably, Empire retained an investigator (EB **Exh. H**. ¶79, 89 and 91) and it is alleged that "**upon information and belief, "Silverman" [sic] works or consults at the business currently doing business under the trade name "Image Rent A Car; "however, he has not agreed that he was the principal of Image, nor has he responded to any letters or phone calls**." Exh. H ¶81.  Further it is alleged in ¶91 that "Although **Connie Grey appeared at a deposition in July 2013 in the Coicou Action**, Image continue to fail to support efforts to respond to discovery in the Coicou Action."  "Therefore, to date, Image, and its principal, Sebag, continue to fail to cooperate in its defense of the Coicou Action." Id ¶92.  **Zilberman, Grey and Sebag also breached their fiduciary duty to the estate in failing to cooperate with the insurer.**  They should be compelled to cooperate with Empire so that any claims can be satisfied from the Debtor's insurer.    There's also another verified personal injury lawsuit (for a post-petition injury), entitled "Jaehyuum Kim and Jaesin Cho. V. Image-Rent-A Car AKA Group Travel Solutions, Inc." that was commenced April 24, 2012.  This is also attached as Exh. H. **Apparently, the public is also unconvinced of the artificial separation of the Debtor and GTS.**

[11]  At a 341 meeting and prior to the SOFA amendment, Zilberman testified at the 341 meeting that earnings were only $700,000 to $900,000 in 2010.  See  Exh. F hereto; see also Exh. A to the Trustee's Turnover Motion.  The SOFA was amended and now reflects earnings of $1,438,974 in 2009 and $369,247.02 in 2010 and zero in 2011. This amendment on February 15, 2012 was made only after the bank statements were caused to be produced and it was abundantly apparent that the SOFA was false.  However, based on deposits into just one of the Debtor's accounts ending in 1611, earnings appear to be DOUBLE than what is stated in the amendment.

10.    Zilberman lists himself as 100% owner and president of the Debtor in the SOFA and signed the Petition, Schedules and SOFAs under Penalty of Perjury.  A recent deposition of Zilberman, by the Trustee's counsel (coupled with his prior testimony at the 341 meeting and at a Rule 2004 exam) shows the falsity of Zilberman's Petition, Schedules and SOFA.  See Exh. **A**.

11.    On October 14, 2012, the Trustee commenced the Adversary Action against Sebag, Zilberman, Adir Plaza, Adir Group and GTS.[12]

12.    On February 13, 2013, the Trustee filed a motion for the turnover of property and documents (as only limited bank accounts for the Chase Account ending in *1611 had been produced.)  By order dated April 30, 2013 (the "Turnover Order"), this Court granted the motion. By the Turnover Order, the ordered the turnover of Court directed that:

"the Debtor, by its principals, officers, employees and/or agents … turnover to the Trustee on or before 12:00 pm on May 15, 2013 all property accounts, funds and monies held in the name of or title to the Debtor including but not limited to the vehicle bearing New York license number ESB1283; and (b) any books and records in the Debtor's possession."   See Docket #82.

13.    The Debtor failed to comply with the Turnover Order.   At the pretrial conference on May 14, 2014, Bruce Weiner, Esq., counsel to Zilberman (who at the time advised that he was not counsel to the Debtor (EB. **Exh. E**. Tr. 18:6-7, but now filed the Claims Objection on behalf of the Debtor) advised the court that a vehicle that the Trustee expected to be turned over "was disposed of before the bankruptcy was filed, so it never existed." Exh. E. Tr. 17: 25 and 18: 1-2;

---

[12] By the Adversary Action (which was commenced before the full extent of the fraud was uncovered), the Trustee seeks the recovery of (a) "not less than **$3,486,165** plus interest" against one or more of the defendants as property of the estate; (b) monies in an amount to be determined against Zilberman and Sebag for **breaching their fiduciary duties** by deepening the insolvency of the Debtors; (c) the "Image Rent-A-Car" **Trademark** transferred for free to Adir Group in or about April 2010; (d) **http://www.imagerentacar.com**, the Debtor's website which was transferred to Group Travel Solution, Inc.; (e) the Debtor's "**goodwill**"; (f) the Debtor's **vehicles** transferred to Group Travel Solution, Inc. for approximately $75,000 when the Trustee estimated that they were worth approximately **$200,000**; (g) **$100,000** paid to insider **Sebag**; and (h) **$697,233.14** paid to Adir Plaza between March 2009 and 2010 and which currently has registered with the New York Department of Vehicles in its name and the name of Group Travel Solution, Inc. **more than 200 vehicles**, including pricy vehicles, such as Mercedes Benz, BMW and Porsche.

17: 11-12.   Notably, Zilberman testified at a 341 meeting on June 7, 2013 that there were  "three

to ten vehicles" within 3 months of the filing.   See EB **Exh. F (relevant pages of 341 meeting**

Tr. 6:19-20.  Just a month after the bankruptcy filing, 29 vans were being offered on Image's

website for asking prices between $13,500 to $20,500.  See **EB Exh. F** (website listings follow

Tr. of 341 meeting); see also EB  Exh C (Vehicle "9, pp. 76-83) as an example of a vehicle

having been transferred from Adir Plaza to GTS after the bankruptcy and  Citi Capital (the

recipient of $644,000 in payments from the Debtor on behalf of Adir Plaza in 2009 alone),

released its lien (Exh C p. 81).

14.      In his recent deposition, Zilberman testified that at the time of the filing, the

Debtor had vehicles registered under its name, but states that he didn't consider those vehicles to

be the Debtor's "due to the debt that I have and the different dues that I had to pay."  He

suggested that they belong to Naim since he would take over the payments on the vehicles. (Exh

A.Tr. 51: 19-23, Tr. 52.)  Additionally, no tax returns or financial statements (including balance

sheets, profit and loss statements, statement of cash flows, income statements and inventories )

were produced; no documents pertaining to any vehicles, including transfer documents filed with

the DMV, and no bank statements from other bank accounts were produced, when Zilberman

testified that the Debtor may have more than one bank account and when the Chase bank account

ending in 1611 reflects transfers to a host of other unknown bank accounts. See **Exh. A,** Tr. 31:5.

15.     The Trustee and defendants to the Adversary Action entered into a proposed

settlement agreement.   Digby filed the Dismiss Motion to both on substantive grounds,

including that it was impossible to determine the reasonableness of the proposed settlement when

(a) Mr. Zilberman had not ever been deposed by the Trustee, (b)  when no material documents

(other than the Chase bank statements) had been produced by the Debtor enabling the Trustee to

fully investigate, and (c) the settlement terms were too low and too precarious given the magnitude of fraud reflected in the Adversary Action, including the approximate $3,000,000 in transfers from the Debtor's bank account in the year or so prior to the bankruptcy.[13]   Further, Digby asserted that based upon filings with the NY Secretary of State (reflected in EB **Exh. I**) which reflect David Baksht and not Naim as the chief officer of Adir Group, Inc. and GTS, Naim has specious and questionable authority to sign on behalf of such companies.[14] Digby sought to dismiss the case in the event that the Trustee failed to prosecute the action as contemplated by Digby when it agreed to relieve Daniel Gershburg, Esq. so that the Trustee could retain same as special counsel.

**Trustee Has New Incriminating Evidence and Testimony, *inter alia*, Evidencing the Fraud, and that Debtor's secretary (Grey) Simultaneously Signed For both Transferor and Transferee of the Debtor's Assets**

16.    The Trustee adjourned the hearing on the Settlement Motion to conduct further investigation.   In the interim, Registration and Transfer documents from the DMV were obtained.  The Trustee also deposed Zilberman for the first time on October 6, 2013. See EB Exh. A.  This investigation resulted in conclusive evidence of fraud.

17.    The picture is now clear.   Zilberman owned both the Debtor and Adir Plaza. Adir Plaza had no operations independent of the Debtor. EB Exh. A Tr. 41, 44, and no employees. Tr. 44:16-17.   Its role was simple.  It simply had title to the cars that the Debtor used

---

[13] By its Dismiss Motion, Digby noted that Debtor's Bank Statements (for account ending in 1611) reflect that <u>over $3 Million passed through the Debtor in 2009 and $500,000 in the first 3 months of 2010</u>.   The Debtor's March 2010 bank statement reveals $244,294.70 was deposited into the Debtor's account in March of 2010 alone, which amounts to **$2,931,536 in annualized gross revenue.**   <u>See</u> Relevant pages of March and May 2013 Bank Statements attached in EB Exh. B.   This same bank statement for March 2010 also reveals $<u>177,693.80 in "electronic withdrawals."</u> <u>Id</u>.   The April 2010 bank statement is **MISSING**, and has not been produced despite several orders to do so.  The bank statement for May 2010 **reveals that the balance in that particular account was stripped to less than $3,000**. <u>Id.</u>

[14] Digby, also noted that  Mr. Baksht has also claimed that he has been the victim of **mail fraud**, alleging that GTS mail that should have gone to his address was intercepted and forwarded without his permission  to  391 Empire Blvd and that  US Postal Office is investigating same. <u>See</u> Exh. D to Dismiss Motion.)

for its business.  Tr. 41, 44. (Although it appears from the DMV records that the Debtor registered some cars in its name, the vast majority were in Adir Plaza's name.)  As Adir Plaza generated no funds of its own (having no operations independent of the Debtor[15] and no employees Tr. 44:16-17), the cars were paid for by the Debtor either directly to Adir Plaza or to its lenders. Id, Tr.38: 15-21, Tr: 39-40.   As its owner,  Zilberman (individually and through the Debtor) had complete dominion and control over Adir Plaza and its vehicles. The companies were essentially one company.    The Debtor (and not Adir Plaza) operated the car rental company at 391 Empire Ave, generated all of the revenue and paid all of expenses of operations, including paying for the cars or the financing of the cars and the insurance. See  EB Exh. A,  Tr. 37-40, 62- 64.  Zilberman took out a line of credit in Adir Plaza's name, the debt service of which the Debtor paid. Exh. A, Tr. 37-40.   Zilberman guaranteed the line of credit. Exh.A, Tr 40: 1-3. [16]  There was no written agreement between Adir Plaza and the Debtor documenting their relationship. Exh. A Tr. 65:7-9.

18.    The DMV documents reveal that in April of 2010 a tactical decision was made to hide both the revenue and assets from creditors (i.e. Digby).   GTS was formed on April 27, 2010, according to the NY Secretary of State, which was (1) one month after the commencement of the Trademark Action.    Despite having no assets, operations, revenue, or business of its own, within days of its formation, GTS became the transferee of both name of "Image Rent A Car", the website of Image and the vehicles which the Debtor purchased in the name of Adir Plaza for little or  no consideration (in fact, (completely ignoring the corporate entity). Zilberman

---

[15] Likewise, Zilberman testified at his 341 meeting that Van Rental, the related company that also filed, was basically run through Image. " See  Exh. D to Turnover Motion. Tr: 5 and 10.

[16]  (As Adir Plaza was simply a receptacle for the cars paid for by the Debtor (via the millions of dollars of transfers), Zilberman could hope to shield these cars from creditors.   **He did this before**.  According to his testimony,  Zilberman formed Image Rent A Car, Inc. because his predecessor company, Adir Rent A Car  (which too operated at 391 Empire Ave.) became the subject to a suit by a creditor which alleged that it was owed $400,000. See Exh. A, Tr. 14-18: 2)

mentions only that **he** (and not the Debtor) <u>personally</u> received some money from "wife's side uncle" Naim[17] and that GTS became responsible for paying off the line of credit guaranteed by Zilberman by selling the cars and paying off the lines and "keep[ing] the operation going" Tr. 53.) (By necessity (due to lienholders, etc.) the transfer of vehicles to GTS moved at a slower pace than the website and name transfer, occurring over a span of two years.  In some transactions, Gad Sebag also signs on behalf of the Debtor, even though the Debtor's SOFA fails to reveal that he is an officer or director of the Debtor. The same is true for Connie Grey. <u>Egregiously,  Grey, the Debtor's office manager and (according to Zilberman)  "temporary" officer of both the Debtor and Adir Plaza (Exhibit A, Tr. 72:13, 82:13-17),</u> **signed transfer documents acting on both sides of the transactions,  often signing on behalf of the Debtor as "seller," Adir Plaza as the "seller" and also on behalf of GTS as the "purchaser,"  with Zilberman's authorization.**[18]  (Exh. A, Tr. 77: 20-25 and to 78).   According to Zilberman,

---

[17] There is no written agreement evidencing this purported purchase or any purported amount paid.  Exh. A,  In terms of consideration for the purchase, Zilberman testifies  Naim (not GTS. Tr. at 54:17) personally gave him money:   "He [Naim] paid some money-he paid some money in payments, cash payments given to me, and a couple of dollars, [with] "couple of dollars" meaning few thousand dollars at different times, again and again, and there was a relationship." Tr. 55: 3-8.  Later, in response to the question of what "the overall consideration for taking all of the vehicles from Image and Adir and the debt," Zilberman testifies that it was "about 100,000 in cash" and "**I received it**." Tr. 74:13 (Emphasis Added).   According to Zilberman, he used part of the money to pay "regular street people" who were "clean up guys" Tr. 74:22. Other than paying the "street people, in terms of the whereabouts of the alleged funds, Zilberman testified that he kept it:  "**[I] took it for myself for part of the company's-company's expenses and overall my share.**" Tr. 75:21-22 (Emphasis Added).  In addition to causing the vehicles to be transferred to GTS,  Zilberman also arranged for the transfer of real property titled in the name of  Adir Plaza to be transferred to an entity owned by 387 Empire LLC (owned by Zilberman Tr. 45) **which then transferred to Philippe Naim** (Tr. 45)

[18] By way of example of various transactions, transfer documents for nine vehicles are attached as **Exh. C** with a cover page prepared by Digby describing same.

As an example, reference is made to " **Vehicle #2**" - Transfer from **Image to GTS** is done by saying they are the same entity (Complete document is Exhibit C,  pages 9 – 17,

- Page 9 - The title application for GTS shows **David Baksht's** home address (719 E. Parkway) as the home address for the company.
- Page 10 - **Grey signs as secretary for GTS**, even though she is the secretary for the Debtor.
- Page 12 - Gad Sebag signs on behalf of Image

Grey now works for GTS.  Exh. A, Tr. 54:14.  Additionally, GTS filed an Assumed Name

Certificate with the Division of Corporations assuming the name of Image Rent A Car on May 2,

2010.   A copy of such certificate is attached to EB Exh. C, page 14 out of 93; <u>see</u> also Exh. A,

Tr. 75-77. From May 2010 to present, GTS has continuously held itself out as Image Rent A Car,

is the titled owner of the assets that Image paid for, operates out of Image's physical address (Tr.

55) under a sign bearing the name "Image Rent A Car," operates the Imagerentacar.com website

- continuing to enjoy significant traffic and revenue from that site, and continues to employ at

least one Image insider, Grey.

19.     Further, not surprisingly, although Zilberman claims he "sold" the assets a year

prior to the bankruptcy, his actions tell a different story.  He authenticated his signature on a

document transferring a Chevrolet to GTS on August 26th, 2011, which was subsequent to the

bankruptcy.  Exh. A, Tr. 83 and Exh. C, page 80. The goal of all of this is obvious: keep the

---

- Page 14 - GTS filed an **Assumed Name Certificate with the Division of Corporations** assuming the name of Image Rent A Car on May 4th, 2010, and uses this certificate to facilitate the transfers to GTS at the DMV.
- By GTS's simply assuming the name Image and acting as Image, from the DMV's standpoint, there was never a transfer and no consideration had to be paid as it really only involved a name change!

Reference is also made to  "**Vehicle #8**", which was a Nissan that was transferred from Adir Plaza to GTS **just a week prior** to the **bankruptcy** . (Complete document is on pages 66 - 74)

- Page 67 -  **Grey signs as the secretary for GTS, the transferee even though she works for Adir Plaza and Image.**
- Page 69 -  **Grey signs as Vice President for Adir Plaza**, the Seller, on the same transaction she signs as the secretary for GTS, the buyer.  **Naim also signs for GTS as the buyer**.
- Page 72 - The lienholder, Citi Capital, releases the lien. In 2009 alone, the Debtor made $644,000 in payments to Citi Capital on behalf of Adir Plaza as reflected in the Debtor's Chase bank account.  On the very day of the bankruptcy, March 24, 2011, Vehicle #8's lien was released, enabling GTS to obtain this vehicle free and clear.

See also **Vehicle 6**,   Exh. C, Page 38 and **Exh. J (which includes the full set of documents involved in the transfer of "Vehicle 6").** In that transaction involving **Vehicle 6**, Grey signs a title transfer document on behalf of Adir Plaza (Exh. J, p. 5) to "Philippe Naim-Group Travel Solutions."   Then Grey, on behalf of GTS, applies to register the vehicle in GTS's name (Exh. J p.2), informing the DMV of the name change from Adir Plaza Inc.to GTS.   Exh. J, p. 3 and Exh. C, p. 38.

revenue, goodwill, assets, and even the name of Image Rent-A-Car alive, but get rid of the creditor: Digby Adler Group, LLC.

20.     By not producing DMV documents, disclosing the name of the Debtor's accountant, producing any books and records and tax returns, and not disclosing the transfers on the SOFA, great effort was made by Zilberman to keep the Court, the Trustee and Digby in the dark despite the fact that he signed such documents under penalty of perjury.  Despite the Debtor's obligation to keep books and records and turnover same along with assets, Zilberman now admits that the Debtor had an accountant (named "Klitnik;" see Exh.t A, Tr. 35:4-10), that Ms. Grey would provide the accountant with financial information (Id; Tr. 35:17) and handle the Debtor's records and that very significantly, Zilberman "took [the Debtor's books and] records away" when Naim got new servers and came into 391 Empire Blvd.  In terms of the records, he simply says **"I might have disposed them**." Exh. A, Tr. 66:7-8.  The Fraud that has been committed is documented and palpable by virtue of Zilberman's own testimony, the DMV records and bank statements and should not be countenanced by this Court.

**Request for Relief**

21.     Digby respectfully requests that the Debtor grant it the Requested Relief, as defined in the first unnumbered paragraph above.

**Legal Argument In Support of Cross Motion to Dismiss Claims Objection**

I.      **Standards for Standing:**

A. **The Trustee Is the Only Entity Afforded the Right to Object to A Claim Unless the Objectant Can Prove that it Has An Actual Pecuniary Interest; that it will be Directly and Adversely Affected by the Allowance of the Claim (the "Standing Rule")**

Bankruptcy §502(a) provides that a claim, proof of which is filed under §501 is deemed allowed unless a "party in interest" objects. In re Greening, 152 F.3d 631, 633 (7th Cir. 1998).

Under the Bankruptcy Code, standing to object to a proof of claim in a chapter 7 is defined in §

502(a).   Only a "party in interest" may object to a claim. A "party in interest" is not defined by

the Bankruptcy Code, but standing in bankruptcy cases is narrower than Article III standing. In

re Ray, 2010 WL 759838, at *2 (7th Cir. Mar. 8, 2010).   There is no entity other than the

Trustee who is statutorily afforded the right "to examine proofs of claims and objects to the

allowances of any claim that is improper." 11 USC. §704 (5).   "The majority of courts hold that

as a general rule "the chapter 7 trustee alone may interpose objections to individual proofs of

claim. In re Thomson, 965 F.2d 1136, 1147 (1st Cir. 1992).  Standing must be established by

showing that such person has a "significant stake" in the outcome of the matter.  Sierra Club v.

Morton, 405 US 727, 731-32 (1972).  The objectant must show it has an **actual pecuniary**

**interest** in the outcome of the controversy. In re Citi-Toledo Partners II, 254 B.R. 155, 163

(Bankr.N.D.Ohio 2000) (emphasis added); Manshul Construction Corp., et. al. 223 B.R. 428

(Bankr. S.D.N. Y. 1998); In re CultAwareness Network, Inc., 151 F.3d 605, 607 (7th Cir. 1998);

In re Ulz,401 B.R. 321, 327 (Bankr. N.D. Ill. 2009).  The bankruptcy court's order must

"**directly and adversely**" affect that interest. Depoister v. Mary M. Holloway Found., 36 F.3d

582, 585 (7th Cir. 1994) (emphasis added).A chapter 7 debtor will not usually qualify as a "party

in interest" with standing to object to claims because the debtor has no pecuniary interest in the

distribution of assets of the estate.  Kieffer-Mickes, INc. v. Riske (in re Kieffer-Mickes, Inc.),

226 B.R. 204, 208-209 (BAP 8th Cir. 1998); Ultz.

### B.   The Two Exceptions to the Standing Rule, to wit:  (A) Solvency of the Debtor or (B) Existence of NonDischargeable Debts Are Inapplicable

Some courts allow for exceptions if (a) the debtor's estate is solvent. In re 60 East 80th

Street. Equities, Inc. 218 3d 109, 115 (2d Cir. 2000) (citing Collier on Bankruptcy); or (b) the

debtor can benefit from an objection to a nondischargeable claim or an objection to an excessive

claim that, if granted, would allow for the maximization of the distribution to the holder of the nondischargeable claim. See Collier on Bankruptcy§502.02 [c] at 502-13 (Resnick & Sommers ed. 15th ed. Rev. 2009); In re Toms, 229 B.R. 646 (Bankr. E.D. Pa. 1999 (due to the continuing obligation [of the nondischargeablec claim], the debtor's continuing liability after bankruptcy could be affected.")

Since a chapter 7 debtor is normally insolvent, the debtor is considered to have no interest in how his assets are distributed among his creditors and is held not to be a party in interest.   "'A surplus is highly unlikely in a liquidation proceeding, and standing based on a potential for surplus is unlikely to succeed.'" Pascazi v. Fiber Consultants, Inc. (In re Fiber Optek Interconnect Corp.) 445 B.R. 124 (SDNY 2011), quoting Manshul, supra, at 430);   In re Woodmar Realty Co., 241 F.2d 768 (7th Cir. 1957); In re Pramer, 131 F.2d 733 (7th Cir. 1942); Gregg Grain Co. v. Walker Grain Co., 285 F. 156 (5th Cir. 1922), cert. denied, 262 U.S. 746, 43 S.Ct. 522, 67 L.Ed. 1212 (1923); In re Watson, No. 03-133355, 2004 WL 3244420, at *1 (Bankr. M.D. La. 2004) ("the schedules indicate that this will not be a surplus case, because the debtor's liabilities are greater than [sic]his assets." (In re Toms, 229 B.R. at 651(also referring to the debtors' bankruptcy schedules).

Cases allowing objections typically involve individual debtors whose claims objections, if granted and successful, will have a direct benefit by reducing liability on nondischargeable debts.   The individual would be "directly and adversely" affected if he or she weren't allowed to object to a claim. **This is not applicable here**. The Debtor is a corporation whose schedules reflect that it has **no assets** and whose principals are defendants in avoidance actions, accused of fraudulently transferring assets prior to the bankruptcy. Now, the Trustee has documentary evidence and testimony evidencing the blatant fraud and fraudulent transfers involved in this

case.  Further, this same Debtor has ignored efforts by the Trustee to turnover assets and books and records despite a turnover order.   Likewise, the Debtor failed to turn over books and records, despite the Turnover Order. Indeed debtors who fail to turnover assets or who are otherwise subject to avoidance actions, even if they are individuals, have not been afforded relief to object to claims or settlements of assets.

**II.      The Debtor Lacks Standing As It Is Insolvent.  Even if Zilberman Had Filed the Objection, He Would Have Lacked Standing as he is a Defendant In Trustee's Avoidance Action**

**A.   A Debtor Which Created the Insolvency Cannot Claim Insolvency**

Reference to the oft cited Manshul Construction Corp., et al.  223 BR 428 (Bankr. SDNY1998) case is critical as, like Image, the case involves a corporate debtor and shareholders (the "Shulmans") who are the subject of fraudulent conveyance suits by the Trustee.   The court found that they lacked any pecuniary interests in the estate, whether categorized as debtors, creditors or equity holders.  The Schulmans sought to expunge claims filed against the corporate debtors.  The trustee opposed the defendants' attempts to object asserting that the Schulmans had no standing to object to the claims of the debtors' creditors because they are not parties in interest under § 502(a) of the Bankruptcy Code.  The Manshul court observed that "When the Debtors filed their petitions, their schedules showed no equity in the estate and neither of the Schulmans were listed as a creditor." Likewise, the Debtor showed no equity and listed no assets. There were no insider proofs of claims filed; instead, the insiders, like the Schulmans, are the subject of avoidance actions.

According to the Court, regardless of whether it considered the Schulmans in their individual capacity or as alter egos of the corporate debtors, they still lacked standing to object to claims in the main bankruptcy case.  As recognized by the Court, "it is the Trustee, not the

Debtors, who is charged with the duty of administering this case." Manshul, 223 B.R. at 428.

That duty includes objecting to claims. The court distinguished chapter 11 from chapter 7,

reflecting that the Code specifically includes the debtor as a party in interest in chapter 11 and

not in a chapter 7. See 11 U.S.C. §§ 1109(b) & 1121(c). The Manshul court recognized that a

"debtor's standing is limited because an assignment of its causes of action to the Trustee

promotes orderly collection of assets." Id, citing In re Gribben, 158 B.R. 920, 922

(S.D.N.Y.1993). "To allow debtors to assume the role of examining and objecting to claims

'would permit them to usurp the trustee's authority and to require the courts to rule on objections

where the allowance or disallowance of the claim is meaningless to the administration of the

estate.'"Manshul at 430, quoting In re Woods, 139 B.R. at 877;. See In re Sun Ok Kim, 89 B.R.

116, 118 (D.Hawaii 1987) ("The debtor's role is limited to advising the trustee of the validity or

invalidity of the claim. The trustee then decides whether to object.").

According to Manshul, even if defendants were considered alter egos of the debtors, they

still lacked a pecuniary interest in the property of the estate and recognized that "surplus is

highly unlikely in a liquidation proceeding, and . . . standing based on a ***potential surplus*** is

**<u>unlikely to succeed</u>**." Manshul at 430 (emphasis added), quoting In re Martin, 201 B.R. 338, 344

(Bankr.N.D.N.Y.1996) (citing In re Slack, 164 B.R. 19, 22 (Bankr.N.D.N.Y.1994). The court

distinguished the corporate case from the individual case of Mulligan v. Sobiech, 131 B.R. 917,

920 (S.D.N.Y.1991) where an individual debtor was allowed object to a claim which would free

up monies to pay his dischargeableclaim. The Manshul court recognized that "the Mulligan

Court found that if the debtor's objection to the claim were sustained, it would "**<u>directly</u>**

**<u>benefit"</u>** the debtor by making funds available to pay dischargeableclaims. There is no such

parallel here." Id  (Emphasis added).  Likewise, there is no parallel in the Image case where Image has claimed it has no assets and scheduled none and where Image is a corporation.

Notably, the court also rejected their right to object as equity holders or purported creditors based upon the reasoning above). The court also found that the Shulmans lack standing on the basis that they are defendants in the fraudulent conveyance law suit. The court rejected this argument, citing In re FBN Food Servs., Inc., 1995 WL 230958 *4 (N.D.Ill. April 17, 1995) (defendant in adversary proceeding not a party in interest with standing to participate in the allowance or disallowance of claims process), appeal dismissed, 82 F.3d 1387 (1996); In re Delta Underground Storage Co., Inc., 165 B.R. 596 (Bankr.S.D.Miss.1994) (defendant in adversary proceeding lacked standing to object to settlement in main case).  As recognized by the court, "the Schulmans have no interest in this estate beyond their interest as defendants in an adversary proceeding. To permit them to sustain this motion would lead to the illogical result of catapulting them to standing above the Debtors and their estates' creditors." (Emphasis Added). Id. at 431.

**In a similar vein, although Zilberman did not file the Claims Objection on his own behalf, sustaining the Debtor's motion would lead to the illogical result of catapulting Zilberman and the other defendants to the fraudulent conveyance and breach of fiduciary action (who schemed to remove the Debtor's assets beyond the reach of creditors) above the creditors of the estate.**

Similarly, in In re 60 East 80th Street Equities, Inc., (In re Papaanayoutou) 218 F.3d 109 (2nd Cir. 2000), "Slabakis", the sole shareholder of the debtor and purported creditor of the Debtor filed an involuntary petition against the debt a day prior to a scheduled foreclosure sale, thereby frustrating the sale of the debtor's sole asset, a property located at 60 East 80th Street, NY, NY (the "Property").  The mortgagee ("Dorlexa") vacated the stay and completely its

foreclosure action and obtained a deficiency judgment against Slabakis.  The Trustee commenced an adversary action against Salbakis and various tenants in possession of apartments at the Property, who were alleged to have received below-market leases, on the eve of a foreclosure action on the Property, in order to destroy the value of the Property and force the mortgagee to sell the mortgage to Slabakis at a steep discount. Default judgments were entered against the tenants, etc. ("Judgments").   The Judgment debtors sought to vacate the Judgments. The Bankruptcy Court denied those applications after a hearing, and referred Slabakis's allegedly perjurious testimony in connection with the hearing to the U.S. Attorney's Office.  Concluding that recovery against the Judgment Debtors was unlikely, the Trustee then petitioned the Bankruptcy Court to sell the Judgments to Dorlexa $15,000 with a release by Dorlexa of the $1.2 million deficiency judgments against the estate.  Id. at112-113___ *113

The Bankruptcy Court dismissed the Debtor's motion to vacate the sale, and held that, under the applicable case law, the Debtor had no standing to object to the sale. In fact, it "had no more entitlement to notice [of the sale] than any other corporate entity in the world or any passerby in the street," In re 60 East 80th Street Equities, Inc., No. 96 B 20772 (Bankr. S.D.N.Y.  1999). The Debtor then appealed the Bankruptcy Court order denying the debtor's motion.  The District court affirmed the bankruptcy court ruling and sanctioned the debtor's counsel in connection with the appeal.  Id. At 114.   The 2nd Circuit dismissed debtor's challenges as completely "without merit." Id. at 115, holding that the debtor clearly lacked standing to challenge the sale and noting:

> It is well-established that a Chapter 7 debtor is a "party in interest" and has standing to object to a sale of the assets, or otherwise participate in litigation surrounding the assets of the estate, only if there could be a surplus after all creditors' claims are paid. See, e.g., L. King, Collier on Bankruptcy § 721.02[2] (15th ed. rev. 1996) (explaining that a Chapter 7 Trustee has a duty to provide notice to creditors of the Trustee's intention to use, sell, or lease property outside the normal course of the

debtor's prepetition business); id. at § 502.02[2][c] (stating that a debtor is a party in interest and has standing to object to a claim where there could be a surplus after all claims are paid); In re <u>Vebeliunas</u>, 231 *116 116 B.R. 181, 189-90 (Bankr. S.D.N.Y. 1999) (explaining that a debtor retains an equity security interest in the estate of the property only when the debtor can demonstrate that there would be a surplus for his estate), appeal dismissed, <u>246 B.R. 172</u> (S.D.N.Y. 2000); In re <u>Roussopoulos</u>, <u>198 B.R. 33</u>, 44 n.9 (E.D.N.Y. 1996) (noting that "an insolvent Chapter 7 debtor lacks standing to challenge a proposed sale of estate property because he lacks a pecuniary interest in such property"); cf. In re Gucci, <u>126 F.3d 380</u>, 388 (<u>2d Cir. 1997</u>) ("To have standing to appeal from a bankruptcy court ruling in this Circuit, an appellant must be an 'aggrieved person,' a person 'directly and adversely affected pecuniarily' by the challenged order of the bankruptcy court." (quoting <u>Kabro Assocs. v. Colony Hill Assocs.</u>, 111 F.3d 269, 273 (2d Cir. 1997)). Both the Bankruptcy Court and the District Court in this case found that there was "no evidence that a surplus is a reasonable possibility in these proceedings," App. at 653, <u>nor that the Debtor had any equitable interest whatsoever in the Judgments since the sole owner's fraudulent conduct undermined the value of the Debtor's sole asset and gave rise to the Judgments in the first place</u>.  218 F.3d at 115-116. (Emphasis Added).

**Likewise, Zilberman's fraudulent conduct in causing the Debtor to transfer millions of dollars to finance vehicles held in Adir Plaza's name, which he then caused to be transferred to GTS undermined the value of the Debtor's estate.  With the assets now being removed from the estate and turnover motions ignored, Zilberman made sure that the Debtor had no assets and therefor no surplus. He, with his cohorts, made this Debtor insolvent.  By virtue of its insolvency, there is no exception from both a legal and equitable standpoint.**

### B.  Even In A Case Involving An Individual With a Non Dischargeable Claim, The Court Conditioned Compliance On Turnover of All Assets

Reference is made to the attached unpublished decision of Bankruptcy Judge Richard L. Speer in <u>In re Linda Malsh</u>, (Bankr. ND. Oh June 12, 2009; attached hereto as Exhibit "1" which is instrumental in this case and consistent with the foregoing.  The <u>individual</u> debtor objected to the claim and the court recognized exceptions afforded individuals who have nondischargeable

debt and who would otherwise be liable but for the objection.  But the court refused to grant the

debtor relief as she had failed to turn over assets, ignoring court order:

> In his motion, the trustee related to the Court that the Debtor has yet to fully comply with this Court's order to turn over all nonexempt assets. To the extent this statement is true, the Court is not disposed to allow the Debtor to prosecute her objection to claims. <u>By objecting to the claims of her creditors, the Debtor, on the one hand, seeks the protection of a court order, while at the same time ignoring an order of the court. This is disingenuous and clearly constitutes an abuse of the bankruptcy process</u>. <u>Id</u> at 4. (Emphasis Added)

> Consequently, pursuant to 11 USC §105(a), the Court will not proceed to determine the merits of the Debtor's objection to claims 3 and 5 <u>until the Debtor has complied with this Court order of turnover</u>.  Furthermore, if the Debtor fails to timely comply with her obligation under the order of turnover, the Court will §105(a), grant the Trustee's Motion to Strike.  Id, at 4. (Emphasis Added)

### C. The Foregoing Rulings Are Consistent with, <u>Inter Alia</u>, The Goals of Bankruptcy, of Promoting Equality of Distribution of <u>Estate Assets, Compliance with Turnover Provisions and Other Sections, Such as §502(d)</u>

In a similar vein, §502(d) precludes an entity (such as a creditor) from which property is

recoverable or that is a transferee of an avoidable transfer (such as a preference or fraudulent

transfer or a turnover proceeding), from sharing in the distribution of estate assets unless and

until such property or voidable transfer has been returned to the estate. Section 502(d) provides:

> Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title. 11 USC §502(d).

 Notably, Zilberman is not a creditor and did not file a proof of claim, but even if he were,

he would be entitled to no recovery on account of its claim until he returned all of the property of

the estate he squandered and also complied with the Turnover Order.

## CONCLUSION

WHEREFORE, Digby respectfully requests that its Requested Relief be granted and any such other and further relief as it deems just and proper.

Dated: New York, New York
      January 9, 2014

*/s/ Barbie Lieber*
Barbie Lieber (BDL 5891)
Lieber & Lieber, LLP
60 East 42nd Street, Suite 2222
New York, New York 10165
Phone:  (212) 949-5586
Fax:  (212) 949-5586