Barbie D. Lieber, Esq.
Lieber & Lieber, LLP
60 East 42nd Street, Suite 2222
New York, New York 10165
Phone:  (212) 949-5586
Counsel to Digby Adler Group, LLC d/b/a/ Bandago

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------- x
In re IMAGE RENT A CAR, INC.,                    Case No. 1-11-42390 NHL

                    Debtor.                          Adv. Pro. No. 12-01288 (NHL)
--------------------------------------------------------------X

## Affirmation in Reply to Trustee's Response to Digby's Motion to Dismiss

Barbie D. Lieber, of Lieber & Lieber, Esq., counsel to Digby Adler Group LLC d/b/a

Bandago ("Digby;" the Debtor's <u>sole</u> unsecured creditor to have filed a proof of claim;  **the**

**"largest unsecured creditor account[ing] for over 98.5% of the creditor body," <u>according to</u>**

**<u>the</u> Trustee** in para.13 of his motion to approve settlement dated July 12, 2013 (the "Settlement

Motion"); and  whose federal trademark litigation against the Debtor and its sole shareholder),

Schneior Zilberman ("Zilberman"), admittedly precipitated the filing of the bankruptcy case),

files this affirmation  in reply to the Trustee's Response (the "Response") to Digby's Cross

Motion to Dismiss the case (the Dismiss Motion").   The Trustee does not deny that this Court

should refer this matter to the US Attorney for investigation.    It does not deny the fraud and

concealment that has been alleged.  The Trustee is seeking to prevent the dismissal of this case,

despite that this is not the "honest but unfortunate debtor" the Bankruptcy Code was intended to protect.

This Debtor, which concealed transfers, assets and other pertinent information and admittedly

used this case to thwart the Trademark Action, does not deserve the continued protection.

<u>Marrama v. Citizens Bank of Massachusetts</u>, 549 US 365, 127 S. Ct.1105, 1107 (2007).

## This Court Should Strike Trustee's Response As It Is Untimely

1.      Local Rule 9006-1(a)(ii) required the Trustee to file opposition papers within seven (7) days prior to the hearing.   I received an email from Jordan Pilevsky's paralegal, yesterday at 4:51pm attaching the Trustee's Response and advising me that I would be eceiving a hard copy via Federal Express today.   There is absolutely no excuse for the Trustee's failure to file opposition to the Dismiss Motion  two days prior to the scheduled hearing, given that he has had six months to have filed same. As such, Digby requests that it be stricken and the Dismiss Motion be granted because it is evident that the Trustee never had and does not have any intention to aggressively litigate the case against Defendants and as set forth below, all of the factors necessary for dismissal are relevant here.

## The Trustee Fails to Refute any Facts that Justify Dismissal of the Case

2.      In their Response, the Trustee (like the Debtor and Defendants in their opposition papers) do **not** dispute the facts reflecting deceit, fraud and concealment in this case.  He cannot as the fraud is now documented by Zilberman himself in his deposition and by the bank records, DMV documents and the blank and skeletal petition, schedules and statement of financial affairs. The Debtor admits to filing the case to prevent Dibgy's litigation from moving forward.  (see Strike Motion).  Instead, he simply asserts that the case shouldn't be dismissed as Digby has "actively participated" in this case.  That Digby "actively participated" does not constitute a factor for dismissal. (Indeed, as set forth below, Digby's active participation, including its unearthing of incriminating information, caused the Trustee to seek the retention of Digby's prior counsel so that he could commence and actively pursue the Avoidance Action; the trustee now seeks to settle for a fraction.   But for the Trustee's actions, Digby would have moved to dismiss years back.)   In In re Lombardo, 370 B.R. 506, 512-13 (E.D.N.Y. 2007), Judge Eisenberg considered the

following factors, most commonly considered by courts in determining the existence of "cause" to dismiss a case under § 707(a).  <u>In re Griffieth</u> 209 B.R. 823, 827 (Bankr. N.D.N.Y. 1996) (first 6 factors); <u>In re O'Brien</u>, 328 B.R. 669, 675 (W.D.N.Y. 2005) (last 8 factors).

**<u>The factors and as they are applied to this case warrant dismissal:</u>**

"**(1) the debtor's manipulations having the effect of frustrating one particular creditor**." Yes.

"**(2) the absence of an attempt to pay creditors.**"  Yes.

"**(3) the debtor's failure to make significant lifestyle changes.**"  N/A.

"**(4) the debtor has sufficient resources to pay substantial portion of debts.**"  No, because of the Transfers.

"**(5) the debtor inflates expenses to disguise financial well-being." Yes**.  Schedule F was inflated.  No claims other than Digby's were filed.  No meaningful books and records (other than an incomplete set of bank statements for just one of the Debtor's accounts), or tax returns were turned over to verify or ascertain expenses.  By virtue of the asset transfers to Zilberman's company, Adir Plaza, and Naim (via newly formed GTS), the Debtor's well-being was destroyed. Now uncle Naim gets to continue the Debtor's business (with the assistance of the Debtor's secretary and officer Grey (Tr. 54) who facilitated the transfers Tr.77-78) using the name "Image Rent A Car" and the Debtor's location, phone number and website, Tr. 55, 77:13.  Zilberman testified to currently working with uncle Naim in Naim's moving company. Tr.61.  Further, by transferring the assets to Naim, Zilberman could be assured that a line of credit guaranteed by him (Tr. 40) would be paid by the continuation of car sales and rentals. Tr. 53.  Further, Zilberman arranged for the purchase of real property in the name of Adir Plaza (which was completely dependent on the Debtor for funds) and then transferred that property to a company formed by him

and then to Naim. Tr. 47-49.  Thus, the Debtor's well-being was destroyed while preserving Zilberman's.

**"(6) the debtor is overutilizing protections of the Bankruptcy Code to the unconscionable detriment of creditors."**  Yes.  Digby has been significantly prejudiced by this Bankruptcy, in terms of delay and expense.  It is headquartered in California and brought suit there, alleging that the Debtor engaged in trademark and copyright infringement and cybersquatting.  Digby spent an inordinate amount of time and expense in the Trademark Action which has been halted by virtue of this bankruptcy.   Zilberman has used this bankruptcy to shield himself and conceal fraud, after the District Court allowed Digby to name him and his brother in law Sebag personally in the Trademark Action and after the District Court denied three (3) motions of  Defendants to dismiss and change venue.

**"(7) the debtor reduced his creditors to a single creditor in the months prior to the filing of the petition."**  Digby is the only unsecured creditor to have filed a claim.  Priority tax claims amount to only approximately $4,000.

**"(8) the debtor filed in response to a judgment, pending litigation or collection action."**  Yes, as admitted by Defendants' counsel in open court and in Zilberman's deposition.

**"(9) there is an intent to avoid a large single debt**."  Yes, as admitted by Zilberman and his counsel and they continue to do so in their Response to the Strike Motion (defined below).

 **"(10) the debtor transferred assets**."  Yes, to Adir Plaza (a shell company owned by Zilberman without any employees and which had no independent operations (Tr. 41, 44) and to newly formed GTS (allegedly controlled by uncle Naim) without documentation, including any documented consideration.

 **"(11) the debtor is paying debts to insiders."**  Yes, Zilberman testified to paying brother-in-law

Sebag approximately half of the $300,000 he allegedly put into the business (there's also a payment reflected on the bank statements of $100,000 to Sebag), as well as paying himself any purported cash he received from the transfer of assets, and taking a $1,500 a week salary while bleeding the company. Zilberman testified thatthe Debtor paid the expenses of his shell company, Adir Plaza, including its lenders and insurance.

 **"(12) the debtor failed to make candid and full disclosure."** Yes, not even the millions of dollars of monetary transfers to Adir Plaza, let alone the transfers of its name, website and vehicles to uncle Naim (via newly formed GTS,) were disclosed.

 **"(13) the debts are modest in relation to assets and income."** Yes. Other Digby's, there are virtually no debts. The assets and income were transferred to insider controlled entities .

 **"(14) there are multiple bankruptcy filings or other procedural 'gymnastics.'"** N/A.

 **"(15) the unfairness of the use of Chapter 7."** Yes, completely. Zilberman and defendants (without ever filing for bankruptcy) have used this Court for three years to prevent Digby from prosecuting its claims in California, where all of Digby's non-party witnesses reside and when Digby has already spent tremendous time and expense. <u>The Debtor filed a year after the Trademark Action commenced, after it was defeated on its motions to dismiss or change venue and just days after the District Court granted Digby's motion to add Zilberman and Sebag as individual defendants on the basis that they are *alter egos* of the Debtor</u>. The filing also occurred while Digby's second motion to compel the turnover of records and seek sanctions for non-compliance was sub judice.

     3.     Even though courts dismiss cases when only some of the factors are present, <u>see</u> <u>Lombardo</u> 370 B.R. 506, **here, <u>all</u> applicable factors are present**. Dismissal is appropriate when a debtor has used the bankruptcy filing with the "intention to avoid a large single debt *based on*

*conduct akin to fraud, misconduct, or gross negligence*." <u>Lombardo</u>, citing <u>In re Zick</u>, 931 F.2d

1124, 1129 (6th Cir.1991) (emphasis added).  Image Rent A Car is an example of an "egregious

case that entail[s] concealed or misrepresented assets and/or sources of income…and intention to

avoid a large single debt based on conduct akin to fraud, misconduct or gross negligence" and thus

warrants dismissal.  <u>Zick</u>, 931 F.2d at 1129.

    4.    In <u>Lombardo</u>, in furtherance of ensuring that "honest but unfortunate debtors"

obtain fresh starts, as enunciated by <u>Marrama v. Citizens Bank of Massachusetts</u>, 127 S.Ct. at

1107, Judge Eisenberg dismissed the case of a debtor who the judge found filed the case to

prevent her matrimonial attorney's attempts to collect on her outstanding legal fees.[1]  The

<u>Lombardo</u> court also noted that the Debtor did <u>not</u> refute the allegations raised by her attorney in

seeking the dismissal, despite "that [the] burden shift[s] to the debtor to prove her good faith"

"where a pa[r]ty calls into question a debtor's good faith and the party has met the burden of

showing cause for dismissal."  <u>Id</u>. citing *In re Tamecki,* 229 F.3d at 207.  The Lombardo court

held that:

> "<u>the Debtor has not shown that her bankruptcy petition was filed in good faith</u> with an effort to obtain a fresh start and that her Chapter 7 case should not be dismissed." "The Debtor has <u>not filed any written response to the Motion</u> or any pretrial statement nor has she appeared to testify in her own defense or to refute any *514 of Verkowitz's allegations as set forth in the Motion and pre-trial statement. **Therefore, the Court accepts Verkowitz's testimony as true.**  Moreover, any factual assertions made by Debtor's counsel at the hearing with regard to the Debtor's motives for filing for bankruptcy relief and good faith are merely argument in the absence of the Debtor's testimony or evidence." Id. at 513-514. (Emphasis Added).

    5.    Likewise, other than asserting that Digby "actively participated" in this case, in its

Response, the Trustee (like Defendants and the Debtor) <u>did not dispute any of the factual</u>

---

[1] <u>In re Marino</u>, 388 B.R. 379 (Bankr. E.D. N.C 2008) (following <u>Lombardo</u>, dismissing case finding that that "bankruptcy was timed to preclude the arbitration and its primary purpose is to avoid her obligation" to creditor law firm.)

<u>allegations in support of the Dismiss Motion relating to fraud and concealment</u>.  Again, they can't, given Zilberman's testimony at his deposition, as well as bank statements, DMV documents, blank statements and schedules, Grey's email regarding civil and criminal fraud and failure to turnover books and records, etc.

6.    In <u>Desiderio, v. Parikh, (In re Parikh),</u> 456 B.R. 4 (Bankr. EDNY 2011), Judge Grossman found that bad faith pursuant to §707(a) was established where the plaintiff alleged that the Debtor fraudulently transferred assets within the year preceding the bankruptcy filing with the intent of defrauding creditors; failed to preserve financial records from which his financial condition or business transactions could be examined; knowingly and fraudulently omitted assets and liabilities from his schedules and statements; knowingly gave false testimony  at the §341 meeting; failed to satisfactorily explain the loss of assets sufficient to meet his liabilities; and failed to obey a lawful order of this Court.  The court held that:

   "the Debtor has without question exhibited a <u>reckless disregard for the veracity of the information contained in his petition, schedule and statements</u> such that this court can only conclude that the omissions and misstatements contained in the Debtor's written filings and in his section 341 meeting testimony <u>was material, knowing and done with fraudulent intent…and that dismissal under section 707(a) is warranted</u>" <u>Id</u>. At 25-26.(Emphasis Added)

7.    As the debtor in the above-referenced case was an individual, and the creditor sought the denial of discharge or the dismissal of the case, the court was able to grant the creditor a denial of discharge.  However, here, there is no right as this involves a case of a corporation, and not an individual.  Accordingly, dismissal is warranted.

**The Trustee's Rebuttal -"Active Participation" by Digby-Is Not A Factor, But Nevertheless Caused the Trustee To Seek to Retain Digby's Counsel and Enabled Him to Commence the 26 Count and 35 page Avoidance Action From Which The Trustee And His Counsel Now Seek to Benefit**

8.       The Trustee asserts in paragraphs 11 and 12 of their Response that the Dismissal Motion should be denied as Digby has "actively participated in the proceedings since the initial 341 meeting and that Digby has requested that the Trustee and counsel perform additional services and tasks in connection with the Adversary Action."  <u>This does **not** constitute one of the 14 factors reflected below.</u>

9.       Nevertheless, the foregoing is extremely <u>disingenuous</u>.  Digby did what any plaintiff in a contentious prepetition federal court litigation would have done when its defendant filed for bankruptcy after a year of litigating:  investigate the bona fides of the filing.   As averred in the Laguana Affidavit, it was difficult because this Debtor was not forthright and concealed information.

10.       Ms. Laguana also explained to me and as evidenced by the docket and court transcripts, that it was also difficult because the Trustee did not appear to take an active role in investigating the affairs of the Debtor and ensuring its compliance with the turnover provisions, despite §§704 and 542(a), pleased to sit back and allow Digby to incur that expense and time of seeking 2004 orders and examinations and motions to compel discovery.  Indeed, as revealed by a transcript of a hearing on Digby's 2004 motion, the Trustee was not present and although Judge Bernstein invited him to attend, my client advised me he did not.  As reflected in the Laguana Affidavit, <u>after Digby had unearthed incriminating information and spent tremendous time and expense, the Trustee requested that Digby relieve Daniel Gershburg as its counsel so that he could retain him to commence action and prosecute same against Defendants.</u>  Mr. Laguana has averred

that:

> "[B]eing that the Debtor listed a number of purported "creditors" on the petition and concealed and/or falsified other information contained therein (that had to be proven false), it would have been premature to move to dismiss the bankruptcy case following the bankruptcy. When it was becoming apparent (after Digby's investigation) that this was only a 2 party case involving a fraudulent petition and with one unsecured creditor (to wit, Digby), it was in or about that time that the Trustee requested that he retain my own counsel to aggressively litigate." ¶19 Laguana Affidavit.

> "Had I known that the Trustee would not complete his investigation and prosecute the Adversary Action, I would have never agreed to relieve Mr. Gershburg as Digby's counsel and would have moved to dismiss the case, especially when it was becoming apparent that Digby was the only creditor and the petition, schedules and statement of financial affairs contained false information and concealed other information, as set forth below." ¶20 Laguana Affidavit.

11.     By virtue of Mr. Gershburg's engagement, Mr. Gershburg was able to use the facts he obtained  (**at Digby's expense**) from previously representing Digby in Bankruptcy Court and the facts and documents filed in the Trademark Action to draft **a 26 Count, 35 page Complaint**, commencing the Avoidance Action.  **It is egregious for the Trustee to now complain that Digby actively participated in the case, when the Trustee seeks to benefit from that participation by entering into a very low and tenuous settlement of the Adversary Action so that he can pay**

**his commission and legal fees and costs.** [2]   This conduct is not condoned by Courts.  <u>See In re</u>

<u>Meyers</u>, 425 B.R. 296 (Bankr. S.D. Miss. 2010) (denying settlement with the debtor which

contemplated (a) settling an action (the "Bankruptcy Action") by the trustee against the debtor for

recovery of monies transferred and for a declaratory judgment that the assets of a company

"Infinity" owned by debtor constituted property of the estate on the basis that it was a mere

continuation the debtor's d/b/a "P/L" (same employees, same address, same phone number and

insurance) and as such a "successor in interest," and (b) allowing the debtor to litigate a pending

action in District Court (the "District Court Action") against its insurer (which (i) denied coverage

to Infinity, claiming that it insured P/L and not Infinity, (ii)  had counterclaims against  the debtor

(the insured) for unlawfully diverting funds to Infinity, and (iii) had  asserted that the District

Court Action belonged not to the debtor, but to the trustee, as property of the estate on the basis

that Infinity was really a "successor in interest" to P&L).  The court questioned how the trustee

---

[2] Digby filed its Dismiss Motion after it became apparent that the Trustee was entering into a settlement with defendants for only $120,000 (an amount equal to **<u>less than ½ of one months' revenue, approximately 4 PERCENT of the approximate annualized revenues of the Debtor of $2,931,536; and equal to only 2.8 PERCENT</u>** of the **$4,283,419** in monetary transfers sought to be recovered via the Adversary Action;payable over 2 years without any collateral to secure same, with 4 opportunities to default after written notice; and  which if paid, would be substantially exhausted by the Trustee's professional fees, expenses, commission and administrative claims), when (a) the Trustee was **suing defendants** for "<u>not less than</u> **$3,486,165,"** plus other damages and co-founder **<u>Sebag alone fraudulently received</u> <u>$100,000</u>** as evidenced on a bank statement; (b) the **Trustee had <u>not</u> yet deposed Zilberman** or **<u>obtained the turnover</u>** of critical missing documents (or vehicles) or subpoenaed third parties for same, such as banks and the DMV, so as to fully assess the relationship between the parties, the players involved and the transactions among them, as well as the magnitude and identity of the assets actually transferred, to allow for an informed decision as to the probability of success of the litigation; and (c) **the Trustee had retained Daniel Gershburg, Esq., as special counsel**, who was **ready, willing and able** to litigate the action, and was confident in the case.  The Trustee did not have to have his main bankruptcy counsel involved in the litigation or the resolution of same.

could settle her successor in interest claim against the debtor when although she reviewed the

pleadings in the District Court Action (which was considering the same successor in interest

arguments alleged by the trustee in the Bankruptcy Action ) and had spoken to opposing counsel,

she had not reviewed  "transcripts from depositions" and certain other documents in the District

Court Action (Id. at 305-306) so to properly assess and allow the Court to assess the probability of

her success  in pursuing the successor in interest claims against the debtor in Bankruptcy Court. Id.

at 305.  The Court also noted that the insurer's counsel who had been litigating this precise issue

(and who believed the position to be strong, like Daniel Gershburg, Esq. here) had offered to

represent the trustee as special counsel in the prosecution of the successor in interest claim.  The

court also found that the settlement was too contingent to approve, as there was no certainty that

payments would actually be recovered under the proposed agreement, just as there would be no

assurance that Defendants here would ultimately pay any future settlement installment.); In re

Remsen Partners, Ltd., 294 B.R. 557 (Bankr. S.D.N.Y 2003) (denying settlement that would have

paid all or substantially all of the settlement proceeds to attorneys and administrative expenses).

  12. The Trustee's counsel has the audacity to suggest that Digby "has failed and/

or refused to conduct any discovery." **That is absolutely false as set forth below. As set forth**

**above and below, the Trustee and his counsel have exhibited a pattern of wanting to reap the**

**benefits of the Avoidance Action without having to spend their own time and expense,**

**despite that such action belongs to  Trustee, and not Digby, who is empowered  to prosecute a**

**§544(b) avoidance action**  (and most recently, the Trustee tries to latch onto the Debtor's Claims

Objection which was made without standing).

 13. Following the Dismiss Motion, Digby spent countless unearthing and sharing

information with the Trustee and his counsel (via email and conference calls) further highlighting

facts and forwarding documents that they had not necessarily considered when the Trustee entered into the settlement. <u>Given the foregoing and substantive objections raised in the Dismiss Motion (as well as the corporate authority issues) and Digby and I thought that the Trustee was reconsidering its position to settle and was starting to express an interest in prosecuting the action</u>. The Trustee requested that Digby adjourn the Dismiss Motion. There was no reason to adjourn the hearing on the Dismiss Motion unless the Trustee evidenced steps toward prosecuting the action. Accordingly, Digby conditioned its adjournment on the Trustee's agreement to depose Zilberman. Although the Trustee seems to object that Digby did not actually conduct the deposition, it was not its place to. Digby is not the Trustee and was not afforded the right pursuant to §§544(a) and 550 to bring the Avoidance Action.[3] In hindsight, I should have been suspicious of the Trustee's counsel's true intentions when after the Trustee agreed during a conference call to conduct the deposition on which basis I adjourned, Mr. Pilevsky notified me that I should be the one to conduct the deposition, which was inappropriate as I am not the trustee. After threatening to advise the court and proceed forward with the deposition, Trustee's counsel agreed to conduct the deposition.

14.    But nevertheless, it was ***Digby's* active participation (and discovery)** that enabled

---

[3] The Trustee complains of legal fees and costs. The Trustee chose to have 3 counsel present at Zilberman's Deposition (Messrs. Gershburg, Pilevsky and Herbst). No one forced the trustee to hire Digby's counsel and commence the Avoidance Action in the first place. If he did not, Digby would have made the Dismiss Motion years back**.** Further, given its complaint about legal fees and costs, at this point, the $120,000 proposed settlement would probably only cover his legal fees and commissions and not much more. **These post settlement legal fees and expenses were incurred by Trustee's counsel when it appeared that the Trustee had decided instead to pursue the Avoidance Action and not the settlement (and Digby was granting the Trustee's requests for adjournments of the Dismiss Motion based upon such understanding).** This has come to an abrupt halt (despite the incriminating testimony), including the abandonment of Naim's and Grey' scheduled depositions after they failed to show**. The Trustee's counsel should disclose their total fees.**

the Trustee to depose **Zilberman and obtain incriminating testimony**. (Outrageously, as of the date of the Dismiss Motion on July 31, 2013, the Trustee never even deposed Zilberman on the bank statements, or otherwise, let alone moved for a contempt order. This is true notwithstanding that the Avoidance Action was filed in October 2012 and that the answer was filed  December 12, 2012.)  It was Digby and **not** the Trustee who ordered and paid for thousands of pages of DMV records (including DMV registration, title and application documents).   The trustee never subpoenaed these documents. (Similarly, it was through Digby's efforts and expense (via Mr. Gershburg ) that the bank statements that were attached to the Exhibit Binder were obtained.)   It was Digby  (at its own cost) which obtained thousands of pages of  DMV documents and reviewed, synthesized and explained them to the Trustee to facilitate the Avoidcance Action..   It was Digby and I who had conference calls with the Trustee and his counsel sharing and explaining  (both verbally and visually) what we had uncovered.

      15.    **The news was startling**:  Connie Grey (the Debtor's secretary) was signing vehicle transfer documents as an officer of the Debtor, Adir Plaza and GTS so as to facilitate the transfers of vehicles by the Debtor and Adir Plaza to GTS.   There were multitudes of vehicles transferred by the Debtor and Adir Plaza to GTS for no stated consideration on the DMV documents, except for one transfer revealing a $6,000.  The Liens on the cars were paid off at the time of transfer.  Digby discovered that GTS filed an Assumed Name Certification with the NYS Department of State on May 4, 2010 (Exh. C, page 14/93), whereby GTS assumed the name Image Rent A Car, which certificate the parties egregiously used to facilitate car transfers from the Debtor to GTS, leading the DMV to believe that the Debtor and GTS were the same company, to wit, only a name change was involved, and as such, no fees, taxes etc. would be required. See fn. 17. Exh. C:  "Vehicle 2" pp 9-17.  (Notably the Debtors and Defendants do not even refute these facts in their Response.

They cannot; given the testimony and the documents.) A more complete revelation of the egregious facts that emerged is included in Digby's motion to strike the Debtor's Claims Objection, Supplement the Dismiss Motion and Request that the Court refer the matter to the US Attorney for investigation (the "Strike Motion) made part hereof.  Among other things, Digby also supplied the Trustee with state court complaints that David Baksht had forwarded to Digby, including one entitled <u>Jaehyuum Kim and Jaesin Cho. V. Image-Rent-A Car AKA Group Travel Solutions, Inc.</u> [4]  Also uncovered from David Bashkt was an email from Grey a month before the filing, relaying concerns about civil and criminal liability for fraud in response to a "propos[al] [to] mov[e] assets from Image just prior to the filing." <u>See</u> **EB Exh. G.**  **It had now become clear from the documents obtained that the Debtor, Adir Plaza and GTS were in actually one company and alter egos of each other and GTS was simply continuing the operations of the Debtor at its address, with its phone number and name and with the assistance of the Debtor's secretary, Grey.**

      16.     It was Digby who made charts, summaries and pleadings etc., available on

---

[4] David Baksht aka Lipsker  (who formed GTS and who is its owner and CEO according to the NY Secretary of State, but whose operations were taken over without Mr. Lipsker's consent by Zilberman's uncle Philippe Naim) was  also extremely helpful to Digby and me by supplying us with documents (including, but not limited to state court complaints filed against <u>"Image Rent A Car, Inc.  doing business as Group Travel Solutions", as well as the incriminating email from Connie Grey referring to fraudulent transfers and civil and criminal fraud)</u>  and additional information that evidenced fraud, which Trustee's counsel referred to in Zilberman's deposition. <u>Despite the Trustee's assertions to the contrary, Mr. Basksht was available to speak to the Trustee and wanted to (he'd contact me asking why they hadn't called him).</u>   As a religious man, he simply was not able to meet on certain days which were religious holidays.  Notably, during a conference call on September 11, 2013, the Trustee expressed difficulty in reaching Mr. Baksht. I responded that I never had such difficulty and questioned whether they were sending emails rather than calling, which they were. I advised them to try calling.  <u>Further, at during the conference call, the Trustee said meeting with Basksht was not really necessary.</u>

"Google Docs" so as to facilitate the Trustee's deposition of Ziblerman.  Digby and I sent

questions to the Trustee's counsel so as to facilitate his questioning of Zilberman.  I created a

summary of the transcript of the 2004 exam to facilitate the Trustee's questions., etc.   In the week

prior to the deposition, Digby and I vigorously provided information to Mr. Pilevsky to help

prepare him for the deposition.  From the information contained in the DMV documents (coupled

with the bank statements and other new documents), the complete story was emerging and the

fraud was now palpable.

17.    <u>The new evidence evidenced such egregious behavior that not only did Jordan

Pilevsky attend the deposition, but so did Gary Herbst, Daniel Gershburg and the Trustee</u>. I was

invited by the Trustee to attend the deposition, but Zilberman refused to testify if I continued to

stay. So I left, but kept emailing information to the Trustee for him to convey to Mr. Pilevsky who

was conducting the deposition (even though Daniel Gershburg was retained as special counsel to

prosecute the litigation.)   **Following the deposition, Mr. Laguana and I spoke to Messrs.**

**Herbst, Pilevsky, Gershburg and Messer who were on speaker phone and spoke excitingly as**

**to the incriminating testimony, indicating that Digby was right--"<u>Zilberman admitted to</u>**

**<u>everything</u>"** and further stated Zilberman could not provide any evidence documenting the

transfers or money paid. The companies were operating as one.  The Trustee commented that he

was "in and out" of the deposition but could see that they got a lot of good information.

18.    <u>Given Zilberman's admissions during his deposition and the DMV documents (and

the vulnerable nature of the vehicles which could be sold off)</u>, **I would have anticipated any**

**trustee to jump at the opportunity to file a motion for summary judgment**.  I would have also

expected a trustee to have expedited the transcript (which it did not) and sought <u>(a) a</u> **declaratory**

**judgment** that the property (including the vehicles) of Adir Plaza and GTS/Naim (which were

paid for by the Debtor, as well as all of the Debtor's other property, including but not limited to its name, website and customer lists, etc. and revenues etc. ) are property of the estate on the basis that they were successor in interests and/or alter egos of the Debtor (and/or that the companies should be substantively consolidated); (b) **emergency relief** ensuring that no further transfers of vehicles of GTS or Naim occur as the estate is diminished daily (and has been for the last 3 years through sales reflected in DMV documents) and requiring that the revenue be forwarded to the Trustee; (c) **add as defendants Grey** (who signed vehicle transfer documents in an official capacity for the Debtor and the transferees, and who, in breach of her fiduciary duties, deepened the insolvency of the Debtor given Zilberman's testimony) **and Naim**, who Zilberman refers to interchangeably with GTS, and who is now apparently operating the rent a car business as "Image Rent a Car" at the Debtor's location, and (**despite Zilberman's admission that there was no documented consideration other than cash given by Naim to Zilberman personally**) also works with Zilberman at Naim's moving company.

19.     This never occurred despite my requests to do so and despite my emails to Trustee's counsel that Mr. Bashkt was reporting that vehicles were being sold off the lots quickly since the deposition. (Further, my client and I found it perplexing that although the Trustee served a subpoena and notice of deposition on Grey and Naim, respectively, Mr. Pilevsky granted numerous liberal adjournments to Grey and Naim.) Meanwhile, to deflect attention away from themselves, Defendants filed a claims objection, objecting to Digby's claim. At the "final adjournment," Mr. Pilevsky advised me via email that Naim failed to show as he was supposedly "out of the country." Grey simply did not show. The Trustee never sought to compel their appearance. The Trustee must have thought that the depositions of Grey and Naim were important

. Why give it up? )[5]  The Trustee's counsel clearly lost interest  and my client's willingness to

continuously adjourn the Dimiss Motion at the Trustee's counsel's requesting  believing that the

Trustee had not lost interest unfortunately resulted in further delay and prejudice to my client.  <u>My</u>

<u>client feels used, to say the least. Clearly, my client has wasted months as the Trustee wants to</u>

<u>settle after all</u>.

      20.    <u>The Trustee reflects in paragraph 7 that "after concluding the deposition, and</u>

<u>reviewing documents relating to the Debtor's pre-petition financial affairs, it was clear that the</u>

<u>settlement memorialized in the Stipulation was one which exceeded the 'lowest point of</u>

<u>reasonableness.'"</u>  They assert that the transfers described in the depositions were the very

transfers the trustee sought to avoid and recover.   **<u>That completely undermines the</u>**

**<u>documentary evidence obtained evidencing the transfers.   It completely undermines the</u>**

**<u>critical prong "the likelihood of success in the litigation</u>**."   <u>Prior to Digby's unearthing of the</u>

<u>DMV documents, and other documents, including Grey's email, the Trustee had nothing concrete.</u>

**<u>Now, not only do the DMV documents evidence the fraudulent nature of the transfers,</u>**

**<u>(whereby  the same signatories are signing on behalf of transferor and transferee, for no</u>**

**<u>consideration, etc.), but also that the transferee entities/Naim are successor in interest</u>**

---

[5] The Trustee continues to seek approval of a settlement agreement.  The Trustee seems fine with the fact that Naim ignored the date for the initial deposition and all adjourned dates and that Naim is now "**out of the country**."  The Trustee could have brought on a motion to compel his attendance, but chose not to, just as he failed to bring a motion for contempt for the Debtor's failure to comply with the Turnover Order.   <u>Given the NY State Secretary filings, which make no reference to Naim, the fact that  Naim ended up with the Debtor's business, including the vehicles purchased by it, along with real property, and the fact that that Naim still has not been deposed,</u> **it is egregious that the Trustee is still seeking approval of a settlement**.  It is also egregious that the Trustee is completely fine with the fact that Grey ignored his subpoena to attend the scheduled deposition.  Why were the notices and subpoenas sent at all?  In a similar vein, why bother to commence a 26 count action, conduct no discovery (not even of Zilberman and move to contempt if the plan was to rush to settle for 2.8%?

**companies and/or alter egos**.  The testimony paved the way for the Trustee to seek and obtain a

declaratory judgment that the vehicles and the business revenue belong to the Debtor.  The

testimony paved the way for a motion for summary judgment. The Trustee failed to disclose to the

Court the facts underlying the Avoidance Action that he was seeking to settle.  He simply listed

the factors for approval of the proposed settlement. Now the facts are much more compelling in

the Trustee's favor (and against Defendants) given the documentary evidence obtained.  Further,

the Trustee completely ignores that Mr. Gershburg was willing, ready and able to prosecute this

action and that is why my client agreed to relieve him as its counsel.   Although the Trustee seems

to worry about fees, the Trustee did not have to have both its main and special counsel engage in

services related to litigation.   Mr. Gershburg strongly believed in the case and was willing to take

on the risk.  And if the Trustee had deposed Zilberman prior to commencing the Avoidance

Action or shortly thereafter, undoubtedly, the Trustee would not have reached the settlement he

did and would not have had his attorneys spend time on drafting the short settlement agreement.

This case should be dismissed.  The settlement fails just as it did in In re Meyers, 425 B.R. 296

(Bankr. S.D. Miss. 2010) where the trustee failed to consider and give adequate weight to

deposition testimony and where the Trustee had attorneys who were willing to act as special

counsel and take on the risks of litigation. **There is no purpose to this Fraudulent Case.**

     21.    It is also disturbing that the Trustee states that Digby's claim should be determined

when (a) in  three (3) years, the Trustee never filed a claims objection objecting to such claim and

as such it is deemed "allowed"  under §502 (a), (b) the Trustee used Digby's claims and its

Trademark Litigation as the basis for its $4 million 26 count, 36 page law suit, and (c) the Trustee

is aware that Zilberman  testified to disposing of records and averring that no books and records

are now in existence (meaning that Zilberman has spoiled the very evidence that it needs to prove

its actual damages for trademark infringement, cybersquatting and copyright infringement, such as customer lists by name and email (and the amount each customer spent), bank statements from all accounts, tax returns, financial statements reflecting, revenue/profit, etc.).   Indeed, the Trustee has stated in para. 13 of its Settlement Motion that Digby is the **"largest unsecured creditor account[ing] for over 98.5% of the creditor body," according to the Trustee."** (Emphasis Added.).

22.    Further, the **Trustee's position is inconsistent with §§544 and 550 and case law**. The Supreme Court in <u>Moore v. Bay</u>, 284 U.S. 4 (1931) and courts interpreting sections 544(b) (1) and 550 (a) of the Code unanimously **reject** any arguments that the property that is the subject to avoidance actions is to be limited by creditor's claims.   The Estate is to be restored to the position it was in prior to the transfers, regardless of the number and amounts.  <u>Moore v. Bay</u>, 284 U.S.4 (1931), <u>FBN Food Servs.</u>, 1995 U. S. Dist. Lexis at, 5012-5013; <u>Manshul Constr. Corp</u>, 223 B.R. 428 (Bankr. S.D.N. Y 1998); <u>Stalnaker v. DLC, Ltd. (In re DLC, Ltd.)</u>, 295 B.R. 593, 606 (8th Cir. App. Panel 2003);  <u>Committee of Unsec. Creditors of Interstate Cigar Co., Inc. v. Interstate Distrib. Inc. (In re Interstate Cigar Corp., Inc.)</u> 278 B.R.8, 18 (Bankr. E.D.N.Y. 2002);In <u>Acequia, Inc. v. Clinton (In re Acequia, Inc.)</u>, 34 F.3d 800 (9th Cir. 1994).  <u>See</u> Digby's Reply dated February 2, 2014 (incorporated herein and made part hereof) to responsive papers filed by the Debtor and Defendants) for a full discussion of the foregoing.

23.    The foregoing rules allow trustees to focus their attentions on restoring the estate to where it should have been prior to the transfers, also consistent with the trustee's obligations pursuant to §704. As reflected in the cases above, the claims adjudication process is distinct and separate from its obligation to collect and reduce to judgment property of the estate. Section 704 does not even require that a trustee object to any particular claims.   From the bank account

statements produced for the Chase account ending in no. 1611, covering January 2009 to May 2, 2010 (and excluding April 2010 as that statement was never turned over), the Debtor **deposited** the sum of **$3,583,264.92**.  In March 2010 alone, the Debtor deposited $244,265.00. The April statement is notably missing. Two months later in May 2010 (only 10 months prior to the bankruptcy), the account shows only $6,781 in deposits, and the balance had **dwindled** **to** **less** **than** **$3,000**.   No attempt has been made to restore this estate, not even the filing a motion for contempt relating to the Turn Over Order.   The Trustee should be acting in the interests of the creditor in furtherance of his fiduciary duties, not himself, the Debtor and the Defendants.

24.    Finally, despite the prejudice (substantial delay and costs) that Digby has suffered, believing that the Trustee would actually litigate the very action it agreed to relieve its former counsel to prosecute, <u>the Trustee continues to oppose the dismissal and justify its abominably low settlement by asserting that Digby has had recourse in the District Court is not true.</u>   <u>The Trustee completely ignores the order of the District Court which issued a stay of the entire action; the filing by Digby of a motion with the District Court seeking the lift the stay with regard to the individual defendants; and the Order of the District Court denying Digby's motion, on grounds of "judicial economy" leaving the stay on the entire action in place until the bankruptcy case is "resolved."</u>   It is apparent that the District Court believed that the Trustee would pursue the Debtor's assets for the benefit of creditors, <u>which did not happen</u>.   If this case is dismissed, Digby can now litigate the action it was stayed from litigating for the last three years by the filing of this fraudulent bankruptcy and can seek the recovery of fraudulent conveyances the Trustee wants to abandon for a minute fraction of the damages sought in the Avoidance Action, despite his fiduciary duties.

25.    Finally, <u>the Trustee seeks to bind my client to the settlement agreement given that I</u>

<u>commented on a draft settlement agreement back nearly one year ago, on March 13, 2013</u>, and

notwithstanding that my client personally sent a very detailed email to the Trustee and his counsel

on June 19, 2013 objecting to the proposed settlement.[6]  When I commented on the draft settlement

agreement, I had been recently retained, not fully familiar with the facts, but familiar enough to

know that the proposed settlement of $120,000 was below the lowest point of reasonableness.

---

[6] From: **Sharky Laguana** <<u>Sharky@bandago.com</u>>
Date: Wed, Jun 19, 2013 at 3:04 PM
Subject: Image settlement objection
To: Jordan Pilevsky <<u>JP@lhmlawfirm.com</u>>
Cc: Gary Herbst <<u>GFH@lhmlawfirm.com</u>>, Daniel Gershburg <<u>daniel@danielgershburg.com</u>>, Barbie Lieber
<<u>barbie@lieberlegal.com</u>>, <u>gh@lhmlawfirm.com</u>, <u>gmesser@messer-law.com</u>, <u>gremesser@aol.com</u>
Hello all,

As some of you may know, my name is Sharky Laguana and I am the CEO of Digby Adler Group DBA Bandago,
which is the only creditor in the Image Rent-A-Car Inc. bankruptcy case, other than a claim for a few thousand
dollars or so.

My understanding is that the Trustee has reached a settlement agreement with Image which will allow Image to
settle the Trustee's complaint for $120k, paid in monthly installments of $5k over 2 years, with zero interest. As it
stands now a confession of judgment of $100k can only be entered against Gag Sebag after the 4th default.  I am
writing because I have serious concerns about these settlement terms, especially in light of information I have
recently obtained from the New York State DMV.

Right now Bandago's plan is to object to the settlement, as well as file a complaint with the Department of Justice
regarding the concealment and fraud pervasive in this Bankruptcy filing. My primary concern is that the Debtor,
through its principals, has criminally concealed and transferred significant sums of money and assets that should be
retrieved for the benefit of the Debtor's creditors.

Bandago has personally invested tens of thousands of dollars conducting an investigation through the 341 meeting,
2004 exams and document requests. The results of this investigation enabled the Trustee to file the complaint to
recover fraudulent conveyances against the Debtor's affiliates and principals, and to file the Turnover motion. It is
inexplicable why a contempt motion seeking missing documentation, sanctioning defendants and issuing notices of
depositions has not been filed as anticipated. Why not try to reap the benefits from the work that had already been
done?  … It was my understanding that the contempt motion and the deposition notices were going to be prepared
and served immediately after the last hearing.
With all due respect, it is impossible for me to understand why an agreement to settle this matter for $120,000 was
made without pursuing these actions. This is particularly true in light of the fact that Bandago's former counsel, Mr.
Gershburg, was ready, willing and able to continue his prosecution of the action, as he was very confident in the
case.
Finally, new information has come to light about the extent of the Debtor's assets from NYS DMV (see below and
attached), as well as large quantities of assets that may have been illegally transferred from the Debtor to other shell
companies under the control of the principals. Without investigating and retrieving the following information, the
reasonableness of this settlement cannot be determined……

My client and I contacted Mr. Gershburg confused as to how the Trustee could reach such a low and precarious settlement.  He advised us that the Trustee negotiated and reached the settlement amount acted without his involvement. He was as surprised as we were.  I found the Trustee's actions completely perplexing as the Trustee had retained Mr. Gershburg as special counsel to represent him in connection with the 26 count $3,486,165 plus Adversary Action.   Given Mr. Gershburg's knowledge of the facts, I would have thought that he would have been the one to have engaged in settlement discussions, or at least have participated in discussions or otherwise have been consulted New to the case, I was unaware that the $120,000 figure was reached without the Trustee's ever deposing Zilberman and questioning him on the bank statements, etc. and without ever obtaining documents and vehicles the Debtors were resisting their turnover  since the bankruptcy.  I also voiced my client's and my vehement concerns to Mr. Pilevsky regarding the abysmally low settlement.  Like Mr. Gershburg, he too advised me that the Trustee reached this settlement on his own, without his input.    I asked if the Trustee could try to renegotiate.   Mr. Pilevsky advised that this is the figure the trustee already reached.  It seemed set in stone.   So, in mid-March 2013 (unable to change the settlement amount), I commented on the stipulation, which was overly loose and liberal in favor of defendants (with, *inter alia*, inadequate provisions for penalties and provisions for compliance).  (Notably, it was not until a conference call on June 24, 2013 with Trustee's counsel did I learn that the Trustee's counsel's fees were already $60,000.  Mr. Pilevsky estimated his fees at $20,000 and Mr. Gershburg estimated them at $40,000. With and Trustee's commission, this totaled to approximately $75,000, far greater than my client and I imagined they would be when I originally commented the draft, leaving a very small recovery on his claim.)

      26.      Weeks and months passed without the Trustee's success in being able to get Defendants to sign the settlement agreement.  Once it was clear that Defendants were engaged in a

game of delay and gamesmanship and given that I had advised the Trustee's counsel of Digby's disapproval of the settlement amount, the Trustee should have moved forward with the litigation, deposing Zilberman and ensuring the turnover of missing documents and/or subpoenaing third parties . Instead, from mid-March to mid-May, 2013, Zilberman was not deposed. Special counsel did obtain from the Court on April 30, 2013, the Turnover Order from the Court, which required that the turnover of books, records and a vehicle on May 15, 2013.

      27.    After the passage of two (2) months, during which the defendants failed to sign the trustee's proposed settlement agreement, Defendants now announced that they wanted  Digby to release them from all liability, which Digby advised would absolutely not be acceptable.   At a pretrial conference in May 14 2013, the parties advised the Court of Defendants' insistence of a release and Digby's unwillingness to sign any agreement containing same unless there was another parallel agreement with separate consideration resolving its claims against non-debtor defendants.  Mr. Gershburg advised the Court that the Debtors still had not turned over documents pursuant to the Turn Over Order as well a vehicle which Mr. Weiner advised the Court was no longer in existence.  It was at that hearing that Mr. Weiner admitted  "the reason [the Debtor] filed this [Bankruptcy Petition] was, you know, to put an end to the California litigation."   Immediately following the pretrial conference, I met with the Trustee and his counsel in the hallway, whereby I again vehemently voiced Digby's objection to the $120,000 settlement amount and the fact that the Trustee had pursued a settlement, without even obtaining missing documents and deposing Zilberman.  **Mr.Gershburg then advised me that he would serve notices of deposition, (which he never did prior to the Trustee's counsel's request for an adjournment of the Dismiss Motion, five months later).  Counsel also failed to move for a Contempt Order despite that the Turnover had been violated**.  Despite Mr. Laguana's averments in his affidavit

consistent with the forgoing, the Trustee completely ignores the foregoing in his Response.

28.    In the meanwhile, Digby started to uncover additional DMV documents which were shedding light on the amount and extent of fraudulent transfers, many involving very expensive vehicles. This made the case significantly easier to prosecute and much stronger— clearly making any settlement of $120,000 impossible to accept. Mr. Laguana presented these findings to the Trustee and his counsel via email on June 19, 2013 (fn 6).   In that email Mr. Laguana stated clearly and unequivocally that Digby was opposed to the settlement as drafted, and politely requested that the Trustee seek a turnover of the vehicles identified so that the claim could be immediately paid. The Trustee then went ahead and reached the agreement with the Debtor **<u>over Digby's vociferous objections</u>**, and filed that proposed agreement with the court on July 15, 2013.

## <u>CONCLUSION</u>

WHEREFORE, Digby respectfully requests that its Requested Relief be granted and any such other and further relief as the Court deems just and proper.

Dated: New York, New York
           February 4, 2014

*/s/ Barbie D. Lieber*
Barbie D. Lieber (BDL 5891)
Lieber & Lieber, LLP
60 East 42nd Street, Suite 2222
New York, New York 10165
Phone:  (212) 949-5586
Fax:  (212) 949-5587

.