Barbie D. Lieber, Esq.                                          Hearing: May 15, 2014
Lieber & Lieber, LLP                                            3:30 pm
60 East 42nd Street, Suite 2222
New York, New York 10165
Phone:  (212) 949-5586
Counsel to Digby Adler Group, LLC d/b/a/ Bandago

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
In re IMAGE RENT A CAR, INC.,                    Case No. 1-11-42390 NHL
                    Debtor.                       Adv. Pro. No. 12-01288 (NHL)
_____ X

### Supplement to Request that Court Refer this Matter for Investigation Under 18 USC §3057(a), Following Depositions & Receipt of 2010 Tax Return Showing 77 Vehicles Transferred for $1 Each

Digby Adler Group LLC d/b/a/ Bandago ("Digby), the Debtor's <u>sole</u> unsecured creditor

to have filed a proof of claim and whose Federal Trademark Litigation against the Debtor on

February 10, 2010 and against the defendants Gad Sebag and Schneoir Zilberman on March 21,

2011 admittedly precipitated the filing of the bankruptcy case on March 24, 2011 (ZTr.59:2-6),

files this Supplement to its Request dated January 9, 2014 (Docket #s 89 and 90) that the Court

refer this Matter for Investigation to the Appropriate US Attorney Pursuant to 11 USC §105(a),

18 USC§§3057(a), 152 and 153 (the "Referral Request") given, *inter alia*,  material omissions,

concealment of assets, false oaths and claims as set forth below. 18 USC §3057(a) provides that

> "any <u>judge, receiver or trustee</u> <u>having reasonable grounds</u> for believing that any
> violation under chapter 9 of this title or other laws… regarding insolvent debtors…<u>has
> been committed, or that an investigation should be had</u> … **shall** report to the… United
> States attorney all of the facts and circumstances of the case, the names of the witness
> and the offense or offenses believed to have been committed. (Emphasis Added)

1.   The Debtor (via Zilberman) filed for bankruptcy on March 24, 2011 and Gregory Messer,

Esq. was appointed chapter 7 Trustee.  On August 1, 2012, the Trustee commenced an adversary

action (seeking a demand of $3,488,165) against Defendants Schneior Zilberman, Gad Sebag,

Adir Rent-A-Car, Adir Plaza, Inc. and Adir Group, Inc.  The Trustee sought to settle the

adversary action for $120,000, payable over 2 years, which Digby opposed and also moved to dismiss the case on August 1, 2013 (Docket No.90). On January 9, 2014, Digby filed the Referral Request and the facts (and all defined terms set forth therein) are incorporated herein by reference. By its Referral Request, Digby asserted that the Debtor, a rental company of "luxury and standard" vehicles, continued to operate throughout the bankruptcy under the name "Image Rent A Car" at its same address, website and telephone number under a new corporation, Group Travel Solution, Inc. ("GTS"), via Philippe Naim, which for $0 became the transferee of all of the Debtor's vehicles as well as the vehicles paid for by the Debtor but placed in the name of, Adir Plaza, Inc., Zilberman's shell company(NTr.37:16-17; 41:21). Digby alleged that with **Connie Grey** (the Debtor's key employee, **whose legal name turns out to be "Chanah Vilenkin"** VTr. 94) and **Naim** (Zilberman's wife's uncle who now admits to having **"No" authority to have signed on behalf of Adir Group, Inc** the settlement agreement with the Trustee and affidavit of confession of judgment, NTr. 62:13,56:11, 58:22) at the helm, Zilberman could maintain dominion and control over the operations. "Connie Grey" signed documents filed with NY State on behalf of the Debtor and Adir Plaza, transferring the vehicles to GTS, and then signed NY State registration applications on behalf of GTS. On February 5, 2014, this Court directed that depositions of the following individuals be taken to investigate the facts: Naim; Vilenkin; Sebag; and David Bakht. The deposition transcripts for each of such individuals is referred to as "NTr.","VTr.," "STr.," and "BTr," and together with the one for Zilberman "ZTr.," and GTS' amended 2010 Federal Tax Return are being filed contemporaneously herewith. The exhibits that the Trustee used to question are included in the Exhibit Binder "EB" attached to the Referral Request: (Docket Nos.102, 104, 105, 106). Any bolded or italicized words referenced in quotations of testimony are with emphasis added.

2.   The Court scheduled a status conference on May 15, 2014.  For the convenience of the Court, and to supplement the Referral Request, set forth below is a summary of the testimony of the above referenced individuals, as well as an Amended 2010 Tax Return (the "2010 Return") produced by defendant GTS and filed herewith which further supports the Referral Request:

**A. Sebag** is Zilberman's brother in law. STr. 19:6.   Naim is also Sebag's uncle. STr. 31:22-23.

**1.** *Corporate Role*.  <u>Sebag is not mentioned on the Chapter 7 Petition in any capacity, other than as a "creditor" on Schedule F.</u>  According to Sebag, "**Image Rent A Car was my company**." STr. 30:12-13.  Vilenkin also testified that Sebag owned Image. VTr. 8:17. When asked if he was the "**chief executive officer,**" Sebag responded "**yes, it was under my name**." STr. 30:18.   He testified that Zilberman "approached" him in 2004 to "help" him out as "[h]is business was not going well.  That's –he didn't run the [predecessor company, Adir Rent A Car] business properly." STr. 19:6-10;19:8-9. (Zilberman closed down Adir Rent A Car after being sued for $400,000 by a dealer. ZTr. 15-20.) So, according to Sebag "**I bought this [new] company [the Debtor] and I let him use my name for whatever he needed.**" STr. 19:17-19.  "Image Rent A Car was **under my name** but pretty much all activities were done from the office with my signatures occasionally on all kinds of documents and this had been going on for many years." STr. 20:2-6.  **The "company's name [was] on my name and to use my credit to get cars from companies that provide cars.**" STr. 20:17-19.  "For that you have to be a person with some credit and have—and guarantee that the payments will be made on time and that was me since he cannot do any of it" STr. 20:22-25.   As testified by Sebag, "**I opened the bank account originally, I believe at Chase.**" STr. 22:23-23.  According to Zilberman, "Gad and myself would look at [the bank statements] from time to time". ZTr.33:4.   According to Zilberman, Sebag had access to the <u>records</u> of Adir Plaza, ZTr.50: 3 and "probably" Vilenkin did as well.  ZTr. 50:5-7.  Sebag was the one to sign the *lease* on behalf of Image Rent A Car as tenant. STr. 35:10. Sebag testified that he would come about "once a month" to the Debtor's business site at 391 Empire Blvd.  STr. 22:16.  Vilenkin said "occasionally." VTr. 18:24.

**2.** *Litigation and Exit Strategy*: Sebag testified that he "started being aware" of the Trademark Action "sometime maybe three years ago…."  STr.30:21-22, Sebag testified he asked Zilberman "**at various times to try to find an exit as soon as possible**" ZTr.20:8-9.

   **A. "…..I do know that with the years the same thing that was before me have been to Image as well which means that he owed money to people that lend him cars, gave him cars, et cetera, and it was not going well. It was all under my name…"  So, Sebag asked Zilberman at various times to "try to find an exit as soon as possible."** STr. 32:15-25; 32:17-18 .

**3.** *Asset Transfers*: Vilenkin was questioned about a 2005 Dodge that was originally registered in the name of **Gad Sebag**. (VTr. 76:7-25; EB Exh. C p.34 "Vehicle "5"). The transfer document reflects the "<u>Seller's" name as "Gad Sabag</u>" (VTr. 76:23-25) with the seller's signature and "<u>**Buyer's" name "Group Travel Solution, Inc.-Philippe Naim**</u>" and it was dated "**5/12/10**." (EB Exh.C P.35). <u>**Vilenkin answered "no" to the question of "would it be a surprise if Gad Sebag was present when these documents were signed**</u>?" VTr. 77:11. Following the transfer, the Dodge was then registered by "Connie Grey-Sect" on behalf of GTS. (EB Exh.C, p32-33) and Vilenkin authenticates her signature. VTr. 76:11. The almost identical signature that appeared next to the "Seller's" name **"Gad Sabag"** with respect to the above referenced Dodge, also appeared on a transfer by **<u>Debtor</u>** of a 4yr old '06 Chevrolet EXP (EB Exh. C p. 12) to GTS in **<u>May 2010</u>** (*10 months prior to the Bankruptcy*.) Vilenkin testifies that the signature on the transfer document signed on **<u>April 11, 2010</u>** (Exh C. p.12) on behalf of the Debtor-"**Seller**" was either "Schneior or Gad Sebag" (VTr.11) and that the signature of the "**Buyer" was Naim's**. VTr. 71:22. Vilenkin signs the vehicle registration document (Exh.C p.10) as "Connie Grey" as corporate "secretary" for GTS. VTr. 70:22. This vehicle was referred to as "Vehicle #2" on EB. Exh. C. pp. 9-17. ***<u>Despite the transfers and Sebag's requests "every few months" for an exit strategy,</u>*** (STr. 32:17), according to Sebag, **"I'm not aware that [the Debtor] was sold."** STr. 11-12. When asked if he was familiar with GTS's operations, Sebag stated "I know they rent cars pretty much like it was before. I don't know details…I don't know where they go the cars…." STr. 34: 15-18. When asked who owns GTS, Sebag responded "I don't know." STr. 34:12. He further states "it is the company that is operating now under my uncle's name…" STr. 34:8-9.

**4.** *"Loan" to Brother- In- Law and Debtor's Repayment*: <u>Sebag was listed as a Creditor on the Debtor's Petition</u>. Sebag was asked whether he "loan[ed] money to Image Rent A Car." STr. 23:24-25. He responded: "**I did lend money to my brother-in-law…**" STr. 24:2-6. He estimated that he loaned around $200,000, STr. 28:6, from line(s) of credit against his real property. STr.24:5. He was not sure how much he still is owed, STr. 28:15-16, and testified:

> "Q. Is it your testimony that to date Image Rent A Car still owes you money.
>
> **A. My brother-in-law owes me money. I am not going to sue a company for my money. I gave it to him as a family member, not as a business investment. I was not out to make any money on this business. If the company is gone and he repaid me in thirty years, that's also fine. I am not suing Image Rent A Car for my money.**
>
> Mr. Weiner: But did you loan the money to Image Rent A Car?
> **A. To my brother-in law, yes.**" See STr. 28: 17-25; 29:2-6…
>
> "Q. Do you have any documents substantiating that money was lent or this was a family lending situation so you didn't memorialize that with documents.

**A. This is going back to close to ten years ago. I don't have any documents, no. It was from the line of credit. I don't think I have a way to get the original checks on it, no."** STr.29:10-18

 Vilenkin likewise recalls being told by Zilberman "close to the inception of Image Rent A Car" that Sebag loaned money. VTr. 84:5-8.   Zilberman testified that Sebag obtained a mortgage against Sebag's personal home to obtain the funds. ZTr. 22:8. Sebag testified that he lives at 1449 Carroll Street, Brooklyn, NY. STr. 7:9 and that he purchased it around ten or eleven years ago and year or two later, took a line of credit with <u>Bank of America</u> for $75,000 which he took out one or two years after the purchase and has a $175,000 mortgage. STr. 10:16-23. "My mortgages under my properties are close to ten years old. ***Nothing was paid more than the regular monthly payments***." STr. 27:19-22.  He was asked "<u>was any of that money ever paid back to you</u>?" His response was **"slowly, slowly, not in big chunks and not from the business."** STr. 24:20-21.  Sebag was then shown one of the Debtor's Chase bank statements (marked Plaintiff's Exhibit 1 STr. 26), that reflects a withdrawal entry on August 11, 2009 for $100,000 as an online wire transfer via <u>Bank of America</u> with the beneficiary "Gad Sabag," (STr. 26:17-25), which Sebag acknowledged **"would be a payment" from the Debtor.**" STr. 27:4-6, to the line of credit against his home.

***(5) Real Estate Purchased "Four Years Ago"***:  In addition to his personal residence, Sebag testified he owned three (3) other homes, which he rents out.  He described a 2 family house on Presidents Street  (purchased prior to his current home)which he rents out and identified the names of the tenants. STr. 12.  With respect to the remaining properties he owned at 719 Lefferts Avenue and 732 Lefferts Avenue, Brooklyn NY, he was not as forthcoming:  When asked about them, he stated:

**"A. The purchase price was six seventy five [for 718 Lefferts Avenue].  Just to mention, the first two properties, I have these tenants for many years.  The other two [at 719 Lefferts Avenue and 732 Lefferts Avenue] I have somebody managing it so I'm not really involved so much, therefore, I'm not familiar with the [tenant's] name, the complaints, the leaks, et cetera**.

Q. Do you know who lives at the 718 Lefferts Avenue property?
**A. No, I do have a mortgage."** STr.14:15-25**....**
Q. You mentioned that you have someone who manages your property.  Who manages the property?
**A. A Friend of mine**
Q. What is your friend's name?" STr.15:6-10 [witness then consults with his counsel]
**A. It's my mother, my mother."** STr.15:13**.**

Ultimately after many attempts to ascertain the identity of the tenants at 718 Lefferts Avenue, Sebag testified:

"**A. At 718, I have my sister Valerie. She lives there. She pays rent**.
Q.  Is Valerie married?
A.  Yes.
Q.  Who is her husband?
**A.  Her husband is Schenoir, my brother-in-law and my sister.**
Q.  Schenior Zilberman?
**A.  Yes**." STr. 18:12-21.

Sebag was also asked earlier before he disclosed the names of the tenants:

"Q.  Mr. Sebag…on 718 Lefferts Avenue, how long have the tenants been living there?
**A.  Pretty much since it was purchased." STr.17:6-9.**

Sebag purchased 718 Lefferts Avenue **"approximately  four years ago,"** (STr. 14:11-12), **_which coincides with 2010, the year in which the vehicle transfers to GTS began_**.  Sebag purchased the property for **$675.000**." STr. 14:15-16.   Sebag testified that such property has a mortgage of approximately $450,000 (STr. 15:3).  With respect to 732 Lefferts Avenue, Sebag **never identified** **the names of the tenants** or **the "private lender"** on that property. STr. 13:11-12; 14:8; 18:9.  Like 718 Lefferts, this property was also purchased approximately **four** years ago, 14:11-12; STr.13:16, **_which also coincides with the time period of the transfers of the Debtor's vehicles in 2010_**.

**B. Zilberman** filed the bankruptcy petition for the Debtor.  The petition and statement of financial affairs ("SOFA") reflects **no property, no inventory, no transfers, no accountants, no bookkeeper or office manager, no current or former shareholders, officers or directors** (other than himself).

**1.  _Shareholders, Officers, Directors_**.   Sabag is **not** listed on line 21 of the SOFA, but despite Sebag's testimony that he is the owner, Zilberman listed himself as "**100" PERCENT stockholder** and testified that he **authorized himself** to file the Debtor for bankruptcy. ZTr. 58:24. (The Debtor's tax returns were never produced so it is unknown how the ownership was reflected therein.) Vilenkin was not listed either, even though Zilberman testified that he authorized her to act as vice president and officer of the Debtor as well as Adir Plaza in order to execute documents transferring vehicles to GTS. ZTr. 77:25; 78:1-3; 72:13; 82:13-17; 77: 20-25 to 78; 21-22. When asked "Did she have any other purposes as an officer besides transferring assets?"  Zilberman responded **"I'm not sure.**" ZTr. 82:25.  When asked if Sebag ever authorized Vilenkin to make payments for the Debtor, Zilberman testifies that "Gad Sebag says, this is all good- there's 100 percent trust and its my business to run." ZTr. 33:15-18.  Zilberman testifies that he was an employee of Image, ZTr. 33:19-20, and received a salary of "$1,500 a week" ZTr. 34:2.  Sebag did not take a salary. ZTr. 34.

**2.  _Records and Accountants_**: Zilberman testified that the Debtor's accountant was Mr. "Klitnik" ZTr. 35:4-10.  Vilenkin provided all financial information to Klitnik. ZTr. 35:17, 23.

Zilberman can't "remember" whether the Debtor filed tax returns. ZTr. 91:19.  Zilberman just testified that books and records of the Debtor are "no" longer in existence. Tr. 65:19. "**I took the [records] away**." Tr. 65:23.  In terms of the records, he testifies **"I might have disposed them,"** Tr. 66:7-8.

**3.  *Transfers (Monetary and Real Property)***: From the Debtor's bank accounts statements ending in No. 1611, covering January 2009 to May 2, 2010 (and excluding April 2010 as that statement was never turned over), the Debtor **deposited** the sum of **$3,583,264.92**. (EB Exh. B). In March of 2010 alone, the Debtor deposited $244,265.00. Two months later in May 2010, the account shows only $6,781 in deposits, and the balance had **dwindled** **to** **less than $3,000**. See EB Exh. B.  In addition to substantial unspecified "electronic withdrawals" and payments that appear to be for personal expenses, <u>the bank statements reveal that millions of dollars of the Debtor's monies were transferred to the benefit of Zilberman's shell company</u>, Adir Plaza (EB Exh.B), which allegedly had "no workers", ZTr. 44:14-16, and <u>served as a receptacle ***to hold title to vehicles the Debtor used for its business***</u>. ZTr. 41; 44.  When asked:  "What did Adir Plaza do? What was its function?" Zilberman responded "ultimately it's –we got a line of credit and released back the cars to Image Rent A Car." ZTr. 36:17-19.  The Debtor (and not Adir Plaza) operated the car rental company at 391 Empire Ave, generated and took all of the revenue (ZTr. 37:25; 38:2-4; 64:23-25) and  would "pay all expenses on the vehicles, the bank." ZTr. 37: 16-17.  Monies were either paid to Adir Plaza's banks (which financed the purchase of the vehicles) or to Adir Plaza directly.  ZTr. 39: 15-20; 39:21-25, 40:1-4; <u>see</u> EB Exh. A. There was no written agreement between the Debtor and Adir Plaza.  ZTr. 65:7-9.   Zilberman was shown certain entries on the Debtor's bank statements and testified that (a) an insurance payment of $20,166.66 for Adir Plaza reflected on a statement would have been paid by the Debtor (ZTr. 63, 64:23-25); (b) a bank entry that reflects an online wire transfer to Citibank for $15,296.70 that references "Adir Plaza" was used to pay "whatever fees it is for the bank which gave [a line of] credit to Adir Plaza, which Image Rent A Car operates," ZTr. 66:16-25 67; 2-3; and (c) a bank entry that reflects the Debtor's payment to Banco Popular of $12,179.88 for vehicle leasing was for a "line [of credit]" for Adir Plaza and not for the Debtor. ZTr. 67:17-22.  Zilberman even caused real property at 387 Empire Boulevard, Brooklyn (a smaller lot within the lot of 391 Empire Blvd. NTr.66:5-6) to be purchased in the name of Adir Plaza and then caused that property to be transferred to another company formed by him, which was then transferred the property to Naim. ZTr. 44:18-25, 45-49.  Zilberman is "not sure of the date" the transfer took place. ZTr. 60:23. Naim testified it was in 2008 NTr. 65:20, 66:20.  **Based upon the undersigned's communications with the Trustee, and unless recently produced, it does not appear that Naim turned over the deed requested by the Trustee.  NTr. 70:17**.

**4.  *77 Vehicles Transferred for $1 Each (Prior to the Bankruptcy)*:**

On **February 10, 2010**, Digby commenced the Trademark Action. GTS was formed on **April 27, 2010**.  On **March 21, 2011**, Zilberman and Sebag were added as defendants to the

Trademark Action. On **March 24, 2011** the Debtor filed for bankruptcy. The Debtor's vehicles and the vehicles purchased by it and titled in Adir Plaza were transferred to GTS over time in 2010 and 2011.   In response to the question of "how many vehicles did you take from Image Rent A Car?," Naim testified (at NTr. 9:10-11)  that approximately

   **A.  "Between fifty and sixty…" vehicles were transferred from Image Rent A Car.".**

There may have been sports cars, like "Porsches." NTr. 47:16. Naim testified that when GTS opened the only entity that he "took" vehicles from was "Image Rent A Car."  NTr. 8:21-25. Trustee's counsel questioned Naim about the purchase price paid by GTS for the vehicles:

   "Q. Was any money exchanged at that time?

   **A. No, just if I have a good memory, I think it was <u>one hundred dollars</u>.**

   Q. One hundred dollars?

   **A. Just, like a way to close by us, handshake."** NTr. 37:16-19.

Naim testified that the vehicles were sold "as soon as we took over." NTr. 10:12.   The Trustee questioned Naim on how much the vehicles were sold for, to which he responded:

   **A. Those sales is about I can say between seventy to a hundred [thousand dollars].**  NT11:22-23.

Some of these proceeds were used to pay "**real estate state taxes**" NTr. 12:7.

The **NAKED TRUTH** about the <u>number</u> and <u>value</u> of the transfers is reflected in **<u>GTS' 2010 Federal Amended Tax Return</u>**, which reflects the following:

   *- **GTS became the owner of 78 vehicles for $78 in May 14, 2010.**   **One** <u>**Dollar**</u> **per** <u>**vehicle**</u>*. (Tax Form 4562 Statement-1120)  (78 exceeds Naim's estimate of 50 to 60 vehicles transferred). Below is a small sampling of the tax filing showing **78** vehicles purchased for **<u>$1 each</u>**:

**Form 4562 Statement - 1120**

| Item No. | Description of Property | Date Placed In Service | Asset Code | Bus. Use % | Cost or Other Basis | Se De |
|---|---|---|---|---|---|---|
| **Listed Property** | | | | | | |
| Listed property with more than 50% business use (Line 25 and 26) | | | | | | |
| 8 | Auto | 5/14/2010 | V-6 | 100.00% | 1 | |
| 9 | Auto | 5/14/2010 | V-6 | 100.00% | 1 | |
| 10 | Auto | 5/14/2010 | V-6 | 100.00% | 1 | |
| 11 | Auto | 5/14/2010 | V-6 | 100.00% | 1 | |
| 12 | Auto | 5/14/2010 | V-6 | 100.00% | 1 | |
| 13 | Auto | 5/14/2010 | V-6 | 100.00% | 1 | |
| 14 | Auto | 5/14/2010 | V-6 | 100.00% | 1 | |
| 15 | Auto | 5/14/2010 | V-6 | 100.00% | 1 | |
| 16 | Auto | 5/14/2010 | V-5 | 100.00% | 1 | |
| 17 | Auto | 5/14/2010 | V-6 | 100.00% | 1 | |
| 18 | Auto | 5/14/2010 | V-6 | 100.00% | 1 | |
| 19 | Auto | 5/14/2010 | V-5 | 100.00% | 1 | |
| 20 | Auto | 5/14/2010 | V-5 | 100.00% | 1 | |
| 21 | Auto | 5/14/2010 | V-6 | 100.00% | 1 | |
| 22 | Auto | 5/14/2010 | V-6 | 100.00% | 1 | |
| 23 | Auto | 5/14/2010 | V-6 | 100.00% | 1 | |
| 24 | Auto | 5/14/2010 | V-6 | 100.00% | 1 | |
| 25 | Auto | 5/14/2010 | V-6 | 100.00% | 1 | |

**- GTS then Sold 20 of these 78 vehicles FOR $296,417, FREE AND CLEAR OF LIENS** (Form 4797, entitled "Sales of Business Property").

| Part II | Ordinary Gains and Losses (see instructions) | | | | | | |
|---|---|---|---|---|---|---|---|
| 10 | Ordinary gains and losses not included on lines 11 through 16 (include property held 1 year or less): | | | | | | |
| Auto | | 5/14/2010 | 9/13/2010 | 12,250 | 0 | 1 | 12,249 |
| Auto | | 5/14/2010 | 8/19/2010 | 28,000 | 0 | 1 | 27,999 |
| Auto | | 5/14/2010 | 10/4/2010 | 27,600 | 0 | 1 | 27,599 |
| Total from Continuation pages | | | | | | | 228,570 |
| 11 | Loss, if any, from line 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | | 11 | ( ) |
| 12 | Gain, if any, from line 7 or amount from line 8, if applicable . . . . . . . . . . . . . . . | | | | | 12 | |
| 13 | Gain, if any, from line 31 . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | | 13 | |
| 14 | Net gain or (loss) from Form 4684, lines 34 and 41a . . . . . . . . . . . . . . . . | | | | | 14 | |
| 15 | Ordinary gain from installment sales from Form 6252, line 25 or 36 . . . . . . . . . . . | | | | | 15 | |
| 16 | Ordinary gain or (loss) from like-kind exchanges from Form 8824 . . . . . . . . . . . . | | | | | 16 | |
| 17 | Combine lines 10 through 16 . . . . . . . . . . . . . . . . . . . . . . . . . | | | | | 17 | 296,417 |

| 10 | (a) Description of property | (b) Date acquired (mo., day, yr.) | (c) Date sold (mo., day, yr.) | (d) Gross sales price | (e) Depreciation allowed or allowable since acquisition | (f) Cost or other basis, plus improvements and expense of sale | (g) Gain or (loss) Subtract (f) from the sum of (d) and (e) |
|---|---|---|---|---|---|---|---|
| Auto | | 5/14/2010 | 12/16/2010 | 4,000 | 0 | 1 | 3,999 |
| Auto | | 5/14/2010 | 10/5/2010 | 7,500 | 0 | 1 | 7,499 |
| Auto | | 5/14/2010 | 7/12/2010 | 11,000 | 0 | 1 | 10,999 |
| Auto | | 5/14/2010 | 7/15/2010 | 5,500 | 0 | 1 | 5,499 |
| Auto | | 5/14/2010 | 8/12/2010 | 17,937 | 0 | 1 | 17,936 |
| Auto | | 5/14/2010 | 8/18/2010 | 18,500 | 0 | 1 | 18,499 |
| Auto | | 5/14/2010 | 9/20/2010 | 18,500 | 0 | 1 | 18,499 |
| Auto | | 5/14/2010 | 10/21/2010 | 12,000 | 0 | 1 | 11,999 |
| Auto | | 5/14/2010 | 10/1/2010 | 18,400 | 0 | 1 | 18,399 |
| Auto | | 5/14/2010 | 9/20/2010 | 13,250 | 0 | 1 | 13,249 |
| Auto | | 5/14/2010 | 7/12/2010 | 19,000 | 0 | 1 | 18,999 |
| Auto | | 5/14/2010 | 11/15/2010 | 20,000 | 0 | 1 | 19,999 |
| Auto | | 5/14/2010 | 5/25/2010 | 8,500 | 0 | 1 | 8,499 |
| Auto | | 5/14/2010 | 6/10/2010 | 9,000 | 0 | 1 | 8,999 |
| Auto | | 5/14/2010 | 8/2/2010 | 17,500 | 0 | 1 | 17,499 |
| Auto | | 5/14/2010 | 8/23/2010 | 17,500 | 0 | 1 | 17,499 |
| Auto | | 5/14/2010 | 10/4/2010 | 10,500 | 0 | 1 | 10,499 |

- **GTS** had a **capital gain of $296,417** from the sale of 20 of the 78 Vehicles, an average gain of **$14,820 per vehicle** (Tax Form 1120, line 9). If the 78 vehicles transferred in the last eight months of 2010 alone are multiplied by $14,820, the vehicles were worth approximately **$1,155,960.** (This amount (which only includes vehicles transferred in 2010) far exceeds Naim's estimate that the vehicles were sold for $60,000 to $70,000. NTr. 11:22-23).

- **GTS generated gross receipts or sales of $1,254,195**, of which $296,417 was from the sale of the 20 out of 78 vehicles. -Accordingly, **$957,788 is attributable to rental income** for the eight-month period GTS operated in 2010. -**Annualized, the rental income would be approx. $2 MILLION.** The 57 vehicles that were not sold in 2010 would create rental income in subsequent years until sold. Vilenkin testified that a Mercedes Benz 15 seat Sprinter could be rented for $250 a day. VTr. 92:6. The May 14, 2010 (reflected as the vehicle transfer date) is also the month in which the balance in the Debtor's Chase Bank accounts ending in 1611 was depleted to less than $3,000. EB Exh. B.

**5. *Vehicle Transfers (on and after the Bankruptcy)*:** The number of vehicles transferred by the Debtor is greater than the 77 reflected on the 2010 Tax Return as vehicles were transferred in 2011 as well according to DMV records and deponents' testimony. Zilberman authenticated his

own signature on a document transferring a 2009 Chevrolet to GTS on November 18, 2011, 2011, which was **after** the bankruptcy. ZTr. 83:20; Exh.C, pp. 76-83 ("Vehicle 9"). Zilberman also confirmed Vilenkin's ability to sign a transfer document as "vice president of Adir Plaza" for a Nissan with 27,000 miles that was transferred to GTS in March 2011, **after** the Citi Capital lien was released on March 24, 2011, ***the very date of the bankruptcy filing***. ZTr. 82:1-25; EB Exh. 66-74, ("Vehicle 8"). In 2009 alone, bank records (EB Exh. B) reflect that the Debtor made $644,000 in payments to Citi Capital on behalf of Adir Plaza. Zilberman was questioned:

> " Q.  At the time of its bankruptcy, did [the Debtor] have any assets, any cars that it owned, even if it's a small amount?
>
> **A.  If it had small amount, it was money that was due to be against it from different parties. And so if it owned anything, that was not even belonged to him anymore, even though it was still under the name.** Z.Tr. 30:9-13.

The Trustee further questioned Zilberman and he responded below:
> **A. "You asked me before.  The vehicles that were still under the name Image Rent A Car was technically not theirs anyone, due to the debt that I have and the different dues that I had to pay."** ZTr. 51:19-23.

That conclusion was for the Trustee to make. No vehicles were turned over.  At the pretrial conference on May 14, 2014, counsel to Zilberman and the Debtor advised the court that a vehicle that the Trustee expected to be turned over "was disposed of before the bankruptcy was filed, so it never existed." EB. Exh. E. Tr. 17: 25; 18:1-2.  Unless recently produced, it is Digby's understanding from corresponding with the Trustee that **Naim failed, *inter alia*, to turnover GTS' tax returns for 2011, 2012 and 2013, along with bills of sale for vehicles sold**. These documents are critical to assess the number and value of Vehicles transferred and sale proceeds and rent proceeds generated during those years.

## C. Naim.

**1.  *Relative and Transferee*:**  Phillipe Naim is Zilberman's wife's uncle. NTr. 24:29; 64:1-2 and is Gad Sebag's uncle. STr. 31:22-23.  Zilberman approached Naim to become the owner of the business.  NTr. 28:22.  Naim agreed to be the transferee of the Vehicles despite the facts that he (a) had **no** experience in car industry (NTr. 25:10); and (b) did **not** engage in due diligence, including **not** discussing or seeing any financials or bank statements prior to purchase (NTr. 29) and **not** making any determination whether the company was profitable. NTr. 30:7.  Zilberman and Naim testify that there was no transfer agreement between the Debtor and GTS. NTr. 24:16, 37; ZTr. 54.  The above is true despite the fact that Naim is a businessman, who operated moving companies. Naim testified that has never taken any salary or distribution from GTS. NTr. 17; 23; 18:1-12.  "There was no money to take." NTr.18:18.  But acknowledges he has paid Zilberman,

see below. Naim via GTS ",**took over whatever it was before" the Debtor's "business, the cars"** (including "vehicles", name, "websites," "phones" etc.) and all of the vehicles the Debtor funded and titled in shell company, Adir Plaza.  NTr. 8:10-25, 9, 37,38, 9:14-16, 4:17-21.

**2.** *Lack of Corporate Authority*:  Naim testifies that he *never heard of co-defendant Adir Group, Inc*. (NTr. 56:14), but signed **a settlement agreement with the Trustee** (NT. 58:22) on its behalf (which was submitted to the Bankruptcy Court to be "so ordered", as well as an affidavit in support of confession of judgment. The Trustee questions him:

> "Q. …Did you recognize this signature under Adir Group, Inc.?
>  **A. My signature, yes**.
> Q. Do you have authority to sign on behalf of Adir Group, Inc.?
> **A. No.**
> Q. Did anybody go with you to the notary public to execute this document?
> **A. No."**(NTr.62:9-19).

He testifies: **"I signed wherever Chani told me to sign….Probably I made a mistake and signed that. I don't know. I don't remember**." NTr. 59:7-16.  Trustee's counsel questioned Naim as to why he signed the confession of judgment:

```
24        Q.   Why didn't sign any of the other

25     confession of judgments.  If you didn't know

2     what to sign, why didn't you sign for the

3     other ones?

4         A.   Because that's where they told me

5     to sign.

6         Q.   You were told to sign by Adir

7     Group?

8         A.   No, I was told by the people who

9     presented those papers.

10        Q.   Who presented it?

11        A.   Chani.
```

NTr. 66:24-25; 63:1-11 The Trustee also questioned Naim on the  **corporate kit for GTS:**

> "Q. Do you maintain a corporate kit for Group Travel Solution?
> **A. "Chani [Vilenkin] does**." NTr. 49:22-24."……
> Q. I would ask that you produce that corporate kit to my office
> **A. I don't know if I it still have it but I hope**." NTr. 50:5-8.

(In the undersigned's last communications with the Trustee, GTS had not produced the corporate kit.) Baksht testified that GTS and Adir Group, Inc. are **_his_** companies. BTr. 12:21-22; 13:2-4; 14:9-11, consistent with the New York Secretary of State filings.   He was shown Creditor's Exhibit B "Biannual Statement for Group Travel Solution," which he testified that he prepared, dated April 2012. BTr. 43:17-23.   Baksht had also alleged that he and his companies had been the victim of mail fraud and that defendants had, without Baksht's consent, filed change of address forms for GTS and Adir Group so that the mail for the companies would be forwarded from  791 Eastern Parkway, Brooklyn,  (the addresses for  such corporations as set forth in with filings with the Department of State) to the Debtor's address at 391 Empire Blvd Brooklyn, New York.  The bank statements of GTS covering July 2013, reflect payments to the United States Post Office.  Baksht has asserted that he has filed a complaint with the United States Post Office. See BTr. 20 and Appendix.

**3.  _Purchase of New Vehicles_**: The Trustee also questioned Naim on the purchase of any **new vehicles**:

> "Q.  But over the course of time, did Group Travel Solution purchase new cars to  operate its business?
>
> **A.  No.**
> Q. Does Group Travel Solution own any cars today?
> **A. No.**"  NTr. 12:17-23.

**In terms of "NEW VEHICLES":** Form 4562 of the 2010 Amended Tax Return also reflects that in **2010 GTS purchased 10 vehicles in 2010 for $81,595, $59,373, $51,848, $25,000, $14,950, $14,950, $10,500, $25,000, $19,100 and $15,500**, totaling approximately $292,097. Based upon the $311,114 reflected as current liabilities on GTS's balance sheet in its Tax Returns, it appears that these vehicles were financed.  A tax law called Section 179 allows a vehicle rental business to depreciate up to 100% of the full value of a brand new vehicle, even if financed over multiple years. This offers a tremendous savings for the car rental company which can use this law to substantially reduce taxable income, thereby keeping cash profits while showing a loss on Federal returns.  The Federal tax return also reflects that GTS claims $558,000 a year in leasing and finance expenses for the eight months of operation in 2010, which means that GTS also leased out a significant number of vehicles, contributing to the generation of $957,788 in rental income.

After previously testifying that he did not purchase new cars, Naim authenticated his signature on a Registration Title Application in the name of GTS for a **2011 _Mercedes-Benz,_** reflected on pages on EB Exh. C pp. 55-56 (listing only 25 miles on it at the time of purchase).  NTr. 48:9, 23-25.  Naim testified that "we sold one recently" and he wasn't sure if it was the "same one." NTr. 49:15.  Vilenkin testified that the one recently sold was a 15 passenger Mercedes-Benz Sprinter, VTr. 46:17, 47:5, and in the past two years, GTS had owned "luxury vehicles," such as

Chevy Conversion Vans, an Escalade, and a BMW (which Vilenkin testified could have been owned by either Image or Adir Rent A Car). VTr. 49-51. She also testified that two of the Chevrolet Conversion vans were recently sold. VTr. 52:25. GTS or Image also owned or leased a Land Rover. VTr. 51:3-4. (Vilenkin also testified that one of the vehicles was sold over the summer for $32,000. **GTS has turned over bank statements for 3 different bank accounts covering 2013, however none of these statements reflect an incoming wire transfer of $32,000 during the entire year of 2013.** When asked if the $32,000 was deposited in the bank, Vilenkin responded "that one I think was a wire transfer…*I don't remember [whether that wire went into GTS's bank account.*]" VTr. 53:16) (This begs the question of whether there were other accounts.) **Additionally, from Naim's testimony below, it appears that GTS also generated income in "cash".**

As set forth above, when asked if GTS owns any vehicles now, Naim responded **"No"**. NTr. 12:23. Vilenkin testified about *Nine (9) vehicles that were currently owned* by GTS and are subject to the Trustee's motion to sell such vehicles. The rest of the 22 vehicles were leased.

**4.** *Salaries and Distributions*: **Naim testified that he takes** *no salary or distribution* **from GTS**. NTr. 17; 18:18. Naim also testified that GTS has three employees (NTr. 16:20-21; 52:18-21-53): to wit, Vilenkin who was recently increased from $150 to $200 per week (NTr. 53:1-12); "Kizzy" who receives $450 a week (NTr. 53:25) and Nigel, who receives $350 a week (NTr. 54:6). Accordingly, employee overhead was approximately $950 to $1,000 a week or approximately $52,000 per year, according to Naim's testimony. *Salaries and wages were reported on Line 13 of the Amended Tax Return as $145,143 for the eight months of May through December of 2010, or annualized to twelve months, $217,714 a year,* __which is a difference of approximately $167,000 from Naim's testimony__.

Bank statements turned over by GTS reveal numerous cash withdrawals, for example, **$18,100** in cash withdrawals in July, 2013, alone.

**FEES AND OTHER WITHDRAWALS**

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 07/01 | 07/01 Withdrawal | $5,000.00 |
| 07/01 | Chase ACH Payments Monthly Fee | 25.00 |
| 07/01 | Official Checks Charge | 8.00 |
| 07/16 | 07/16 Withdrawal | 4,500.00 |
| 07/31 | 07/31 Withdrawal | 5,000.00 |
| | **Total Fees & Other Withdrawals** | **$14,533.00** |

| | | | |
|------|------|------|------|
| 07/01 | ATM Withdrawal | 07/01 1000 Nostrand Ave. Brooklyn NY Card 9040 | 200.00 |
| 07/01 | ATM Withdrawal | 07/01 1000 Nostrand Ave. Brooklyn NY Card 9040 | 800.00 |

| | | | |
|------|------|------|------|
| 07/12 | ATM Withdrawal | 07/12 1000 Nostrand Ave. Brooklyn NY Card 9040 | 800.00 |
| 07/18 | ATM Withdrawal | 07/18 1000 Nostrand Ave. Brooklyn NY Card 9040 | 800.00 |
| 07/24 | ATM Withdrawal | 07/24 1000 Nostrand Ave Brooklyn NY Card 9040 | 800.00 |
| 07/24 | ATM Withdrawal | 07/24 1000 Nostrand Ave Brooklyn NY Card 9040 | 200.00 |

**5**. *Bank Accounts:* Naim was also asked **what was the most he had in GTS bank accounts** in the past two years, Naim responded by giving a range between <u>seven and twelve thousand dollars</u>:

```
8        Q.    What was the most that you had in

9    your operating account in the business

10   checking account in the past two years at any

11   one time?

12        A.    Just enough to pay the bills

13   sometime.  Whatever comes, goes out.

14        Q.    What was the most you had?

15        A.    Ten thousand, twelve thousand, five

16   thousand, seven thousand, whatever was

17   available when you sell something.
```

*See* NTr. 55:8-14.

The GTS bank statements for July, 2012 reflect an ending balance of $41,420.22:

| CHECKING SUMMARY | Chase BusinessClassic | |
| --- | --- | --- |
| | INSTANCES | AMOUNT |
| Beginning Balance | | $1,644.37 |
| Deposits and Additions | 41 | 161,680.75 |
| Checks Paid | 27 | - 16,608.23 |
| ATM & Debit Card Withdrawals | 60 | - 6,227.30 |
| Electronic Withdrawals | 59 | - 99,044.37 |
| Fees and Other Withdrawals | 1 | - 25.00 |
| Ending Balance | 188 | $41,420.22 |

The GTS bank statement for August, 2013 reflects an ending balance of $23,177.16:

| CHECKING SUMMARY | Chase BusinessClassic | |
| --- | --- | --- |
| | INSTANCES | AMOUNT |
| Beginning Balance | | $6,709.99 |
| Deposits and Additions | 9 | 40,371.44 |
| Checks Paid | 11 | - 2,163.96 |
| ATM & Debit Card Withdrawals | 17 | - 3,207.00 |
| Electronic Withdrawals | 15 | - 18,504.31 |
| Fees and Other Withdrawals | 2 | - 29.00 |
| Ending Balance | 54 | $23,177.16 |

Notably, within the first two years of operation when the Trustee had not yet commenced its adversary proceeding, <u>there were much greater ending balances, such as in June 2010, for</u> **<u>$87,073</u>**. **Further, Naim did not turn over bank statements covering July 2011 through June 2012, so it is unknown what the balances in the accounts were then**.

14

**6**. _Zilberman's Continued Work Relationship at 391 Empire, With Naim and payments to Him_

Vilenkin testified that Naim operated his moving business from 391 Empire Blvd. VTr. 113:14-1. She has seen mail addressed to the moving company sent to 391 Empire Blvd.VTr. 113:15-21. When asked Q. "Do you have any other business relationship with Philippe Naim?" Zilberman responded as follows: **A. "I help him out with moving company."** ZTr. 61:11-14;. Vilenkin admits to being aware that Zilberman and Naim worked together at Naim's moving company. 113:11. Earlier, she testified that Zilberman "occasionally" visits GTS 391 Empire Blvd. VTr. 30:14. Zilberman testified that the moving company has "different names Remarkable Movers". ZTr. 61:16-17. Naim testified that Zilberman helped him out "three years ago, four years ago," NTr. 64:17-18, and referred to his companies as Empire Delivery (recently closed) and Moving Destination (recently opened). NTr. 73. According to Naim, he never paid Zilberman for his services to the moving company, NTr. 64:13-14, because he paid him in connection with the vehicles. NTr. 13:14. Naim testified that after the transfers, he paid Zilberman cash of between "**seventy to sixty" thousand dollars** (NTr. 23:24) to pay back for liens on about 15 vehicles (NTr. 39:6) that were paid off prior to the transfers. NTr. 40:15; NTr. 20-21. He also testifies that such money was not paid from GTS's bank account, but "it was paid in cash." NTr. 70:20-22. When asked where the cash came from, "selling the vehicle and giving it partially." NTr. 71:102. In response to the question "If I understand correctly, Group Travel Solution took cash," Naim testified "some cash, most of the money that I paid was from my personal money from income from the moving business." NTr. 71:13-18. According to Zilberman, GTS did not pay him any funds for the asset transfers. ZTr. 54:17. He states: Naim gave him "**some money...cash payments** _given to me_**, and he gave me a couple of dollars, meaning a few thousand dollars at different times, again and again, and there as a relationship**." ZTr. 55:3-8. He later testified that "**it was about... 100,000 in cash,** ZTr. 74:7-8, and "**I received it**." ZTr.74. "**I took it for myself for part of the company's-company's expenses and overall-my share**." ZTr. 75:21-23.

 **D. GTS**: During the transfers, occurring in 2010, 2011 and possibly later, the Debtor's employees including Vilenkin, Nigel Bullen (fleet manager), (VTr. 23; Tr.24:15) and Jose Felix, rental agent at Image (VTr. 24:18) and Adir Rent Car (V. 23:10) continued to work at 391 Empire Blvd. VTr. 102:7, 11; 24:18; 23:6-7. (_**There is no definitive time by which the Debtor stopped operating and Naim began operating the business since transfers were still being made by the Debtor and Adir Plaza (via Vilenkin, Zilberman, Sebag) in 2010 and 2011 after GTS had succeeded to some of the Debtor's vehicles in 2010 (via registration applications completed by Vilenkin on behalf of GTS**_. EB Exh. C) The signage at 391 Empire Blvd (VTr. 43:12) and rental contracts remained "Image Rent A Car," rather than Group Travel Solutions. VTr. 43:17, 53:16. Image and GTS used accountant Mr. Klitnick to prepare sales tax returns. VTr. 97:20; 96:12-13. GTS also uses accountant Samuel Eidelman, CPA to prepare income tax returns, VTr. 97, and Vilenkin believes that GTS has prepared returns since the formation. VTr. 98:2**. Yet, despite the Trustee's Demand Letter (defined below), it appears that only the**

**2010 tax returns were provided.**  GTS continued to use Image's telephone number: 1 (718) 771-6666.  VTr. 133.  According to Vilenkin, while working at the Debtor, Vilenkin primarily used the email address chanie@imagerentacar.com VTr. 54:15, 24. While working at GTS, she continued to use <u>chanie@imagerentacar.com</u> VTr. 54:15.  The email addresses were not changed because "**We were still doing business as d\b\a image rent a car.  People knew us as image rent a car.**"  VTr. 54:23-25 .  GTS filed the Assumed Name certificate (Exh. C p.14, VTr. 72), whereby, as explained by Vilenkin, GTS assumed the name of Image Rent A Car in May 4, 2010, for "**continuity or customer recognition**." VTr. 73:5-7.   After the transfers, <u>Zilberman would visit GTS</u>. VTr. 30:12-14.  NTr. 11:22-23.

**E. 1.** *Vilenkin's Role in Transferring and Registering Vehicles--Use of Name "Connie Grey"*
Vilenkin worked for Zilberman at his former company, Adir Rent A Car (VTr. 9, 10:2) prior to 2004 and then for the Debtor when it "took over" in **2004.** (VTr. 9, 10:2).  She is also friendly with Zilberman's wife and attends family "simchas and celebrations" with the Zilbermans VTr. 52:8.  She testified that her **legal name is "Chanah Vilenkin**," **which is reflected on returns, bank accounts and W2s**. VTr. 94.  <u>Sebag, Naim and Baksht identified [V]ilenkin as her last name</u>.  **NTr. 15:13, STr. 23:21; BTr. 29:20**, and they referred to her as "Chanie" or "Chani." ***Yet, she used a non-legal name "Connie Grey" on DMV documents she signed as an officer of each of the Debtor and Adir Plaza, transferring vehicles titled in either of their names to GTS***. (See below, the use of "Connie" in email address concerning asset transfers, but signing it "Chanie") Once the vehicles were transferred, she signed registration documents in an official capacity on behalf of GTS. She authenticates her signatures on these documents signed either as corporate secretary or vice president of the Debtor, Adir Plaza and/or GTS.  See e.g. VTr. 70:22; 73, 75:15; 76:11; 71:13; 78:15; 78:22;75; 78-79:4;  81:19; 82:6; 90:24.  She testified that Naim appointed her "temporary [corporate] secretary" on behalf of GTS to sign the transfer and registration documents. VTr. 67:9-10, <u>but cannot recall when the appointment was made and if it was ever terminated</u>.  VTr. 67:13, 67:17.  By the same token, Zilberman testified that he provided authorization to act as Vice President and officer of the Debtor and Adir Plaza in signing the transfer documents. Despite authenticating her signatures that she signed often as ***vice president***, she disputes that she was ever an officer or employee of Adir Plaza (VTr. 81;22; 82:19, 82:9; 81:22).  **When asked why she signed in such capacity,** she responds "***I can't recall***."   VTr. 82: 11.  DMV Form V-993 (transfer form) provides that "Any False Statement Is A Misdemeanor."  MV-52 Registration Form reflects that "Making a false statement in any registration application…is a misdemeanor under Section 392 of the Vehicle and Traffic." See EB Exh.C.  **Vilenkin first testified that she was not aware of any litigation that the Debtor was involved in, but then later in the deposition admitted to being aware of the Trademark Action.** VTr. 63:14-20.

E.2.  **Email from "Connie"** **<u>Dated 2/15/11 Re: the Transfer of Assets (the "Connie Email")</u>**

The Trustee questioned Vilenkin on her email address(es).

Q. While working at Image Rent A Car, did you have an e-mail address?

**A. Yes.**

Q. What was the e-mail address?

**A. Chanie@ImageRentACar.com.**

Q. Did you have any other e-mail addresses at Image Rent A Car?

**A. Sometimes, Connie, but I never use it.**

Q. How do you spell that?

**Q. C-O-N-N-I-E.**

Q. So Connie@ImageRentACar.com?

**A. Yes.**

Q. Any other e-mail addresses?

**A. No.**

Q While working at Group Travel Solution, did you have an e-mail address there?

**A. Same**

Q. It was Chanie@ImageRentACar.com

**A. Yes**.

Q. And also Connie@ImageRentA Car.com?

**A. I don't remember the last time that one.** (NTr. 53:20-5, 54:1-19)

Vilenkin was shown the Connie Email (marked as Trustee's "Exhibit 9," which was also attached as EB Exh.G[1] and hereto.   She was asked:

---

[1] It contains a **first message** from "Connie-ImageRAC≤connie@imagerentacar.com≥"  to Nosson [Esq.] on "Tue, Feb 15, 2011 at 12:28 pm":

" Hi Nosson,
**I left a message on your work and cellphone. This email is regarding the same subject matter. I need to file bankruptcy for Image Rent A Car Inc**."  Please call me or email me how we can proceed.  (Time is of urgency)
Thanks Chanie
-Image Rent A Car…
_____
On the same email chain, a **second email** is from Connie-ImageRAC≤connie@imagerentacar.com≥ to davidlipsker@gmail.com and Info@imagerentacar.com and relays a conversation with Nosson Kopel,Esq. to discuss bankruptcy, and references "civil fraud" and criminal fraud." It is sent "February 15, 2011 at 2:33 PM."In part, it states:

Spoke to Nosson Kopel
Re: Image
 A. His fee to start is $1000 filing fee +$3000 attorney fee….
 B  How urgent is urgent?.....
 **"C. There is another aspect to consider-Civil Fraud (its not as bad as Criminal Fraud). The court looks to see any transactions within the last year prior to filing bankruptcy. You are proposing moving assets from Image just prior to filing that could be interpreted as fraud. Have to see when sold Image's assets. If within the past year, they may reverse those sales so the money is there."**
D. The IRS might (probably will) come after you….

"Q. Can you concretely state that you did not write this e-mail?

**A. No. I don't recall every e-mail I ever wrote. This e-mail doesn't look familiar, but I can't say I didn't write it. I don't recall**." (VTr. 60:5-10.)

Basksht was shown the Connie Email, which he testified he received, (BTr. 33:16), via his address at davidlipsker@gmail.com.  According to Baksht, he spoke with Vilenkin "on the phone" following the receipt of the email (BTr. 40:7) and explained to her "that something doesn't sound kosher here and she should be aware not to get involved with this".  BTr. 33:19-23, Tr. 36:24.  Baksht identified info@imagerentacar.com (which was copied on the Vilenkin Email) as one of Zilberman's email addresses BTr. 36:5-7.  Vilenkin also verified that it was Zilberman's email address. VTr.59:8.  In reviewing the Connie Email, Baksht stated that Zilberman was the one who proposed to move assets from Image. BTr. 39:9-11.  Baksht identified Nosson Kopel as a bankruptcy attorney. Tr. 32:21, 36:19-20.  In terms of his relationship with Vilenkin, Baksht testified that he corresponded and spoke with her on the phone, BTr. 31:18-23, as Zilberman told Vilenkin to be in contact with him. BTr. 34:1-4.  "She was sending me documents related to the bankruptcy that Zilberman filed. And she was relating her concerns that she was getting involved in some criminal activities." BTr. 32:1-5.  Vilenkin cannot recall whether she spoke to Baksht before the bankruptcy or not. VTr.39:23.

**E.3.** *Vilenkin's Role in Continuing Operations*:  At Image, as recognized by Sebag and Vilenkin, Vilenkin had access to the Debtor's online banking. VTr. 19:22; STr. 23:16-21 and was in charge of online and insurance payments and insurance paid. VTr. 20:20.  According to Zilberman, Vilenkin "would take care of "payments out of the image bank account."  ZTr. 33:10.  She was given the bank account password either by Zilberman or Sebag.  VTr. 19:20:8.  Vilenkin provided all financial information to the Debtor's accountant, Mr. "Kltnik". ZTr. 35:17; 23.   When asked what her job description was at GTS, Vilenkin testified "**the same as before."** VTr. 31:18.  **Vilenkin was in control, running the "front" and "back office" when Naim is gone**, NTr. 79:1-4 **as he is sometimes present for as little as "a couple of hours**." NTr. 78:15.  Vilenkin would advise Naim, including on the best vehicles to purchase. NTr. 85: 1-15; VTr. 46:7.  She also told him to use Lease Direct, NTr. 19:23, the same company the Debtor used to lease vehicles. VTr. 25:8.    When questioned on company affairs, Naim referred to Vilenkin as the one with the knowledge and familiarity, including greater familiarity with a personal injury lawsuit against the company, NTr. 33-34, 36:17-18, the name of GTS's payroll company, NTr. 54:13-14, and the name of the accountant for GTS. Ntr. 15:8-9.  Vilenkin admits to having online access to bank accounts at GTS. VTr. 31:21.  Vilenkin worked with the accountants to provide them with information necessary to prepare both sales tax and income tax returns, (VTr. 97-98; NTr. 22), as she was familiar with the financial activities. NTr. 24.  Naim referred to Vilenkin as

---

E. This may or may not bring the other [Trademark Action] case to NY and it may or may not help dismiss that case.....

the one who would keep records of payroll, not himself. NTr.54:9.  Naim testified that :

> A. **[Vilenkin] mad[e] sure to pay bills, insurances, make sure to pay the insurance, up-to-date paying the leasing cars up-to-date.  There is a late payment for whatever reason, she used to converse with Honda and Ford, whatever. Payroll, if we have money, she would let me know there is enough money to pay for payroll or not…"** NTr. 83:20-25; 84:1….

> "**A. I gave her authority to make the bill of sale for the cars…**

> Q. When did you give her this authority?

> **A. As soon as I start working there.**

> Q. You had no prior business relationship with her prior to that though, correct?

> **A. No.**

> Q. But you gave her authority to sign off on the bill of sale of the vehicles.

> **A. Sure, I did it because I saw her capabilities. She knows what she was doing.**

> Q. Who makes the decisions as to what cars to lease?

> **A.  Together.**

> Q. So Chanie plays a role in deciding which—

> A. **Not really but she's advising me. I used word advise me."** NTr. 84-85**.**

Vilenkin was in charge of making sure finance payments were made to Lenders. NTr.45:15. Vilenkin and the rental agent oversaw the rental contracts (VTr. 41:14) which would be placed in the office. VTr. 42:11.

Vilenkin was a "middle man" in negotiating a price for a vehicle, with Naim deciding the final sales price. VTr. 48:9-14.  Vilenkin was in charge of the vehicle inventory and was able to recite at the deposition from memory the current inventory of owned and leased vehicles without resorting to any inventory list. VTr. 119:4 In terms of Vilenkin's role at the Debtor, Baksht testified:

> "Q.  In terms of running the day-to-day operations for Image Rent A Car, what role do you believe Chanie played in that?

> **A.  I think she was the general manager of operation. Zilberman would be away a lot of the time and she would run day-to-day and she would run the day–to-day affairs with lawyers, consultants and the day-to-day money operations of the business. She wasn't just a secretary, some lame secretary.**"  BTr. 44:1-10, 43:24-25.

**F. Basksht** is a trademark consultant. BTr. 7:5 and works from his home. Baksht had an employee named Menachem Schneorson, a friend of Zilberman. BTr. 8:18   Baksht met Zilberman through Schneorson and he would ask questions relating to trademark litigation. BTr. 34:12-17. Baksht acknowledged that he was aware of the litigation with Digby Adler and that Digby operated under the trademark "Bandago" (BTr. 44).  Zilberman told Baksht that the Debtor was infringing on Digby's trademark. BTr.45, but Zilberman told him that "I'll ride on the name as long as I can and when I'll be stopped I'll be stopped." BTr. 45:13-14.  Zilberman explained to Baksht that:

> **"A…When people punch Bandago on the computer they get Image Rent A Car and Bandago is very well known in California, it's a seriously well-known company according to Schneior. When they press Bandago, Image comes up and they get a lot of business. Therefore, any expenses [I] may have to pay is more than offset by the money he makes. This is classic trademark infringement calculation."** BTr. Tr. 46:2-10; 45:11-25.

Baksht also recalls seeing the name "Bandago" used on the Debtor's "discount coupons, leaflets…" BTr.53:19.   Baksht referred Zilberman to his attorney Hubener, (Tr. 32:9-11) who defended the trademark litigation.   Zilberman would send documents to Zilberman to send to Hubener and would "sometimes ask me what I would think about it." BTr. 32:14-16. In Baksht's apartment, Schneorson and Zilberman "discuss[ed] moving some companies and assets to Menachem Schmeroson" BTr.. 37:10-16.  Baksht was a party to the conversation. Tr. 37: 2.  He testified:

> **"A."I told him hey guys, I'm not a bankruptcy expert, I'm a trademark expert, but it doesn't sound kosher to me, moving assets just before you file for bankruptcy. You should consult with an attorney before you do that, because it may be criminal. I'm not sure."** BTr. 38:16-25

**Email Dated 7/15/11 from Joseph Y. Balisok, Esq. to <u>Shneior@gmail.com</u> forwarded from <u>Marketing@imagerentacar.com</u> to <u>Davidlipsker@gmail.com</u> to "Start Moving Assets Away" (Attached herto)**

Baksht was shown the above referenced email which provides:

> " Dear Schneior,
> Bandago has requested that the bankruptcy court allow them to subpoena records and depose an officer of Image and Van Rental.
> Should start moving assets away.
> See attached.
> We will need to have Hubener find the affidavit they referred to. Confirm
> that they are not misinforming the court.
> Please feel free to call me if you have any questions. Thank you for your kind attention in this matter. Sincerely,
> Joseph Y. Balisok." Esq…."

Baksht testified that he was copied on the Balisok Email that was forwarded to him.  BTr. 41:25. He testified that Balisok is a family member of Zilberman; 41:4-5.  He confirmed that Schneior@gmail.com is another one of Zilberman's emails. BTr. 42:3-4.  He testified that he spoke to Vilenkin after she received the email, who confirmed that she forwarded it to Baskht. BTr. 42:13-14.  He had a further conversation with Zilberman and Schmerosn. BTr. 42:19; 42:21.   In response to Zilberman's plans to move assets, Baksht testified:

> **"A. I told Schneior Zilberman this is becoming to me any way-you should consult an attorney. This is becoming more and more clear this is becoming very un-kosher and very criminal to move away assets immediately before you file for bankruptcy, sounds very criminal to me. He responded to me don't worry, Balisok will take care of it, he's family, he will take of it. Whatever happens, Balisok know how to take care of it."** BTr 42:23-25; 43:1-8.

Baksht testified that Zilberman hid certain files in Baksht's file cabinets.  Zilberman wanted to protect himself from "go[ing] to prison." BTr. 47:2-10.  Baksht testified that he helped him until he "realized where he was going with it and decided not to continue."  BTr. 34:17-19; 23:13-14. Baksht requested Zilberman to remove the documents BTr. 22:6-10, which Baksht felt were not "kosher documents" BTr. 22:9.  Baksht describes the harsh repercussions of that request. BTr. 9: 1-16.

## MISSING DOCUMENTS

3.      The Trustee sent a letter dated March 5, 2014 ("Demand Letter") requesting the production of

documents by GTS.  Trustee's counsel imposed a deadline of March 17, 2014 for the production and

March 19, 2014 and a deadline for any objections by March 12, 2014. Based upon communications with

the Trustee in April, 2014, and unless recently produced, it appears that information that has not been

received by the Trustee is reflected in Red Bold.   (Both Naim and Vilenkin  testified that Accountant

Samuel Eidelman prepared GTS' tax returns and that Accountant Klitnick prepares the sales tax returns,

and both were have in the past been given company records.) Vilenkin testified that there was a file

cabinet at the premises where documents are filed. VTr.111-113.

1.  "Copies of Group Travel Solution, Inc.'s Federal, New York State and New York City corporate income tax returns, including all attachments, from the year ending 2010 through and including the present.
    **MISSING 2011, 2012 AND 2013 FEDERAL AND STATE INCOME TAX RETURNS SALES TAX RETURNS SHOULD ALSO BE PRODUCED.**

2.  Copies of Group Travel Solution, Inc.'s general ledgers, financial statements, balance sheets, agreements, receipts, correspondence, letter agreements and audits valuation reports for the

period beginning January 1, 2010 through the present.  **MISSING ALL**

3. Copies of all bank statements, cancelled checks and/check images (fronts and backs), deposit slips, payment advices(including without limitation all wire, automatic debt and/or ACH transfers, including payee and payee account number), and signature cards for any and all accounts in which Group Travel Solution, Inc. had an interest for the period beginning January 1, 2010 through the present;

   **MISSING BANK STATEMENTS FROM AND INCLUDING JULY 2011 THROUGH JUNE 2012; MISSING BANK STATEMENT DATED SEPTEMBER 2013 FROM CHASE BANK ACCOUNT #6792, ALL CANCELLED CHECKS, SIGNATURE CARDS FROM JANUARY 1, 2010 THROUGH THE PRESENT**

4. Copies of any real property lease agreements to which Group Travel Solution, Inc. was a party to for the period beginning January I, 2010 through the present;  **MISSING ALL**

5. Copies of any and all vehicle lease agreements or finance agreements to which Group Travel Solution, Inc. was a party to including, without limitation, (a) a Chevrolet Express (2011); (b) 8 Ford Econoline V, 15 passenger vans; (c) 5 VW Passats; (d) 4 Hyndai Sonatas; and (e) 4 Honda Odysseys for the period beginning January I, 2010 through the present;  **MISSING ALL, other than information on currently owned vehicles(a-e)**

6. Copies of any and all bills of sales in respect to any vehicles that Group Travel Solution, Inc. had in its possession, custody and/or control for the period beginning January 1, 2010 through the present;  **MISSING ALL**

7. A copy of the corporate kit for Group Travel Solution, Inc;
   **MISSING**

8. A detailed written statement of any funds or proceeds of sale paid by Group Travel Solution, Inc. and/or Philip Naim to Schneior Zilberman for the period beginning January I, 2010 through the present;"  **MISSING**

## CONCLUSION

WHEREFORE, Digby respectfully requests that its Requested Relief be granted and any such other and further relief as it deems just and proper.

Dated: New York, New York
     May 9, 2014

                             */s/ Barbie Lieber*
                             Barbie Lieber (BDL 5891)
                             Lieber & Lieber, LLP
                             60 East 42nd Street, Suite 2222
                             New York, New York 10165
                             Phone:  (212) 949-5586