UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

In re:                          :
                                   Case #11-42390
IMAGE RENT A CAR INC.           :


                                :
        For Chapter 7
------------------------------:
<u>Plaintiff</u>                       Adversary Case #12-01288
MESSER AS THE TRUSTEE OF THE   :
ESTATE OF IMAGE RENT A CAR,

                                :
          -against-
                                :  271 Cadman Plaza East
<u>Defendant</u>                       Brooklyn, NY  11201-1800
ZILBERMAN, et al.              :  February 5, 2014
                                   2:53:15 p.m.
------------------------------:


    TRANSCRIPT OF MOTION TO OBJECT/RECLASSIFY/REDUCE/EXPUNGE
CLAIMS; MOTION TO COMPROMISE CONTROVERSY; PRETRIAL CONFERENCE;
  CROSS-MOTION TO STRIKE DEBTORS' OBJECTION; CROSS-MOTION TO
 DISMISS THE CASE; REQUEST TO REFER MATTER TO INVESTIGATION
                          BEFORE
                JUDGE NANCY HERSHEY LORD,
           UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

General Counsel for       LAMONICA HERBST & MANISCALCO, LLP
Trustee:                  BY:  GARY HERBST, ESQ.
                               JORDAN PILEVSKY, ESQ.
                          3305 Jerusalem Avenue
                          Wantagh, New York 11793

Special Counsel to        DANIEL GERSHBURG, ESQ., PC
Trustee:                  100 Church Street, Eighth Floor
                          New York, New York 10007


Transcription Service:        Carole Ludwig,
                              *Transcription Services*
                              141 East Third Street #3E
                              New York, New York 10009
                              Phone:  (212) 420-0771
                              Fax:  (212) 420-6007


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

<u>APPEARANCES CONTINUED</u>:

For Defendants in          ROSENBERG MUSSO & WEINER, LLP
Adversary Proceeding:      BY:  BRUCE WEINER, EQ.
                            26 Court Street, Suite 2211
                            Brooklyn, New York 11242

For Digby Adler Group:     LIEBER & LIEBER, LLP
                            BY:  BARBIE LIEBER, ESQ.
                            60 E. 42nd Street
                            New York, New York 10165

<u>**INDEX**</u>

<u>**E X A M I N A T I O N S**</u>

| <u>**Witness**</u> | <u>**Direct**</u> | <u>**Cross**</u> | <u>**Re-Direct**</u> | <u>**Re-Cross**</u> |
|---|---|---|---|---|

None

<u>**E X H I B I T S**</u>

| <u>**Exhibit Number**</u> | <u>**Description**</u> | <u>**ID**</u> | <u>**In**</u> | <u>**Voir Dire**</u> |
|---|---|---|---|---|

None

1    (Proceedings commence at 2:53:15 p.m.)

2            THE CLERK:    Matter numbers 31 through 36 in the

3    case of Image Rent A Car, Inc., and in the adversary

4    proceeding Messer versus Zilberman, et al.

5            THE COURT:    First, we'll take appearances, but we

6    don't have an attorney on the phone.    We have a

7    (inaudible).    So never mind.    Appearances.

8            MR. GARY HERBST:    Gary Herbst and Jordan

9    Pilevsky, Lamonica, Herbst & Maniscalco, General Counsel to

10   the Trustee, Gregory Messer who's also present in court.

11           MR. DANIEL GERSHBURG:    Your Honor, Daniel

12   Gershburg, Special Counsel to Gregory Messer, the Chapter

13   Trustee.

14           MR. GREGORY MESSER:    Good afternoon, Your Honor,

15   Gregory Messer, I'm the Chapter 7 Trustee in this matter.

16           MR. BRUCE WEINER:    Bruce Weiner, Rosenberg, Musso

17   & Weiner for most of the defendants in the adversary

18   proceeding.

19           MS. BARBIE LIEBER:    Barbie Lieber of Lieber &

20   Lieber, representing the Digby Adler Group LLC, the

21   creditor in this case.

22           THE COURT:    Mr. Herbst.

23           MR. HERBST:    Yes.

24           THE COURT:    Tell me who, either you or Mr.

25   Gershburg, or Mr. Messer, examined either at a 341 meeting,

1  a 2004 exam, or a deposition after the adversary

2  proceeding.

3        MR. HERBST:   Your Honor, I am going to have Mr.

4  Pilevsky, who is intimately involved with this, present

5  that.  The reason --

6        THE COURT:   I just want to know who's been sworn

7  under oath in this case.

8        MR. HERBST:   Sure, the reason I rose is I wanted

9  the Court to be aware, while we have a lot of people here,

10  my time will not be billed.  I'm here because of the nature

11  of the allegations that have been leveled in the papers,

12  and I figured if the Court had some questions or concerns,

13  I'd be here.

14        THE COURT:   I have a lot of questions.  It's not

15  so much about the attorneys though.

16        MR. PILEVSKY:   To answer Your Honor's question,

17  Schneior Zilberman, the principal of the debtor, was

18  deposed and sworn, gave sworn testimony.

19        THE COURT:   Tell me when and whether it was the

20  341 meeting, the 2004 exam, or a deposition after the

21  commencement of the adversary.

22        MR. PILEVSKY:   It was an examination before trial

23  after the commencement of the adversary proceeding, and I

24  believe --

25        THE COURT:   So a deposition post-adversary.

1  When?

2            MR. PILEVSKY:    In October of 2013.

3            THE COURT:    Just a couple of months ago.

4            MR. PILEVSKY:    A few months ago.  He was also

5  sworn at the --

6            THE COURT:    That was after the motion to settle

7  the case?

8            MR. PILEVSKY:    Yes.

9            THE COURT:    So who was deposed at the 341

10  meeting?

11           MR. PILEVSKY:    The same individual.

12           THE COURT:    Okay, so that was, he was deposed at

13  the 341 meeting – well, he testified for the corporate

14  Chapter 7 debtor at the 341 meeting, is that right?  Did

15  anybody else testify?

16           MR. PILEVSKY:    No.  I don't believe so.

17           MR. GERSHBURG:    No, Your Honor, I was counsel to

18  the creditor at that time.  He testified at the 341

19  meeting, and additionally after that, when I representing -

20  -

21           THE COURT:    So the 341 meeting was about when?

22           MR. PILEVSKY:    Within 60 days after the filing.

23           THE COURT:    Which is?

24           MR. PILEVSKY:    The filing date was March 24,

25  2011.

1    THE COURT:    This is before my time, which is why

2  I --

3    MR. PILEVSKY:    May 3, 2011, Your Honor.

4    THE COURT:    May 3 was the day of the 341?

5    MR. PILEVSKY:    341.

6    THE COURT:    Okay, the 341.  Okay, so he testified

7  at the 341 meeting, he testified post, at the deposition

8  which was post-adversary proceeding and post-motion.  And

9  was there another time?

10    MR. PILEVSKY:    There was --

11    MR. GERSHBURG:    There was one time after 341,

12  Your Honor, when I represented the Digby Adler Group, we

13  brought him in and he was deposed approximately I want to

14  say six months after the 341 --

15    THE COURT:    That was in a 2004?

16    MR. GERSHBURG:    Yes, that's correct, 2004

17  examination.

18    THE COURT:    And you were still representing

19  Digby?

20    MR. GERSHBURG:    That is correct, Your Honor, at

21  the time.

22    THE COURT:    Okay.  So you deposed him in a 2004

23  in this bankruptcy case.  And when was it?

24    MS. LIEBER:    I'll give you the exact date.  I

25  think I have the 2004.

1          THE COURT:   Yeah, I saw it too.

2          MS. LIEBER:   It's attached to the --

3          THE COURT:   No, I know.   It didn't print.

4          (pause in proceeding)

5          THE COURT:   You can go slower.   I'm not hurrying

6    you.

7          MS. LIEBER:   Okay.   I had printed it out.

8          THE COURT:   You're the only thing on the calendar

9    today this afternoon.   I have all the time.

10          MS. LIEBER:   I printed it out before I came here.

11          (pause in proceeding)

12          THE COURT:   It's part of your cross-motion to

13   strike you think?

14          MS. LIEBER:   Oh, actually, it's attached, the

15   2004 exam is attached to the Trustee's motion to turn over

16   the assets of the case.   So it's the turnover motion, it

17   was in April 2013 turnover motion that was made.   Or, no,

18   April 13, I'm sorry, April 2013 was the order of the Court,

19   and the motion was made before.   So the motion was made in

20   like February I think for the turnover of documents and

21   assets, and it was attached to that motion.

22          THE COURT:   Okay, I'll find it.

23          (pause in proceeding)

24          MS. LIEBER:   Oh, here it is.   Here, I have a

25   copy.   It was - it's November 29, 2011.   November 29, 2011.

1          THE COURT:   Okay.

2          MR. PILEVSKY:   Just so Your Honor knows, I

3  apologize, after that November 29, 2011 date, we, again,

4  attempted to bring in Mr. Zilberman to continue the 2004

5  examination because it was short.  I made a motion before

6  Your Honor's predecessor, Judge Rosenthal, who denied that

7  motion to continue the 2004 at the time.

8          MS. LIEBER:   And if I could qualify what he just

9  said.  When Judge Rosenthal denied this, as part of his

10 rationale for denying it – and this is a court order, so

11 Your Honor could see – he specifically said that it was

12 beyond the scope of a 2004 and that it should be done by

13 the Trustee in a deposition.  So then --

14         THE COURT:   Well, a trust commencement of an

15 adversary --

16         MS. LIEBER:   Correct.

17         THE COURT:   Right.

18         MS. LIEBER:   So that was his rationale, and, of

19 course, he commented on the manner in which it was

20 conducted, but that was beside the point.

21         THE COURT:   Okay.  Joseph Balisok was the

22 attorney for the debtor?

23         MR. PILEVSKY:   That's correct, Your Honor.

24         THE COURT:   He's still the attorney for the

25 debtor?

1          MR. PILEVSKY:   I'm not aware that he withdrew as

2  counsel.

3          MS. LIEBER:   But actually, Your Honor, if I could

4  just qualify.  When they filed the claims objection against

5  my client after three years, it was filed by the debtor

6  first, by Mr. Wiener.  So he is now counsel, my

7  understanding.  And then it was joined by the defendants,

8  and he now represents all the defendants, my understanding.

9          THE COURT:   Well, maybe he does and maybe he

10  doesn't.

11          MS. LIEBER:   Right, exactly.

12          THE COURT:   Who else did you depose?

13          MR. PILEVSKY:   The only individual that was

14  successfully --

15          THE COURT:   In a 341 meeting, 2004 examination,

16  or a deposition?

17          MR. PILEVSKY:   The principal of the debtor.

18          THE COURT:   That was it.

19          MR. PILEVSKY:   That was it, had intimate

20  knowledge of all the facts.

21          THE COURT:   Not good enough.

22          MS. LIEBER:   I'm going to clap on this.

23          THE COURT:   Not good enough.

24          MR. PILEVSKY:   Your Honor --

25          THE COURT:   Not good enough.  Not good enough.

1  Let me – I've done a little work here.  It's not good

2  enough.

3          ATTORNEY:    Inappropriate person.

4          THE COURT:    I'm not saying I'm not going to

5  approve this settlement.  I'm saying that we either can

6  have an evidentiary hearing about the settlement.  We can

7  put this settlement on ice.  We can go do more depositions.

8  Whether we do it as an evidentiary hearing and we put

9  people on the stand in my court or you do it outside and

10 then you bring me a report and then we have a further

11 hearing.  We can discuss that.  Sit down, Mr. Weiner.

12         Some of these people have passed through my court

13 before in another case.  They're not new to me.  And I'm

14 going to stay objective based upon that.  But I will tell

15 you that in order to make sure that we had a proper Chapter

16 7 filing here and we didn't have serious fraudulent

17 conveyances or fraud or bankruptcy crimes or bankruptcy

18 fraud, there are a host of other people I think – well, not

19 a host – but probably a handful of other people I think you

20 need to put on the stand, and you can put them on the stand

21 right in front of me.  And when they tell you they're too

22 ill to come, you can arrange for cars to get them here.

23         I don't see how you can go ahead without having

24 Mr. Nahim under examination, under oath.  Or Mr. Baxt,

25 whose email address is David Lipsker, who was a principal

1   of another debtor in this courtroom, who's been here.  Or

2   the secretary.  Okay, you'll find all of these names, as

3   you know, are going to be Yiddish names --

4         MS. LIEBER:   Miss Gray, Hani Gray her name --

5         THE COURT:    -- that have English names.  Hani,

6   Hannah I know, I know.  Is it too expensive?  Well, maybe.

7   So if that's the case, you know, you have decisions to

8   make. If Mr. Messer doesn't want to continue as Trustee, I

9   assume he can resign, and some other trustee will come on.

10        But, you know, you folks know me, you've been

11  before me.  I don't do this very often, but I really think

12  that before you take a settlement of a fraction of what you

13  think went on here, and other names came up, and you came

14  before me for orders, and there weren't turnovers, and you

15  could've come for contempt.  You need to go do that.

16  Again, which is not to say that I'm going to deny the

17  settlement, because I'm not, because every one of those

18  people who signed it I'd like to see under oath and find

19  out whether they were authorized.

20        Who were the shareholders in all of these

21  companies?  Who is the CEO?  Who has authority?  I mean

22  right now on the face of it I can't go forward anyway

23  because you've got some folks out there, again, they're

24  always out there, who are saying that there's no authority.

25        So I'll hear you, but the bottom line at the end

1    of the day, and, again, it may very well be that this is,

2    you know, you're going to convince me this is a great deal.

3    But I think you have to, in circumstances of this

4    situation, particularly when some of these defendants

5    managed to get the California court to stay the

6    proceedings.  Now I ordinarily would have said, you know

7    what, there's obviously no stay as to the non-debtors, and

8    if we need to determine what the debtor's claim is, we

9    should lift the stay and have the action proceed over there

10   and have them prove up their claim in California.  Nobody's

11   made that motion, or at least I don't think anyone made the

12   motion.  Again, this wasn't always my case.

13              MR. GERSHBURG:   Within the past year, Your Honor,

14   that came up in this courtroom.  Your Honor actually did

15   say that the stay does not apply to all the non-debtors.

16              THE COURT:   Well, it doesn't, but I understood

17   from the papers that that's not right, that somewhere --

18              (interposing)

19              MS. LIEBER:   Right --

20              THE COURT:    -- in time in California, which you

21   may not have known when we discussed this, that the

22   California court has stayed it.

23              MS. LIEBER:   Right, that's what happened, and we

24   went back to the California court and made a motion to lift

25   the stay.  And at that time, the Court said, no, stick to

1  this case because in furtherance of judicial economy the

2  district court probably thought that the trustee would

3  administer the case, look at the assets, move forward with

4  avoidance actions, and then that would be resolved.  But

5  you see --

6         THE COURT:   You know, and then what you've done –

7  what you've done now to this plaintiff-creditor, when you

8  settle for this small amount of money, is they go try to

9  make all kinds of hay with respect to the fact that there's

10 nothing there or whatever went on in California.  Don't you

11 see that happening?  So --

12        MS. LIEBER:   I'm sorry, could you repeat that,

13 Your Honor?

14        THE COURT:   I said what could happen here is that

15 the parties who were defendants in that case can make a lot

16 of hay presumably --

17        MS. LIEBER:   Exactly --

18        THE COURT:   -- as to the amount of money you

19 folks settle for after a full investigation.

20        MS. LIEBER:   Exactly, and that was --

21        THE COURT:   Although it's a different cause of

22 action.

23        MS. LIEBER:   Understood, but – exactly.

24        THE COURT:   But --

25        MS. LIEBER:   Your Honor --

1          THE COURT:    And I guess I also don't understand

2    what happened – somebody has to explain this to me.  At the

3    beginning of the case, and this is where I remember Mr.

4    Gershburg – didn't we agree in unusual circumstance that

5    Mr. Gershburg could come in here and do this work because

6    of the fact that he, you know, again, in an unusual

7    situation allowing him to do that.  So what happened?

8          MR. GERSHBURG:    Certainly, Your Honor.

9          THE COURT:    It may have been that you were

10   charging by the hour, but what happened?

11         MR. GERSHBURG:    No, it wasn't that I was charging

12   by the hour at all.  I was completely cognizant of what I

13   started giving up when I stepped into this role.  What I

14   will tell Your Honor though is, in its infancy when we were

15   filing motions, etc., and we were attempting to – in the

16   best that I can put it, Your Honor, we attempted to get the

17   defendant's cooperation in this.  And when I say

18   cooperation, I meant not having to file motion after motion

19   to compel them to appear somewhere.  And at some point,

20   general counsel had come in who had I should say a better

21   relationship and was able to facilitate this with happening

22   in a much easier fashion than myself coming before Your

23   Honor.

24         THE COURT:    What kind of cooperation did you get?

25         MR. GERSHBURG:    Well, just as an example, Mr.

1  Zilberman appeared for an examination that the trustee had

2  asked him to appear on.  They did not want to - even during

3  the time I was there - Mr. Weiner's client did not want to

4  continue if I was even present in the room because of

5  animosity of the --

6          THE COURT:   I remember that.  I think I came in -

7  I think that was one of the first thing --

8          MS. LIEBER:   No, no, no --

9          MR. GERSHBURG:   No, Your Honor --

10         MS. LIEBER:   -- he's referring to a deposition.

11         MR. GERSHBURG:   This was recently.  And he

12 essentially said I'm not doing this.  He represents Digby,

13 it's your client, it's your client.  And, again, Your

14 Honor, during that period of time it would have resulted in

15 myself making motion after motion and to bleeding any

16 resources, potential recovery as opposed to general

17 counseling coming in and facilitating something like that.

18         I will tell Your Honor that, as general counsel

19 took over, certainly there was no redundancy in terms of

20 the work that was performed.  In other words, general

21 counsel took a leading role in it and I took a back seat

22 where I could in a situation like this.

23         THE COURT:   Okay, well, you know, again, my

24 bottom line here is if your largest creditor is standing

25 here and saying - and maybe she's not so large, maybe it's

1  not so large – but the creditor is standing here and saying

2  don't approve it, and if spending a lot of money doing this

3  here is going to deplete whatever money and risk the

4  settlement, as it might do, who's harmed?  The creditors

5  are harmed; three taxing authorities and the Digby

6  creditor, right?  And professionals, but, unfortunately, we

7  get some of these cases where you gotta dig deeper and it

8  may be more costly, but you don't have a choice.

9           MS. LIEBER:   May I speak, Your Honor, please?

10          THE COURT:   No, let hear from Mr. Herbst.

11          MR. HERBST:   Your Honor, I understand what you're

12  saying, and I don't have any problem certainly complying

13  with Your Honor's direction.  Not at all.

14          This has been a difficult case clearly and

15  frustrating, and a lot of times these are the kinds of

16  cases, unfortunately, as Your Honor knows, that become just

17  a giant well.  You try at some point to come away with the

18  best settlement you think you can so that it doesn't become

19  a self-fulfilling prophecy that the only people that get

20  paid at the end of the day are the professionals.  Clearly,

21  in a case like this, there's been complaints that there's

22  too much time spent, but then you aren't doing enough to

23  pursue certain avenues of inquiry.

24          I get it, I understand it.

25          THE COURT:   You're not going to hear it again,

1  even if, you know, if you want to cover yourself with the

2  office of United States Trustee in this case, I'll make it

3  very clear on the record that, to the extent you've got to

4  spend a lot more time, it's because I made you do it.

5         MR. HERBST:    And, Your Honor, it didn't come from

6  the office of the United States Trustee, so --

7         THE COURT:    Well, I'm saying --

8         MR. HERBST:    -- but --

9         THE COURT:    -- wherever it may come from.

10        MR. HERBST:    But be that as it may, and it's

11 irrelevant to this point of Digby's participation in the

12 underlying settlement that they later objected to.  I'm not

13 going to get into the underlying facts and how we reached

14 it.  Your Honor has raised certain concerns.

15        The only question I raise to the Court is the

16 following.  What we have is a case that has seen – it's a

17 two-party dispute for all practical purposes.  It was in

18 California, they file here in an effort to avoid what's

19 going on in California.  At some point, before we come back

20 with a settlement --

21        THE COURT:    And I've see that scenario before,

22 again.  An infringement case somewhere else, a filing here

23 in the hope of bringing that action here.  I didn't let it

24 happen then.  I don't know if it was attempted here before

25 I got here.

1          MR. HERBST:    And understand, this settlement

2  didn't obviously infringe upon the creditor's rights to

3  pursue those claims.    That was clear in the settlement that

4  we reached.    What is an issue, whether it's here or

5  somewhere else, is the amount of the claim.    So, for

6  example, if Your Honor ultimately determines that claim is

7  a claim of a de minimus amount, of $10,000 or $20,000, then

8  Your Honor's consideration of a settlement for $120,000

9  will be different than if that claim is for 200 or 300.

10          THE COURT:    Not if I think that enough of an

11  investigation has not – not if I don't think enough of an

12  investigation has occurred with potential wrongdoing.

13  We're not just here, I mean one of the things we're here to

14  do is to make sure that there are recoveries for creditors.

15  Okay?  But the other thing we're here to make sure, I'm

16  here to make sure doesn't happen is that we don't have

17  nonsense.    We don't have people, again, entities filing

18  bankruptcy cases in an attempt, with a shell after they've

19  conveyed assets out.    That we don't have one principal

20  saying the other principal, when, in fact, maybe they're

21  not the principal.    Or we don't have defendants in a

22  settlement then saying that they had no, the person had no

23  authority to enter it.    Now, this may be somebody who's

24  just making noise, okay?

25          MR. HERBST:    Well, this --

1        THE COURT:   Notwithstanding that, notwithstanding

2   that, there are two many questions here as to - you know,

3   there's an email, and, again, that same person obviously

4   sent it --

5        MR. HERBST:   Is that the Mr. Baxt, Your Honor?

6        THE COURT:   Yeah, Mr. Baxt --

7        MS. LIEBER:   No, no, no --

8        MR. HERBST:   The one - understand.

9        MS. LIEBER:   -- it's Connie Gray to Mr. --

10       THE COURT:   I understand, but it's Connie Gray to

11  - we don't know what that email is; it's out of context.

12  And we're missing part of that email, the email that would

13  have been question, because obviously A, B, C, D, E, F, G,

14  she's answering somebody's questions.  So we don't have all

15  of that, and, again, it's not in any context.  Just give me

16  an example.  Why is she reporting to him on how it's going

17  to get filed and what's going to get filed and the

18  possibility that's - and all of a sudden now he's the CEO

19  on the other company?  And I'm telling, you we've both been

20  doing this a long time, we can't get this one lie without

21  going further.

22       MR. HERBST:   Your Honor, I have no problem with

23  that.  I wasn't suggesting that we weren't going to do that

24  due diligence, and just for Your Honor's reference, the

25  infamous or, Mr. Baxt, I understand he's been before Your

1  Honor on another matter.  But just so Your Honor's

2  understanding, when this was raised in the objection, we

3  scheduled six, the meetings with Mr. Baxt and also through

4  the creditor said he could help facilitate that; he

5  cancelled every one of those meetings.  And we attempted to

6  explore that.  It didn't provide any benefit because --

7           THE COURT:   Maybe it's because I have the Judge

8  before my name that I got him here to sit in there for

9  three days or four days.

10          MR. HERBST:   It was - and when I found that

11  earlier, I said, well, then I guess we'll go that route.

12          The only point I raise to the Court was I fully

13  understand that you have to view this and all the facts and

14  understand what's happening and whether the people are

15  trying to improperly take advantage of the benefits of this

16  court.

17          My only point was, for the purpose of the Trustee

18  in determining an amount - forget the issue of the inquiry.

19  The inquiry is under a different portion I guess of the

20  fiduciary duty of a trustee.  When you deal with the

21  settlement, whether Your Honor can approve a settlement on

22  a reasonableness, lowest rung standard dollar amount, what

23  we have is initially a claim filed of $300,000, and when we

24  inquired further, it was told it was closer to a million.

25  All we've wanted to know was just how it was quantified,

1  which is not really set forth.  I think there's a

2  complaint.

3         So I think, Your Honor, it would be helpful, dual

4  tracks, if you will, we'll do our inquiry, we'll proceed

5  accordingly --

6         THE COURT:   Doesn't it require me to try that

7  portion of the case that's against the debtor?  It's an

8  infringement claim, isn't it?

9         MR. HERBST:   It is, then, Your Honor, I think the

10 question is of whether this goes back to California and

11 they try it out there.  At least - the reason I say that is

12 at some point it's going to be brought before Your Honor on

13 a dollar amount.  I --

14        THE COURT:   Or, again, or if you dig deep enough

15 and you make enough people testify under oath - maybe that

16 doesn't even matter, I don't know - but if you do that, you

17 know, maybe you start getting some different numbers here.

18 Maybe you don't.  And then you've got a situation where, at

19 least as to the debtor, you know, the creditor is satisfied

20 and I will be satisfied that you've done the proper

21 investigation into figuring out what went on here.  I mean

22 they really go hand in hand.

23        I mean I understand that in the typical case, the

24 ordinary case, what you've done here so far would make

25 sense.  Okay?  A very difficult litigation ahead, you know,

1  there's lists of litigation, you know, again, it's

2  difficult and you come up with a number, but how do you

3  know when it would be time - they default - first of all,

4  you've got this thing over a long period of time.  You

5  know, they're paying very little - not very little - but

6  they're paying whatever they're paying over a long period

7  of time, and all of a sudden there's a default, and now

8  you've got to look to your confessions of judgment, and

9  these folks say not authorized.  So we now have a different

10  litigation, because that's what would happen here.

11          MR. HERBST:  I understand, Your Honor.

12          THE COURT:  Right now you would - I guess you

13  would - I don't know if you were prepared to go forward

14  because I cut you off at the beginning.  But whether or not

15  you're prepared to go forward when we have somebody out

16  there who refuses to appear saying that two of the

17  defendants were not authorized, or Mr. Weiner - I guess Mr.

18  Weiner as to one or two - there were two lawyers, right, or

19  just you?

20          MR. WEINER:  There were two lawyers.  One of the

21  two lawyers is no longer - as of Monday of this week, is no

22  longer in private practice.  And we're in --

23          MS. LIEBER:  Which one is that?

24          MR. WEINER:  And we're in the process of getting

25  - and those defendants are in the process of getting, or

1  that defendant is in the process of getting separate

2  counsel.

3          THE COURT:   Okay, because I had --

4          MR. WEINER:   That was --

5          THE COURT:   -- this chart --

6          MR. WEINER:   -- Group Travel.

7          MS. LIEBER:   The attorney is who, Summerstein?

8          MR. WEINER:   Summerstein took a job with the

9  government, and he's - well, actually with Legal Aid.  And

10  --

11          THE COURT:   It's not the government.

12          MR. WEINER:   Well, it's not the government.  He

13  took a job with Legal Aid.  And he just started on Monday.

14          THE COURT:   Okay, so you had - I mean you have

15  somebody saying that Adir (phonetic) Group and Group Travel

16  were not authorized.

17          MR. WEINER:   We'll deal with that.  I don't want

18  to argue about Mr. Baxt and why we think he's a fraud.  Let

19  those factors come out when the Trustee finally gets him

20  into a room.

21          THE COURT:   All right, I mean let's find out

22  who's Mr. Name (phonetic), Nahim, or whatever his name is,

23  and the other thing that was a little strange is, I guess I

24  don't know, at one point I guess I saw some transcript

25  where somebody said Mr. Baxt is not Israeli.  I don't know

1  why somebody said, first, Israeli, and then he said he's

2  German.

3       Anyway, these – I don't think we could've gone

4  forward today in any event.

5       MR. WEINER:   And, Your Honor, we're not going to

6  go forward.  I just raise this issue because at some point

7  in this case I don't want to be in a situation where, after

8  the Trustee's business judgment, he decides on another

9  resolution.  Your Honor's satisfied except to the extent we

10 still don't know what the amount of the claim is.  Because

11 at the end of the day, the Trustee has to be able to pay

12 claims.

13       Now, whether it's going to be litigated here or

14 litigated in California, it needs to move forward on its

15 own merits at least to determine what the amount is.

16       THE COURT:   Or settled as, again, the idea is

17 you'd have to – if it's settled as to this defendant, once

18 I approve the settlement, it's settled.  I mean there's a

19 stay and there's nothing – you can't proceed against the

20 debtor anymore.

21       MR. WEINER:   No, the only reason I raise that is

22 there could be a circumstance where, depending on what the

23 amount of the claim is, that there's a surplus ironically

24 in a case like this.  And it would seem, when Your Honor

25 considers the interest of creditors, are the creditors

1  being paid in full or are the creditors being paid just a

2  small portion or a larger amount.  That's why I was trying

3  to get to the point of at some point I guess that'll be a

4  consideration under 9019 in weighting the factors of the

5  interest of creditors.  If it's 100 cent case, that

6  obviously is a different factor.

7          THE COURT:   Well, again, at some point, we lift

8  the stay or you've satisfied the creditor with enough of a

9  settlement, so you exchange releases.  I mean I don't know

10  how --

11          MR. WEINER:   I'll make it simple, Judge.  I'll

12  put on the record right now, we will prepare a stip,

13  consent to relief from stay.  Maybe we'll reach a

14  resolution somewhere down the road, I don't know.  We'll

15  consent to the relief from stay.  They can go and litigate

16  the amount of their claim.  And if there was any concern or

17  confusion before, and then obviously this won't be the

18  basis for them to complain that, well, the Trustee

19  investigated and settled it at this amount, that'll be done

20  on its own weight and its own merit.  So we'll consent to

21  relief from stay --

22          THE COURT:   But it's two different things.

23          MR. WEINER:   Right.

24          THE COURT:   It's two different things.  If it

25  doesn't matter, again, if it's a surplus, it's a surplus.

1  If there's any fraud that went on here or any fraudulent

2  conveyances that went on here, or anything that I need to

3  refer to the U.S. Trustee or the U.S. Attorney's Office,

4  we're going to figure that out and whether at the end of

5  the day it's going to bring more money in than what you're

6  settling for or less, I don't know, but we have to go that

7  route in this case.

8          MR. WEINER:   We are.  I'm not suggesting to the

9  Court one bifurcates the other.  We absolutely are going to

10 do what Your Honor has directed, and we have no problem in

11 doing that.  I'm just suggesting to avoid another trial at

12 a later date, to hold the case up in any manner is go

13 ahead, liquidate your claim in whatever form, whether it be

14 here.  If they don't want to do it here, do it out in

15 California.  Get the claim liquidated, and we can then, of

16 course, proceed and do the investigation we have to do.

17         MS. LIEBER:   Your Honor.

18         THE COURT:   Yes.  Your turn.

19         MS. LIEBER:   Thank you.  Okay, I worked hard on

20 these papers you saw, and there's so many things that are

21 mentioned here that I would like to respond to.  There's so

22 much discussion about liquidated claims.

23         What I want to talk about is where we are here.

24 And this case, when it was filed, should have never been

25 filed here.  It was a case that had, basically it was, as

1  they say, a two-party case.   When we filed, after we filed

2  here, the petition – after the debtor filed, the petition

3  was barebones.   There was no --

4         THE COURT:    But it was originally a voluntary 7 -

5  -

6         MS. LIEBER:    It was a 7.

7         THE COURT:    -- in the beginning.

8         MS. LIEBER:    It was a barebones petition.   It had

9  no assets.   Creditors were listed, one of the supposed

10  creditors, insiders, one Mr. Sebagh who was one of the

11  founders was listed as a creditor holding a $250,000 claim.

12  There were no transfers that were mentioned in the

13  schedules, statement of financial affairs.   There was --

14         THE COURT:    Excuse me.   Did you try to depose Mr.

15  Sebagh?

16         MR. GERSHBURG:    Yes, Your Honor.

17         THE COURT:    And what happened?

18         MR. GERSHBURG:    We can't find Mr. Sebagh.

19  There's no address.   As it is with many of these

20  individuals, Mr. Sebagh cannot be found.   He apparently

21  lives somewhere with Mr. Zilberman or in the same contact.

22  We couldn't find him at all.   I went out of pocket myself

23  when I was representing Digby to hire a personal

24  investigator, private investigator, to go to these lots and

25  try and find these individuals.   And just as a matter of

1   reference, not that it matters one way or the other, but I

2   believe during Mr. Zilberman's either deposition or during

3   some sort of discovery, we found out he owned somewhere

4   around 20 or so, you know, different companies here and

5   there.  So it's almost impossible, it was almost

6   impossible, I should say, for us to track down these

7   individuals.  The same as it was for David Baxt when we

8   tried to get him as well.

9            THE COURT:   It's not impossible.

10           MS. LIEBER:   There's a lot here, Your Honor, but

11  what I want to say is this.  We had spent – my client had

12  spent a lot of money here originally with Mr. Gershburg.

13  The case was filed; there was a 341 meeting.  Mr. Zilberman

14  didn't disclose anything about the facts.  He said that

15  there may have been three to eleven cars, but he didn't

16  disclose transfers or anything like that.

17           What happened though is there were turnover

18  motions that my client had paid for, and they kept on

19  defending against them because they didn't want to turn

20  over any property.  So they never turned over tax returns,

21  they never turned over any financial statements.  We had no

22  clue.  The only thing that my client was able to, it helped

23  a lot, were these bank statements that they go, and the

24  bank statements literally showed that literally maybe for

25  14 months there were deposits by Group Travel Solutions at

1  the 391 location of like $3.5 million into this Chase

2  account.  Now, we only have one Chase bank account

3  statement -- we only have statements for one account, but

4  we know that they had a number of statements, and that's

5  actually reflected in the bank statements themselves

6  because it shows all of these transfers to other accounts.

7  And Mr. Zilberman didn't deny it.

8          But in any event, so Mr. Gershburg made motions to

9  compel discovery.  He conducted a 2004 exam.  What happened

10  at that point, from my reading because I have read, I have

11  reviewed the documents on the docket very carefully, he had

12  a period of time within which to depose Zilberman, and I

13  think there was a remaining three or four hours because

14  Zilberman had walked out.  At that time, Mr. Gershburg –

15  and he was very evasive.  And at that time, Mr. Gershburg

16  didn't have an opportunity to even depose Zilberman as to

17  the deposits, the $3.5 million of deposits made into the

18  account.

19          Now, just understand one thing, Judge, when those

20  deposits were made, those deposits, it was 3.583, 3,000,583

21  – I'm sorry – 3 million 5 hundred and – $3.583 million, I'm

22  sorry, between January 2009 to May 2, 2010.  Okay?  Now,

23  they filed the case the following year on March 2011 right

24  after we had, they had failed, they were trying, they had

25  made three motions to dismiss the district court litigation

1   and change the venue.  They were denied, all three motions

2   were denied.

3          In the district court we had made two motions to

4   compel the discovery and then sought sanctions because,

5   quite frankly, to prove our claim when it comes to

6   infringement, and I have conferred with trademark

7   attorneys, to prove our claim it basically is dependent on

8   their profits.  And now Mr. Zilberman recently, when he was

9   deposed, literally has said that he has no books and

10  records; he has disposed of them.  So he has spoiled the

11  evidence.

12         Now, after – when – before – my client had

13  invested a lot of time and a lot of money, and there was a

14  2004 examination, there was a 341 examination.  Meanwhile

15  my client's the one who's spending that.  The Trustee

16  didn't make the motion for the 2004.  He didn't even

17  attend, to tell you the truth.  And, in fact, Judge

18  Rosenthal had invited him to attend.

19         But in any event, at a certain point, after my

20  client has gotten the bank statements and all these

21  documents – one moment, I want to have an opportunity.

22         THE COURT:   What you do there, unfortunately,

23  gets picked up.  So it's much louder than you think.  Go

24  ahead.

25         MS. LIEBER:   After my client spends all this time

1   and money, they decide, yeah, this is a great case.  You

2   can see from the docket there's a notice of discovery of

3   assets.  Why?  Because my client has spent the time to

4   actually discover, get bank statements, get what it can

5   even though there's actually a critical bank statement of

6   April 2010 which still is missing and still hasn't been

7   turned over, notwithstanding your turnover order and

8   notwithstanding your turnover order, that automobile that

9   was referenced in the turnover order is still not turned

10  over, but that's another story.

11          So what happened was Mr. - at a certain point Mr.

12  - can you excuse me?  Mr. Gershburg needed more time to

13  depose Mr. Zilberman, and at that point, they must have

14  conferred with each other.  Mr. Gershburg asked my client,

15  you know, can he retained by, can he be relieved because

16  the Trustee would like to hire him to investigate further

17  and to commence this action.  My client said, well, okay,

18  you're going to commence this action, that's fine,

19  otherwise, I could dismiss this because at this point now

20  we're at the point where I now know that I am the only

21  creditor because the bar date has past and no other

22  creditors have been filed.  Okay?

23          Then they go ahead, but based on the fact that

24  they were going to conduct that further deposition and

25  further investigation which they should have done even

1  before they commenced this action, my client relieved

2  counsel, and he had already spent a ton of money with Mr.

3  Gershburg, upon which the adversary complaint was based and

4  which they want to now settle.  In other words, my client

5  spends the money, they commence an adversary, and now they

6  want to settle for a fee that covers their commission.

7          Now, what gets worse is this.  When they file --

8          THE COURT:  I understand.

9          MS. LIEBER:  When they file --

10         THE COURT:  I understand you're upset --

11         MS. LIEBER:  I'm very upset.

12         (interposing)

13         THE COURT:  I understand where - you know, I hear

14  where it's coming from.

15         MS. LIEBER:  I sit here and I want to kill myself

16  because I know that there's so many things that just are

17  not - they're hiding, okay.

18         THE COURT:  Believe me --

19         MR. HERBST:  Your Honor --

20         MS. LIEBER:  Wait, one moment.

21         MR. HERBST:  I'm sorry, no, no, I patiently --

22         MS. LIEBER:  I want to finish please.

23         MR. HERBST:  She can say what she wants, but she

24  talks about something that we're hiding --

25         MS. LIEBER:  Okay, excuse me, maybe the wrong

1   word.

2           MR. HERBST:   I've not --

3           THE COURT:   Mr. Messer and Mr. Herbst's firm are

4   before me all of the time --

5           MS. LIEBER:   And they're not hiding --

6           THE COURT:   -- and they're not hiding --

7           MS. LIEBER:   Right, I didn't mean that.

8           THE COURT:   -- and it would be very shocking to

9   me, again --

10          MS. LIEBER:   I would like --

11          THE COURT:   These decisions are made very, very

12  often, you know, they have a lot a lot of cases, and it's a

13  question of --

14          MS. LIEBER:   But I want --

15          THE COURT:   -- based upon the claims, what makes

16  sense in his business judgment, all of that.  It happens to

17  be, as I said, maybe I would've come out here with a

18  totally different view of the world if some of these folks

19  hadn't --

20          MS. LIEBER:   But now --

21          THE COURT:   -- crossed my path since I'm sitting

22  here.

23          MS. LIEBER:   I would like to continue because

24  it's important.  So now at this point, they seek the

25  retention of Mr. Gershburg.  They put in an application,

1  and it's objected to by the debtor, at which point Mr.

2  Jordan Pilevsky files a reply, okay, and in his reply - now

3  this is the same (inaudible) would like to say our claim is

4  nothing.  So in the reply he says --

5          MR. HERBST:   Your Honor, I'm sorry, counsel can

6  continue on --

7              (interposing)

8          MR. HERBST:   -- state the facts --

9              (interposing)

10         MR. HERBST:   -- all I said it hasn't been

11 determined --

12         MS. LIEBER:   Fine, in the mean --

13         MR. HERBST:   -- there's no quantification.

14         THE COURT:   Okay, please, I'm not - I want to

15 hear her.

16         MS. LIEBER:   Thank you.  Thank you.  In the reply

17 he writes, he explains that, you know, that in the 2004

18 transcript, as reflected in -- the 2004 lasted less than

19 four hours, including the break.  That's because they had

20 more time to continue it.  And that the bar date has past.

21 The universe of proofs of claims that were filed against

22 the estate total 304,000.  Of that amount 300 is

23 attributable to the creditor's proof of claim.

24             Then they state that --

25         MR. PILEVSKY:   Just for clarification, which

1  reply are you referring to?

2          MS. LIEBER:   I'm looking at a reply --

3          MR. PILEVSKY:   What docket number?

4          MS. LIEBER:   Oh, I don't know.  It's dated – it's

5  Chapter 7 Trustee's reply in further support of the

6  Trustee's application for an order to approve the

7  employment of Daniel Gershburg.  It was after the debtor

8  had objected to it.  And then they say, "As the largest

9  unsecured creditor of the estate, the creditor shares a

10  common goal with the Trustee" --

11          THE COURT:   I understand, but – I understand why

12  --

13          MS. LIEBER:   -- "of maximizing an ultimate

14  recovery."

15          THE COURT:   -- again, what I said before was – it

16  doesn't happen that often, they made a showing --

17          MS. LIEBER:   Right.

18          THE COURT:   -- and I approved it.

19          MS. LIEBER:   Right.

20          THE COURT:   But remember it was post.

21          MS. LIEBER:   And the idea here is that we are now

22  three years later, okay, they have literally taken the

23  position that we're the creditor, we're the one with the

24  claim.  What they want to do at this point – what I want to

25  say is this.  So now they would – they basically have come

1  to this court, despite all of the admissions in the --

2       (interposing)

3       THE CLERK:   -- I need you to speak clearly into

4  the microphone.

5       MS. LIEBER:   Sure.   Despite all of the admissions

6  in Zilberman's deposition, okay, they have come to this

7  court simply saying that, hey, you know what, we'd have

8  entered into the same settlement agreement even without the

9  deposition.   Now, they act as though the same transfers

10 were made or referenced before they even deposed –

11 (inaudible – problem with microphone) that's what they've

12 said to the judge.

13      Well, first of all, I literally have marked up

14 this complaint.   (inaudible) really well (inaudible) there

15 was so many more facts that we have now, undisputed facts,

16 admissions in the testimony.   The bank statements, for

17 instance, we knew that there were deposits of a lot of

18 money, $3 million, which dwindled to $3,000 literally nine

19 months before the bankruptcy was filed.   We didn't quite

20 know he relationship between Group Travel Solutions.   We

21 didn't know – we knew that money was going to Adir Plaza.

22 We didn't quite know that Adir Plaza was owned completely

23 by Zilberman.

24      But in any event, what we have learned, what was

25 really not known here, is Zilberman has confirmed that the

1  money that was from the debtor that ended up going to these

2  lenders on the bank statements were lenders for Adir Plaza.

3  Essentially, what we learned is Adir Plaza is a company

4  that had no operations independent of Group Travel, of the

5  debtor.  It was run by Zilberman.  What he did was he was

6  sued by another – the debtor is a successor company to a

7  defendant, which we didn't know this either, Adir Rent a

8  Car.

9         What we learned in the deposition was Adir Rent a

10  Car was closed.  Then the debtor is formed in the same 391

11  Empire.  Why was it closed?  Because there was a $400,000

12  lawsuit against it, which Zilberman calculates as 4,500.

13  So he opens up this debtor.

14         Then what happens is he operates the debtor.  It's

15  really Adir Rent a Car, but he's closed that, now it's a

16  new sign, now it's the debtor.  And what he did was he took

17  out the assets, he basically would operate this debtor and

18  then transfer $3.8 million in like 14 months before the

19  bankruptcy, and then (inaudible) vehicles that used to rent

20  out by the debtor were placed in Adir Plaza's name.  Adir

21  Plaza has no employees, it has no operations.  It's just a

22  shell, okay, it's just a shell.

23         THE COURT:  Again, I only read pieces of this,

24  but wasn't Mr. Zilberman trying to say that rich Uncle Phil

25  --

1            MS. LIEBER:   Well, no, I'll get to that.

2            THE COURT:    -- was the one who had basically came

3    up with all of the money to pay the lenders, wasn't that --

4            MS. LIEBER:   No, no, no --

5            THE COURT:    Oh, that's not --

6            MS. LIEBER:    -- no, I'm not going to get to that,

7    okay.

8            THE COURT:    I'm letting you vent here.  You

9    understand that none of this is evidence, that I don't take

10   evidence this way --

11           MS. LIEBER:   Okay, then let me vent.  Let me vent

12   then.

13           THE COURT:    Okay.  I'm letting you vent so

14   everybody knows --

15           MS. LIEBER:   I appreciate it.  I have been up all

16   night --

17           (interposing)

18           THE COURT:    -- people sitting in there --

19           MS. LIEBER:   Then let me vent.

20           THE COURT:    -- under sworn affidavit, not from

21   lawyers, but I'm letting you vent.

22           MS. LIEBER:   I appreciate that so much.

23           THE COURT:    Go ahead.

24           MS. LIEBER:   So much.  So then what we have

25   learned in this deposition is that, what we didn't know,

1  was that Adir Plaza had all the cars, had all these

2  vehicles, and when I refer to vehicles, I'm talking about

3  vans that are, passengers vans that have 15 people in them

4  because they're for makels (phonetic), they might be for

5  somebody in the entertainment business.  I mean these are

6  very expensive cars.  They're vans, they're often Mercedes,

7  they're special passenger vans.  It's not just a typical

8  car.

9            And, in fact --

10           THE COURT:    Well, they also may be beat-up 15-

11  passenger vans that the Orthodox community takes to --

12           MS. LIEBER:    Right.  Well --

13           THE COURT:    -- takes to hospitals for people, I

14  mean there's all these good (inaudible) why these vans are

15  used.

16           MS. LIEBER:    I just went online to the Image Rent

17  a Car website yesterday, and I saw a - what's the most

18  expensive one?

19           THE COURT:    It doesn't matter.

20           MS. LIEBER:    (inaudible - problem with

21  microphone)  In any event, (inaudible) all of these

22  vehicles were titled Adir Plaza.  What we didn't then know

23  is that there's a company GTS - we knew that there was a

24  company, we didn't realize that in April of 2011, April of

25  2010, a month after my client commences the last suit, this

1  company's formed.  What we didn't know was name is the

2  (indiscernible) was his (inaudible) uncle, (inaudible)

3  uncle.  (indiscernible) to get the name it was the one who

4  was operating.  He's a relative; now he's operating GTS.

5  What we didn't know was all those vehicles, which were

6  purchased by the debtor, (inaudible) were for the benefit

7  of Adir Plaza.  Why?  To finance the cars.  So millions of

8  dollars were transferred to Adir Plaza.

9         Now they're in the title, now these cars are

10  titled in Adir Plaza's name.  Now, Adir Plaza we now find

11  out transfers all of these vehicles to GTS, plus the debtor

12  transfers the name, the debtor transfers the website, the

13  debtor - and to make it worse -

14         THE COURT:  Well, but what is - it'll come down

15  to what came from debtor.  I mean, again, the website has

16  some value, the name has some value.  The question at the

17  end of the day is going to be those millions of dollars,

18  were they from the  debtor or were they from some other

19  source?

20         MS. LIEBER:  Zilberman has admitted that that was

21  the only source.  Zilberman has admitted under oath that

22  the only source of income was from Image because Adir Plaza

23  had no independent business.

24         So then all the cars are placed in Adir Plaza, now

25  they're transferred to GTS, and now we find that Nahim, the

1   brother-in-law, we asked in the deposition, so, what did

2   you pay for it?  Do you have anything, documentation?  No.

3   First, there were a couple of different statements, and

4   then finally there were inconsistent – finally, he says,

5   well, I personally got cash.  Nahim, what did you do with

6   it?  I put it up – I kept it for myself.  Well, I paid some

7   street people.  Street people?  Yeah, I paid street people.

8   Was it $5,000?  Yeah, about that.  And what did I do with

9   the rest?  I took it, it was for me.

10          Also, what he dose is in Adir Plaza's name he also

11  purchases property.  Guess who has the property?  Nahim.

12          So this deposition was never made, even though Mr.

13  Gershburg had informed the court that he never even

14  finished the deposition and that my client thought, when he

15  was going to be retained, that they were going to do a

16  deposition, they don't do a deposition.  Instead, they

17  commence a complaint without any of this information,

18  without knowing that Connie Gray was an officer of the

19  debtor.  She literally signed transfer documents from GTS

20  and Adir Plaza and transfer documents – Image had cars also

21  – from Image to Adir Plaza.  Image to GTS, she signs on

22  behalf of GTS, she signs on behalf of Image.

23          If they had known that, if they had done their due

24  diligence, even if they hadn't done it before, they

25  should've done it after.  Because what happened was, what

1  they could've done is they -- probably that complaint would

2  have looked very, very different.  And although they want

3  to say that they would have entered into the same

4  settlement if they had known these facts, that's not true.

5          But in any event, what they could have done with

6  these facts is they could've said, hey, these are alter

7  egos of these – these are all alter egos.  Now we have them

8  admitting that there's no documents between the parties,

9  that they had no independent operations before they were

10 formed, and relatives are operating.

11         So, you know, Judge, all of this, all the assets

12 belong, all of the assets belong to this debtor.  And

13 instead, during the past there years, the cars have been

14 sold, nobody's investigated, it's --

15         THE COURT:  Their point though, their point

16 though is the following, that before they spend hundreds

17 and hundreds of thousands of dollars, or time, hundreds and

18 hundreds of thousands of dollars of legal time, in order to

19 – in a case which is not an easy, in a case where nobody

20 wants to show up, where you've got, you know, maybe it's a

21 shell game, maybe it's not, but no one's going to make it

22 easy for them.  That if, in fact, all it got is a few

23 thousand dollars in tax claims and your client's claim, and

24 we have no idea what that claim is, should they be spending

25 that kind of money?  And in most cases, if they did, they

1    would be criticized.  The Trustee would be criticized, and

2    counsel would be criticized.

3           MS. LIEBER:    But my --

4           THE COURT:    Which is why I said at the outset,

5    okay, that I don't find any fault on their part --

6           MS. LIEBER:    Wait, wait, wait, commencing a 36-

7    page complaint?

8           THE COURT:    But the point is that I'm not going

9    to make a finding, whether they're at fault or not at

10   fault. All I'm saying in this case, for my reasons and

11   based upon, again, what I've seen here and what I know, it

12   seems to me we have to go further.  We have to dig further.

13          MS. LIEBER:    Okay, now I want to say one other

14   thing.  So had my client known that here in this retention

15   they're saying, oh, this is for the benefit for the estate,

16   our interests are parallel.  That's what they said in the

17   retention.  And we have a claim of 300,000, and, again,

18   they spoiled the evidence now at this point.  They spoiled

19   my client's evidence.

20          THE COURT:    They might have done that anywhere.

21          MS. LIEBER:    My client though, yeah, but if I

22   were in district court right now, if we were in district

23   court and that happened and this testimony, the judge,

24   because when people spoil evidence, the judge is going to

25   grant a very hefty judgment.  And especially that what we

1   do know is $3.5 million was deposit, and that is what we

2   have to show; we have to show their revenue essentially,

3   and from we know, it's been millions.

4         But I want to say one thing.  The case law makes

5   it very clear, the two Supreme Court cases that I'm

6   thinking about, one is MariMar which is basically saying

7   that these cases don't belong in here.  And the other one,

8   Moore v. Bay, which then is a codification --

9         THE COURT:   One's very old and one's more recent.

10        MS. LIEBER:   -- 550 --

11        THE COURT:   You're talking about MariMar --

12        MS. LIEBER:   Right.

13        THE COURT:   -- dismissal of a voluntary case for

14   lack of good faith, voluntary dismissal, but nobody's

15   (indiscernible) voluntary.  MariMar, you're talking about

16   MariMar --

17        MS. LIEBER:   Yeah, MariMar was not a voluntary

18   dismissal.  What happened in MariMar was that there was

19   this Chapter 7 debtor had concealed transfers and he

20   concealed an asset, a trust.  And the courts looked at -

21   and he wanted - because he was caught, he wanted to use the

22   conversion provisions to --

23        THE COURT:   Right, conversion to 13 or dismiss -

24   yeah --

25        (interposing)

1          MS. LIEBER:   And the court looked at the

2   dismissal and conversion, said, you know --

3          THE COURT:   What otherwise would have been

4   absolute right, the court said lack of good faith, we're

5   not going to let you do it.  I know, I'm familiar with the

6   case.

7          MS. LIEBER:   Right, it's cause, that's right, and

8   they commented that bankruptcy courts look to see for

9   dismissal they look at bad faith, they look at pre-

10  bankruptcy behavior, and they dismiss.  Okay.  And they say

11  it's, the case is for the honest but unfortunate debtor,

12  that's the big quote, and, unfortunately, here it doesn't

13  exist.

14         But the other case that I want to say is the Moore

15  v. Bay case.  In that case, the 544 and a 550 are the

16  codification of that case, and basically, as a matter of

17  law, 550 and 540, when there's - those provisions say that

18  a debtor that is a defendant, if they were to prevail

19  against the defendants, have to turn over the property.

20  There's no qualification on the credit, there's no

21  qualification on the claim of the creditors.  I have cited

22  to a number of cases in this, and it's clear, it's clear,

23  it's written in stone.  There is no exception to that.

24         So my point is that for them to stand here and

25  ignore what, ignore the likelihood of success based on the

1  admissions in Zilberman's deposition, which, quite frankly,

2  they could probably move for summary judgment.  Based on

3  those admissions, they could have moved for summary

4  judgment against him without even any testimony because

5  they already have the admissions, they have the DMV

6  documents where he has signed, Sebagh has signed, he's got

7  the admissions.  They could have come to this court and

8  moved for summary judgment.  Okay?

9        And the point is that for them to now turn it

10  around on us that we have to prove our claim, we didn't

11  want to be here.  We would have been – this case would have

12  been dismissed.

13        THE COURT:   I understand.  First of all, there

14  might have been issues of fact --

15        MS. LIEBER:   So it's contrary --

16        THE COURT:   -- but put that aside for a moment.

17  But I understand, I think what you're saying to me is that

18  if you had known now, if you had known then what you know

19  now about how this would have unfolded, you might have been

20  the first one coming here to seek a dismissal of this case.

21        MS. LIEBER:   Not only that, we have funded this

22  investigation --

23        THE COURT:   I understand.

24        MS. LIEBER:   -- based on, you know, constantly,

25  they're always constantly saying, well – if there was no

1  claim, honestly, if they thought three years ago or two

2  years ago there was no claim, well, then they shouldn't

3  have retained Mr. Gershburg.  If there was no claim, why

4  now after all these years.  And the other thing is they're

5  turning it around.  The focus here is is this settlement?

6  It's not just on a claim.  You have to look, there's so

7  many factors which basically they just list it in their

8  settlement.

9          THE COURT:   The point is it's two different -

10  again, it's two different things.  A trustee's job, to

11  maximize the assets and to make sure, investigate

12  preferences and fraudulent conveyances and bankruptcy

13  wrongdoing of all kinds, that is one obligation.

14          MS. LIEBER:   Right.

15          THE COURT:   And to bring assets into the estate.

16  And then you go look at claims.

17          MS. LIEBER:   Exactly.  Then.

18          THE COURT:   However, I am telling you that there

19  are entities that examine into this, courts have done it

20  too, and they're not supposed to just, again, you're not

21  just supposed to incur legal fees to come up with dollars

22  in an estate if there's more than enough money to pay for

23  creditors.  It happens all the time.  You have a personal

24  injury action settlement.  Trustees come in here all the

25  time and say, Your Honor, or some other (indiscernible),

1  we're settling for this amount.  We have litigation risk

2  here, we've got this possible defense, but more than that,

3  the total number of claims is X.  So it does have a bearing

4  when you decide, when you get a settlement offer to

5  determine what the claims are, it has a bearing.

6         But, again, for a whole host of reasons, and also

7  because I truly feel that when people try very hard not to

8  be deposed or don't comply with orders of this Court or

9  don't show up, I don't like to roll over.  If these folks

10  wanted to depose certain people, and sounds like they did,

11  and they just were frustrated, that's really not good

12  enough.  And they got the message.

13         MS. LIEBER:  And I want to just say one thing,

14  that they did notice Nahim and Gray for depositions.  They

15  liberally granted - I was very - I felt that they were

16  liberally granting too many adjournments, and finally it

17  was, there was a final adjournment date, and neither of

18  them showed, but yet they're still going forward with a

19  settlement.  I'm like, wait a second, the authority is now

20  put - you still feel confident?  It's like our job to prove

21  that this is authorized?  Wait, once now you know there's

22  an issue, why not subpoena, why not make a motion before

23  Your Honor and compel his attendance?  And, quite frankly,

24  as a trustee they never did serve a notice of Sebagh when,

25  as the trustee, the trustee never served that notice to

1   Sebagh for a deposition.

2          But my point is, and it's a very important point,

3   there's a lot of case law under 544 and 550 which basically

4   say that you – which say that you are not to consider the

5   claims.  You are to go after the property.  And had that

6   deposition been conducted, they should have conducted that

7   deposition because the complaint would have looked

8   different, and they should have then made a determination.

9   Instead, after commencing this complaint, 36 pages, 26

10  counts, there was no notices of deposition on anyone.

11  Instead, months passed, and instead, when I had spoken to

12  counsel because I was kind of shocked, they had revealed,

13  Mr. Gershburg and Mr. Pilevsky had revealed that the

14  Trustee, without their participation, entered into a

15  settlement for 120,000 which I was really shocked.

16          THE COURT:   Well, that's not my business.

17          MS. LIEBER:   But --

18          THE COURT:   When the Trustee talks to counsel,

19  that's really not my business.

20          MS. LIEBER:   But I'm not sure why this case

21  should be here.

22          THE COURT:   But, again, I think – now, ironically

23  it's Mr. Baxt who didn't want me to approve the settlement

24  today.  It's kind of a twist of – right --

25          MS. LIEBER:   I'm sorry?

1          THE COURT:    -- it's ironic, isn't it correct --

2          MS. LIEBER:    Oh, oh, oh --

3          THE COURT:    -- that Mr. Baxt didn't want me to

4    approve the settlement today.   He's kind of getting I guess

5    what he wanted, depending upon who he is or where he is in

6    all of this.   But that was the nature of his --

7          MS. LIEBER:    Well, he --

8          THE COURT:    -- what he filed.   He filed back in

9    August saying that folks didn't have the authority to sign.

10         MS. LIEBER:    What he has said to me is that he -

11   I guess he renders trademark services.   He formed Group

12   Travel Solutions and he was I guess on the Department of

13   State, he's their president and CEO and whatever.   And what

14   he has said is that - and mail should be going to him -

15   what he has said that without his consent, Nahim, who is

16   not named on the Department of State as having any

17   interest, then is now operating the debtor.   Operating

18   there.

19         And so what he wants you to know is that he did

20   not authorize the retention of any counsel, and --

21         THE COURT:    Well, I don't know what he wants me

22   to know.   All I'm saying it's kind of ironic - but, again,

23   bottom line, what I don't want to do, and I'm not letting

24   any defendants out of the settlement, I'm not denying the

25   settlement.   I'm going to adjourn these out far enough so

1    that there can be due diligence in connection with the

2    settlement which, again, then they can decide to walk away

3    - come back to me and seek to have the settlement withdrawn

4    or denied or whatever it is because of information they

5    found out and continue with the complaint or not.  But I'm

6    not right now, I'm not denying it.  I'm adjourning them

7    out.

8            MS. LIEBER:   And in terms of my motion to dismiss

9    this case, you know --

10           THE COURT:   I was going to adjourn everything.

11           MS. LIEBER:   Okay, you want to adjourn that.

12   Because, quite frankly --

13           THE COURT:   Because the other thing that I have

14   before me is your request to send this to the U.S.

15   Attorney.

16           MS. LIEBER:   Right.

17           THE COURT:   I think we need to have a record here

18   before I send it to the U.S. Attorney more than what we

19   have.

20           MS. LIEBER:   Okay, good.

21           THE COURT:   And I may decide there isn't enough

22   to send to the U.S. Attorney.

23           MS. LIEBER:   Okay.  Good.

24           THE COURT:   Mr. Weiner, do you want to come up

25   here?

1          MS. LIEBER:    Thank you.

2          MR. WEINER:    Your Honor, I've sat here patiently,

3   and while I think that – I don't want – the fact that I

4   don't think this is the appropriate time to argue all the

5   points of the motion, I know you understand, you let Miss

6   Lieber vent.  I could hear and vent.  There's very little

7   of what she said that my clients agree with.  My clients

8   are confident that when the facts about Mr. Baxt should

9   come out, that everything she said about his role in these

10  things is not true --

11         THE COURT:    It's really not so much about Mr.

12  Baxt --

13         MS. LIEBER:    Right.

14         THE COURT:    I want to know about Mr. Nahim and

15  Mr. – I mean --

16         (interposing)

17         MS. LIEBER:    And Mr. Zilberman.

18         THE COURT:    And I want to know about Hani.  I

19  mean I want to know --

20         MR. WEINER:    Yes --

21         THE COURT:    I want to know these people, and I

22  want to know what they all did in these cases and who they

23  are.

24         MR. WEINER:    Judge, to the extent that I can, I

25  will be sure that they appear to be deposed by the Trustee

1   and his counsel.  So they are defendants in this case, and

2   if the Trustee notices them for deposition, they will have

3   to show up.

4           THE COURT:   Well, they're already on notice for

5   deposition on --

6           MR. WEINER:   There's been no deposition.  I don't

7   represent Miss Gray.  I'm not aware of any deposition of

8   Mr. Sebagh who is my client.  And Mr. Zilberman has

9   appeared for deposition.  And Mr. Nahim is also not my

10  client.

11          MS. LIEBER:   Who is representing them since Mr.

12  Summerstein was representing them?

13          THE COURT:   We don't know.

14          MR. WEINER:   I addressed that issue before, okay,

15  I addressed that issue before.  Your Honor, I'm not --

16          (interposing)

17          MR. WEINER:   -- directing comments to her --

18          THE COURT:   You talk to me, not to each other.

19  Okay?

20          MR. WEINER:   Yes, exactly.

21          THE COURT:   That's number one.  Number two, you

22  need to let him speak because we let you speak.

23          MS. LIEBER:   Yes, thank you.

24          MR. WEINER:   Okay?  So like I said before, it's

25  only recently that Mr. Summerstein decided to leave private

1  practice and take a job with Legal Aid.  We're in the

2  process – it's my understanding that these defendants are

3  in the process of getting new counsel.  I'm going to be

4  discussing it with them, and we hope to have that in place

5  shortly.  Because we understand that the Trustee is going

6  to need to take that deposition, and I think separate

7  counsel should be present, representing Group Travel during

8  that time.

9          So as to all the rest of it that went on for, I

10  don't know, 20 minutes to half an hour, I don't want to go

11  through it.  Much of it can be refuted, much of it we

12  expect will be when the facts of this case come out.

13          THE COURT:  Facts get determined with evidence.

14          MR. WEINER:  Exactly.  Exactly.  I mean probably

15  the most outrageous thing that was said is her client's

16  damages should be based on the income of the debtor.  No,

17  it should not be based on the income of the debtor.  It

18  should be based on the income of the debtor that's

19  attributable to violations of their copyright and

20  trademark.  And that will be, you know, maybe 0.01 percent

21  of the income of the debtor, could maybe be attributable to

22  these violations, a very small number.  That's why in our

23  claim objection motion we quantified it as $1,450 at

24  maximum, 23 hits came in --

25          THE COURT:  Again, I don't care so much about the

1  amount of their claim at this point.

2          MR. WEINER:   So I understand --

3          THE COURT:   I care about the fact that people,

4  that the Trustee or the Trustee's counsel or various

5  counsels wanted to depose people and they made themselves

6  unavailable, and, notwithstanding, we're here, and I don't

7  want to allow that to happen.

8          MR. WEINER:   Well, all I'll say on that issue is

9  to the extent that the people that they want to depose are

10  my clients, I will do everything I can to make sure that

11  they appear at a deposition --

12          THE COURT:   I appreciate it.

13          MR. WEINER:   -- as any attorney who appears

14  before this court --

15          MS. LIEBER:   Who are your clients?

16          THE COURT:   No.

17          MS. LIEBER:   I'm sorry.

18          MR. WEINER:   Judge, this is completely

19  inappropriate.  Number one, she's not supposed to address

20  me directly.  Number two, I have appeared and filed answers

21  on behalf of clients.  It's a matter of record who my

22  clients are.  Okay?  And I don't feel like I need to answer

23  questions put directly to me --

24          THE COURT:   I agree.

25          MR. WEINER:   -- which is, again, inappropriate.

1          THE COURT:    I agree.

2          MR. WEINER:    We could also start by her learning

3    how to pronounce my name.

4          MR. HERBST:    Your Honor, just to conclude.

5    Certainly, we will go and complete the investigation that

6    Your Honor has discussed.  We will complete the

7    depositions.  If we have a problem, we'll be back --

8          THE COURT:    And if you have a problem, come back

9    here --

10          MR. HERBST:    We'll be back before Your Honor --

11          THE COURT:    -- I'll sign orders, I'll send

12    marshals out to pick people up and have them show up here

13    for examinations.

14          MR. HERBST:    I may even do that if I think people

15    are going to be recalcitrant.  In concluding, I'd be remiss

16    if I just don't say.  There's a lot of things that are

17    said.  Your Honor took it as venting.  I appreciate that.

18    There are a host of reasons why a trustee makes decisions,

19    a number of which are not going to be discussed in open

20    court because they lead to potential defenses and the like,

21    and it would torpedo a case, which is always the anomaly of

22    a 9019 settlement.  You almost have to come in and lay out

23    some groundwork as to why you might have problems.  That's

24    not before you; we're not going forward that way.  At the

25    appropriate time, we will do that.

1          I'm not going to reply to all of the things that

2    were said of what happened, what didn't happen, especially

3    since a lot of these things happened even before counsel

4    for Digby was even retained.  And whether a motion to

5    dismiss should have been filed at the beginning of the

6    case, well, Digby could have done that.

7          But that's not where we are.  I'm also not clear

8    of what a motion to dismiss this case, although I think I

9    would be, would relish that fact, quite honestly, Your

10   Honor, would accomplish if Your Honor – I mean the reason I

11   wonder is because if you approve the settlement, they get

12   some money, and then they go to California.  If you dismiss

13   the case, they go to California.  So the little piece of

14   money I think would have been lost in that transaction.  So

15   I'm not sure what would a dismissal accomplish.

16          We understand.  We will complete our

17   investigation.

18          THE COURT:  And, again, it's important that this

19   case, it's also important that the world out there know

20   that we're all watching, so that even if there was nothing

21   that went on here that was untoward, we're watching, we're

22   all watching.

23          MR. HERBST:  I also want to say one more thing,

24   and I respect that counsel says there are new things that

25   cropped up.  But when we entered into this stipulation,

1  this was not a self deal between Trustee counsel and the

2  defendants.  Counsel participated, gave comments to the

3  stip, was actively involved.  One of the things that was

4  bargained for very hard was a provision that left them

5  intact completely to go to California.

6          So I just want Your Honor to understand the flavor

7  of how this came about.  I understand where we are today,

8  but counsel participated in comment on the stip.  I

9  understand her view has changed of this settlement, but not

10 at the time we reached it.

11         THE COURT:  But maybe it'll make you feel better,

12 because I think you heard it before, regardless of what she

13 said, after looking at some of the stuff that I've looked

14 at on both sides, I would - and, again, that's why I didn't

15 hear to you.  This is what I wanted; I wanted more

16 investigation in how we should go forward --

17         MR. HERBST:  We're going to do that, Your Honor.

18         THE COURT:  -- regardless of --

19         MR. HERBST:  We're going to do that, but I just

20 wanted Your Honor to understand the full reason.

21         MS. LIEBER:  And, Your Honor, I'd like to just

22 respond to a couple of things.  He said I participated.  I

23 had just been retained.  I didn't even know that they

24 hadn't done a deposition at that time, and I specifically

25 was so upset and I commented on that, I said how could you

1  have done this, and then I called Mr. Gershburg, I called

2  Mr. Pilevsky.  They said that this was reached by the

3  Trustee.  It seemed set in stone.  I said this is really

4  problematic, and all I did is I commented to make the

5  settlement stronger.  I wasn't saying that I liked this

6  amount.

7        What happened was though, after two months after I

8  commented and then I started to come up to speed, they then

9  wanted, they insisted that there be a release in the

10  settlement.  So when we came to Your Honor in May before a

11  pretrial conference, there was no settlement because Mr.

12  Weiner's clients had insisted on a release.  But during

13  this time, when depositions could've been taken, they

14  weren't, and specifically after this hearing on May 14, I

15  was promised by Trustee's counsel that they would then

16  proceed with notices of deposition which they didn't do

17  until after I filed the dismiss motion, and they would've

18  also filed a contempt motion to move for contempt for

19  failure to comply with a turnover which was back in April.

20        They didn't do that; they just filed - they

21  finally filed a settlement motion even though my client

22  sent emails to them showing them why they shouldn't settle

23  for this amount in June, and I sent emails after we were

24  coming up to speed.  After getting the documents from the

25  DMV and seeing what was happening here, we vehemently

1  opposed this.  So I just wanted to be there for the record.

2          The other thing is that – okay, I don't remember

3  at this point --

4          MR. GERSHBURG:    Your Honor, may I state something

5  just for the record, just for a moment.  And this will --

6          THE COURT:    As long as you stop saying things for

7  the record before 7 o'clock.

8          MR. GERSHBURG:    That's fine.  I hope this will

9  bring it to a conclusion.  Just in terms of reputation and

10 everything else, I've been before Your Honor before, and I

11 hope to be before Your Honor again.  So my only issue – I

12 have several issues with what Miss Lieber represented – but

13 my only issue is the representation that I made a ton of

14 money and then I came into this, and we haven't really done

15 much when it comes to this case itself.  I believe it to be

16 quite inappropriate, and I also believe it to be completely

17 – well, I should say it's not necessarily factual based on

18 everything that was there.

19          THE COURT:    I understand that, because people are

20 frustrated and annoyed and upset and angry.  I just want to

21 get to the bottom of who these defendants are, what their

22 relationships are, what went on here with respect, you

23 know, prior to this bankruptcy filing.  You know, I want

24 what you want.  We all want to figure it out.  And to the

25 extent that you've had difficulty in trying to get to the

1  answers because people are not showing up where they need

2  to be showing up, I'll help you.  That's all.

3          MR. GERSHBURG:    Thank you, Your Honor.

4          MS. LIEBER:    Oh, I just want to mention, yes, I'm

5  sorry, we're nervous about all of these vehicles and the

6  operations right now, and it's been three years.  And even

7  though now we see that these are alter egos and this GTS is

8  operated by Nahim who Nahim is the brother-in-law, and Adir

9  Plaza, who had the title to the vehicles, they continue to

10  have revenue.  They're continuing in business.  And my

11  concern is that we have nothing to stop them, there's no

12  order here, there's no standstill here, there's no –

13  nothing has been commenced asking Your Honor for

14  declaratory judgment, that these assets and the revenue

15  really belong to the debtor because they're really one and

16  the same --

17          MR. GERSHBURG:    We did.  I believe we did --

18          MS. LIEBER:    No.  No, there's no injunction,

19  there's no injunctive relief --

20          THE COURT:    Well, wait, again, nobody came before

21  me with a TRO but that's a hard standard.

22          MS. LIEBER:    Right.  But based on – the thing is

23  this, the declaratory, it was to a limited degree.  But

24  this is the thing, we had a very, they had a very extensive

25  deposition of Mr. Zilberman, and so many admissions came

1  from that.  And as I said before, they could move before

2  Your Honor --

3          THE COURT:   They'll - I'm sure they're going to

4  go back in preparation to deposing other people and re-read

5  Mr. Zilberman's deposition at all three times.  I'm sure

6  they're going to do that to refresh themselves.  It's been

7  a long time since even the original motion to settle was

8  made, so I'm sure they're going to do that.

9          But at the end of the day, I will tell you, that

10  when they recover whatever they recover and they've got

11  whopping legal fees, it's because I've sent them back to

12  make them do a lot more work.  So just so we understand

13  that, nobody has to work here for nothing.

14          MS. LIEBER:   Right, but --

15          THE COURT:   Everyone takes a risk that there's

16  not going to be anything to recover from, but by the same

17  token, nobody has to work for nothing.  So bear in mind

18  that there - you can object at the time if you decide to,

19  but if we've sent them off to do umpteen number of

20  depositions now, and I have, that's going to reflect in the

21  fees at the end of the day, when you make your calculus as

22  to what there is for creditors.  So just so you are aware

23  of that.

24          MS. LIEBER:   Yeah, I appreciate that.

25          THE COURT:   Okay, good.

1          MS. LIEBER:    You know, and I appreciate what Your

2  Honor – Your Honor wants transparency, and I appreciate

3  that because that's what the Bankruptcy Code is all about,

4  and that's what it should have been about when this case

5  was filed.  And the thing is --

6          THE COURT:    It's going to work better, okay, if

7  after this hearing everybody takes a breath, and you're not

8  really on different sides on this thing.  You started out

9  marching as one.

10         MS. LIEBER:    We were what?

11         THE COURT:    Okay, now you've got – I'm really

12 going to suggest that everybody takes a deep breath and you

13 try to stop the hostility between, you know, at least

14 between you and the Trustee and the Trustee's counsel.

15         MS. LIEBER:    Well, I'm not sure what the Trustee

16 is working --

17         THE COURT:    You want to be hostile towards

18 defendants, you know, that's a different story.

19         MS. LIEBER:    I'm not sure what the Trustee is

20 working for.  The Trustee is supposed to be a fiduciary of

21 the estate.

22         THE COURT:    No, no, you need to stop now.

23         MR. HERBST:    Your Honor --

24         (interposing)

25         THE COURT:    Did I --

1          MR. HERBST:    Yes, Your Honor, I'm sorry.

2          THE COURT:    You don't have to - I said it.

3          MR. HERBST:    I tried to sit quiet, but --

4          THE COURT:    You need to stop that.

5          MS. LIEBER:    Okay.

6          THE COURT:    Okay?  Nothing - again, what was done

7    here was people exercising business judgment and business

8    judgment in the context of difficulty of the expensive

9    litigation, there's some money here, claims may not be so

10   high.  I mean they may be, we don't know.  Again, you need

11   to stop criticizing the Trustee and counsel for the

12   Trustee.  It's not going to make your job easier, it's not

13   going to make our job easier, and we don't need to have

14   that kind of hostility.  We have enough difficulty here

15   figuring out what went on for you folks to continue this

16   hostility.  I'm going to ask you to stop.

17          MS. LIEBER:    And I agree.  Trust me, we were very

18   - we were working very well.

19          THE COURT:    You know, this is, the memory of

20   Peter Seeger, you should leave here with like a Kumbaya

21   moment.  Try to work together.  Mr. Herbst, anything else?

22          MR. HERBST:    I'll stay quiet, Your Honor, so you

23   can close the court.

24          THE COURT:    On that note.  All right, now let's

25   pick a date.  I don't know, May sometime?

1          MS. LIEBER:   May --

2          MR. HERBST:   Your Honor, I would probably suggest

3   early June only because I anticipate, given the nature of

4   this case, we will be back here a couple of times.  And I

5   don't mean by Mr. Weiner's clients, but I do mean other

6   people.

7          THE COURT:   All right, 33 through 36, I'm just

8   adjourning whatever's on today.  31 through 36.  Till some

9   day in June.  Why not?  June 18 at 2.

10         MS. LIEBER:   Can I just - for clar --

11         THE COURT:   Unless somebody has a vacation plan.

12         MS. LIEBER:   For clarification purposes, because

13  we're now in February, so that is -- what is that, five

14  months?  What exactly does Your Honor contemplate --

15         THE COURT:   Well, I'm leaving it to them.  In

16  other words, what I've said here is that they can, again,

17  do these depositions in furtherance of what I - again, we

18  have a contested matter here on the settlement, I mean if

19  you want to put it into that context.  Assuming we have a

20  settlement.  We have the other issue of a contested matter

21  on a settlement because some people are saying there wasn't

22  authority for a settlement.  But let's assume we have that

23  issue, plus we have a contested matter because you don't

24  think it should be settled.

25         MS. LIEBER:   Right.

1          THE COURT:    If we have a contested matter, we

2   would do a contested order, we'd be doing discovery on

3   that, but that would be directed at each other.    But

4   instead of doing that, what I'm suggesting is that in

5   furtherance of, whether it's the presentation on the

6   settlement, because I said you don't have enough, that

7   they're going to go out and they're going to take further

8   depositions.    Again, if there's a problem with the context

9   of that, somebody wants to say you already settled this,

10  how can you do that, then we'll just, Mr. Herbst, listen,

11  we'll do a contested matter order if people are giving you

12  a difficult time about the context in which you're doing

13  this.

14          MR. HERBST:    Oh, I don't think so.    No one did to

15  date, no one did to date, because essentially Your Honor

16  raised it correctly, is when the objection was filed, we

17  had a contested matter that normally the objector would be

18  doing the discovery and the depositions.    We said we would

19  do it.    The creditor was a little reluctant to do that.    So

20  we said we'll do that.    We got – that's what the

21  conversation was.    I don't know what to tell you.

22          THE COURT:    It doesn't matter.    I've asked them

23  to do it anyway.

24          MR. HERBST:    So as opposed to the creditor, we

25  did that.    We did the deposition.    We had another one

1  scheduled.  That was the one Your Honor talked about.

2  There was documents produced during that time.  But no one

3  raised the issue of whether it should be - because we have

4  a settlement that there needs to be a specific contested

5  matter order.  It is what it is right now.

6          THE COURT:    Well, if you need one, I'll give you

7  one, but I don't think you do.

8          MR. HERBST:    I don't see that it's necessary.

9          THE COURT:    Again, you may find once you've done

10  some of these depositions, that you don't want to go

11  forward with the settlement.

12          MR. HERBST:    And, Your Honor, to the extent I run

13  into a problem, I could always do it under a 2004 if I

14  think I need to do it that way.  I'm not concerned about

15  the format.

16          THE COURT:    Okay, good.  All right.  What did we

17  say?

18          THE CLERK:    June 18 at 2 --

19          MS. LIEBER:    My only concern is that it is a long

20  time, and it is a very long time from now, and --

21          THE COURT:    I did it on purpose.

22          MR. HERBST:    Your Honor, she's welcome to conduct

23  all the depositions.  We'll sit back and we'll watch.

24          THE COURT:    I did it on purpose to give everybody

25  a long time.

1           MS. LIEBER:   But we've already had - that's what

2    I've been saying.  I mean there's been so much passage of

3    time after we filed the dismissal --

4           THE COURT:   Again, they first have some - they're

5    going to go back and read some depositions.  Then they're

6    going to start noticing people who are not going to be so

7    easy to get.  Then we're going to talk, we're going to hear

8    about Purim and we're going to hear about Pesach and we're

9    going - which we have in March.  In April we have Pesach.

10   You know, let's let them do their depositions.

11          If you want to - if there's a problem, okay, and

12   you want to have a status conference, call my chambers,

13   I'll schedule a status conference.  We can do it

14   telephonically, and we'll save everybody some money.

15          MR. HERBST:   Your Honor, if we finish early,

16   we'll call the Court for a date.

17          THE COURT:   Good.

18          MS. LIEBER:   Your Honor, also, I know you want to

19   adjourn the dismissal motion, but the factor is based on

20   his own testimony really justify the dismissal --

21          THE COURT:   You want it dismissed?

22          MS. LIEBER:   Yeah.  I want it dismissed because

23   the truth is that even though we talked about lifting the

24   stay, we can't go back to the district court.  We tried

25   that.  We're stuck here.  So, yeah, of course, I know that

1   - yes.  You're laughing, but, yes, that's the obvious --

2            THE COURT:   Well, I'm not going to rule on a

3   dismissal motion today.

4            (interposing)

5            MR. HERBST:   I'll tell you, Your Honor --

6            THE COURT:   First of all, there's the motion to

7   dismiss --

8            MR. HERBST:   -- if Miss Lieber would like to

9   bring that on --

10           THE COURT:   First of all, you did it by --

11           MR. HERBST:   -- in the next week or two --

12           THE COURT:   Wait a minute.  You did a cross-

13  motion to dismiss.  A motion to dismiss you've got to, you

14  know, notice the U.S. Trustee and all creditors --

15           MS. LIEBER:   I did, I noticed all creditors, and

16  I gave more time than necessary.  So I treated it as - even

17  though it was styled as a cross-motion, everybody got

18  notice, every single person got notice.

19           MR. HERBST:   Your Honor --

20           MS. LIEBER:   Everybody got notice.

21           THE COURT:   I thought you stood here before and

22  said you didn't want it dismissed.

23           MR. HERBST:   If she'd like to make that motion,

24  renew it --

25           MS. LIEBER:   I want it - I'm sorry?

1          MR. HERBST:    -- I would welcome that.

2          MS. LIEBER:    Wait --

3          MR. HERBST:    I'll eat the fees that we've

4   incurred in this case.

5          MS. LIEBER:    I'm sorry, I didn't hear you.

6          MR. HERBST:    Special counsel will eat the fees

7   he's incurred in this case.  We will be happy to let the

8   case be dismissed and they can go back to California.

9          MS. LIEBER:    Oh, that was my point.  Does he want

10  - are you saying that you're consenting to dismissal?

11         THE COURT:    I'm not.

12         MR. HERBST:    I know Your Honor's not, but I am -

13  if that's a direction that creditor wants to go, we are

14  happy --

15         MS. LIEBER:    Given the fact that I'm the only

16  creditor and the Trustee is not opposing it, why wouldn't

17  this case be dismissed?  We have all the factors right now

18  that justify --

19         THE COURT:    Because you stood here and told me a

20  lot of stuff in the last two hours is a reason why I

21  wouldn't dismiss it.

22         MS. LIEBER:    But actually the reason why you

23  should dismiss is because of what I've told you.  Actually,

24  the factors that warrant --

25         THE COURT:    Again, I am not prepared to dismiss

1  this case today.  If you're telling me you don't want that

2  long an adjournment on your motion to dismiss, I'll give

3  you less of an adjournment, but not much, because I want to

4  find out what went on here.  I mean, again, once something

5  is before me and I have raised issues, I'm not prepared to

6  dismiss it, not till we get more information.

7           MS. LIEBER:   Right, but if - I'm just looking at

8  --

9           MR. GERSHBURG:   Your Honor, if I may.  If Your

10  Honor is moving up the date for a motion to dismiss, then

11  should we still continue --

12          THE COURT:   Yes.  I'm not moving it up much.

13          MS. LIEBER:   I mean if - I think it makes sense

14  to have them the same day.

15          THE COURT:   Well, why don't we - here's what I'll

16  do.  I will make a shorter time, okay, but we'll - I'll

17  allow us to do it by court call.

18          MS. LIEBER:   By, I'm sorry?

19          THE COURT:   For a status.  I will do it for less

20  time just to see where we all are.  Okay?

21          MS. LIEBER:   Thank you.

22          THE COURT:   Everything.

23          MS. LIEBER:   Thank you.

24          THE COURT:   But if anybody wants to appear

25  telephonically through court call, I will allow it because

1  I don't want them to continue to incur fees just standing

2  here and giving me status reports.

3        MR. GERSHBURG:    If Miss Lieber would like to

4  renew her motion for that time --

5        MS. LIEBER:    I'm sorry, I can't hear.

6        MR. GERSHBURG:    -- she can do that.  I have no

7  opposition if she wants to renew her motion.

8        THE COURT:    Yes, I'm adjourning it.  It's a

9  question of renewing the motion.  Assuming she served

10 everybody --

11       MS. LIEBER:    I did serve everybody.

12       THE COURT:    -- I'm adjourning it and I'll deal

13 with it on the adjourn date.  Or not.  In the sense that I

14 really want to see what's gone on here.  I thought you did

15 too, that's what I'm surprised about.

16       MS. LIEBER:    No, this is the thing.  At this

17 point, if the Trustee is going to take the position that we

18 have no claim and that all - really then this is just going

19 to be an exercise and it's further delay.  And --

20       THE COURT:    The Trustee hasn't taken --

21       MR. HERBST:    I never said that.

22       THE COURT:    -- hasn't taken that position.

23       MS. LIEBER:    Well, they're asking us to quantify

24 the claim.  The problem with quantification of the claim,

25 okay, is that, despite what Mr. Weiner said --

1         THE COURT:    I understand that.  No, no, no,

2    adjourn that too.

3         MS. LIEBER:    Right, but the thing is that what we

4    would have wanted this Trustee would be to aggressively

5    litigate this case or settle for a very good number,

6    whatever, obviously.  But if that's where we're headed,

7    that's fine, but if not, then we should know now because --

8         THE COURT:    No, no, no, we should know after

9    they've done the depositions they're going to do and see

10   what they come up with.

11        MS. LIEBER:    Okay.  Okay.

12        MR. HERBST:    Your Honor, I'm sorry, but the point

13   about the claim I raise is in every case.  This is a

14   lawsuit.  It's not a quantification of a claim.  It's filed

15   and allowed until somebody objects.  So $300,000 would have

16   been deemed --

17        THE COURT:    You have not - the Trustee has not

18   objected.

19        MR. HERBST:    We have not objected.  All we said

20   was it seems to make sense to allow it --

21        THE COURT:    Other people have objected.

22        MS. LIEBER:    Right, right, and they have no

23   standing.

24        (interposing)

25        MR. HERBST:    -- to determine that.

1              THE COURT:   I didn't rule --

2              MR. HERBST:   And once it's determined, then Your

3   Honor would have another element in determining whether the

4   settlement were reasonable.

5              THE COURT:   Let's go to May, a date in May --

6              MS. LIEBER:   Thank you.

7              THE COURT:   -- rather than a date in June.

8              MS. LIEBER:   Thank you.

9              THE CLERK:   May 14 at 2.

10             THE COURT:   May 14 at 2, and we can, again, if

11  you want, you could do it telephonically.   Just be in

12  touch.

13             MS. LIEBER:   This May 14, so it's a status

14  conference or is it --

15             THE COURT:   It's the adjourn date where I'll hear

16  from everybody as to where we are.

17             MS. LIEBER:   Okay, so it's the adjourn date where

18  we - okay.   Okay.

19             THE COURT:   Everything, I'm adjourning

20  everything.   Because I don't want to deny the settlement

21  today.

22             MS. LIEBER:   Okay.   So - okay.

23             THE COURT:   Good.

24             MS. LIEBER:   Status conference for May 14 at 2

25  o'clock.

1          THE COURT:   On all the adjourned matters.

2          MR. HERBST:   Are we don't, Judge, because I

3  really --

4          THE COURT:   You need to go.

5          MR. HERBST:   I need to go.

6          MS. LIEBER:   Thank you, Judge.

7          THE COURT:   We've heard twice now you need to go,

8  so you need to go.

9          MS. LIEBER:   Thank you, Judge.

10          THE COURT:   Safe travel.

11          THE CLERK:   All rise.

12          (Proceedings concluded at 4:20:49 p.m.)

13          I, Carole Ludwig, court approved transcriber,

14  certify that the foregoing is a correct transcript from the

15  official electronic sound recording of the proceedings in

16  the above-entitled matter.

17

18

19  _____          _____

20  CAROLE LUDWIG                    April 8, 2014

21

22

23

24

25